UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

---

**JORDAN RINDGEN,**

Plaintiff,

vs.

**BROOME COUNTY; BROOME COUNTY DISTRICT ATTORNEY'S OFFICE; FORMER BROOME COUNTY DISTRICT ATTORNEY MICHAEL A. KORCHAK; FORMER CHIEF ASSISTANT DISTRICT ATTORNEY MARK LOUGHRAN; ASSISTANT DISTRICT ATTORNEY ALYSSA CONGDON; ASSISTANT DISTRICT ATTORNEY AMANDA CRONIN; DISTRICT ATTORNEY INVESTIGATOR JEFF J. WAGNER; UNIDENTIFIED JANE/JOHN DOE #1-10 BROOME COUNTY EMPLOYEES; CITY OF BINGHAMTON; POLICE CHIEF JOSEPH T. ZIKUSKI; CAPTAIN CORY MINOR; DETECTIVE AMANDA MILLER; UNIDENTIFIED JANE/JOHN DOE #1-10 CITY OF BINGHAMTON EMPLOYEES; HAILEY DEMKOVICH; and SAMANTHA HERCEG, all named individuals are sued in their individual capacities;**

Defendants.

CASE NO. <u>3:24-cv-1325 (DNH/ML)</u>

JURY TRIAL DEMANDED

---

## COMPLAINT

---

Plaintiff Jordan Rindgen by and through his attorneys, **ZIFF LAW FIRM**, complaining of the defendants herein, respectfully alleges upon information and belief:

## **INTRODUCTION**

1.    This is a civil rights action brought by Plaintiff Jordan Rindgen ("Mr. Rindgen").

2.      Mr. Rindgen was investigated, charged, arrested, detained, maliciously prosecuted, and tried as the perpetrator of an alleged rape and drug charges, allegedly committed on or about November 27, 2021, in the early morning hours at 141 Washington Street, Binghamton, Broome County, State of New York.

3.      According to Defendant Hailey Demkovich's false accusations, she was sexually assaulted by Mr. Rindgen.

4.      Mr. Rindgen vehemently denied Demkovich's allegations and criminal charges brought by the Binghamton Police Department and Broome County District Attorney's Office, because he was completely innocent.

5.      Mr. Rindgen's arrest, detention, and malicious prosecution were without probable cause or any legal or lawful justification.

6.      Throughout the prosecution, Defendants engaged in numerous constitutional violations to create false evidence and testimony against Mr. Rindgen and ignored, suppressed, concealed and destroyed exculpatory evidence to justify their false arrest, and malicious prosecution.

7.      Mr. Rindgen asserts claims against Broome County and the City of Binghamton arising out of the wrongful acts and omissions of the Broome County District Attorney's Office and the City of Binghamton Police Department and certain employees and agents to these departments, and against named individuals employees and agents of these departments, seeking relief for the violation of his rights secured by 42 U.S.C. § 1983, 1985(3), and 1986 and his rights secured by the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution, Article 1 §§ 1, 5, 6, 11 and 12 of the New York State Constitution, New York state law, and federal and state common law.

8.    Mr. Rindgen's investigation and prosecution were the result of misconduct orchestrated and carried out by the BPD including defendant Joseph T. Zikuski, Cory Minor and Amanda Miller, who failed to perform a constitutionally adequate investigation and blatantly ignored exculpatory evidence.

9.    Mr. Rindgen's investigation and prosecution were the also result of egregious misconduct by the BCDAO employees including Defendants Michael A. Korchak, Alyssa Congdon, and Amanda Cronin during the investigatory phases of the case and continuing through trial.   The shocking misconduct includes, but is not limited to, ignoring, hiding, suppressing and destroying favorable evidence, and suborning perjury.

10.    As a result of defendants actions, Mr. Rindgen suffered irreparable harm and seeks compensatory damages caused by Defendants, including other employees and agents of the Broome County District Attorney's Office and City of Binghamton Police Department, violations of Mr. Rindgen's federal and state constitutional due process and other civil rights; common law and statutory rights; privileges and immunities; including to be free from false arrest; malicious prosecution; perjury and subornation of perjury; cover-up; suppression and concealment of exculpatory evidence; fabrication of evidence; conspiracy to cover up and suppress and conceal exculpatory evidence; failure to intervene; supervisory liability; having a pattern of misbehavior and due process violations; and negligence in hiring, training, disciplining and retention.   Mr. Rindgen also seeks punitive damages against Defendants for their actions which shock the conscience of the public and which consist of a pattern and practice of violations of civil and Constitutional rights.

11.    On October 31, 2023, following a week-long trial, and only two hours of deliberation, a jury acquitted Mr. Rindgen.

## JURISDICTION AND VENUE

12.    This Court has jurisdiction pursuant to 28 U.S.C. § 1331, and 1343(a)(3) and (a)(4), over claims arising under 42 U.S.C. § 1983.

13.    Supplemental jurisdiction over all state law claims exists pursuant to 28 U.S.C. § 1367(a).

14.    Venue is proper in the Northern District of New York under 28 U.S.C. § 1391(b)(2), because that is the judicial district in which the events giving rise to Plaintiff's claims took place.

15.    Mr. Rindgen has complied with the requirements of New York General Municipal Law Section 50-i by making and serving a notice of claim on the County Attorney for the Broome County on January 2, 2024, the City of Binghamton on January 2, 2024, and the City of Binghamton Police Department on January 2, 2024, within the time required by New York General Municipal Law Section 50-e.  More than thirty days have elapsed since the service of that notice.

16.    On Wednesday, June 26, 2024, a 50-h hearing was held pursuant to New York's General Municipal Law § 50-h.

## JURY TRIAL DEMAND

17.    Pursuant to Seventh Amendment of the United States Constitution, Plaintiff requests a jury trial on all issues and claims set forth in this Complaint.

## PARTIES

18.    Plaintiff **JORDAN RINDGEN**, at all times relevant to this complaint, and presently, is a resident of Broome County in the State of New York.

19.    At all times relevant to this Complaint, Defendant **BROOME COUNTY** was and is a municipal corporation organized under the laws of the State of New York.  It operates, oversees and is responsible for the policies, practices, and customs of the Broome County District Attorney's Office (herein referred to as "BCDAO"), which is a department or agency of defendant Broome County responsible for the appointment, training, supervision, promotion and discipline of district attorneys, including the individually named defendants herein.

20.    The individually named Broome County Defendants were at all times employed by Broome County and were acting in their capacity as Broome County employees at all times relevant and pertinent to Plaintiff's Complaint.

21.    At all times relevant to this Complaint, Broome County District Attorney Defendants were duly appointed and acting as District Attorneys and/or agents of the Broome County District Attorney, acting under the color of state law, within the scope of their employment, pursuant to the statutes, ordinances, regulations, policies, customs, and usage of Broome County.

22.    At all times relevant to this Complaint, the individually named and unidentified Broome County employees were duly appointed and acting under color of state law, within the scope of their employment, pursuant to the statutes, ordinances, regulations, policies, customs, and usage of Broome County.

23.    Defendant **MICHAEL A. KORCHAK** was, at all times relevant to this complaint, the duly elected District Attorney of Broome County, acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances regulations, policies, customs, and usage of the City of Binghamton, Broome County, State of

New York.  As such, he was the ultimate policymaker and decision maker for the Broome County District Attorney's Office.  He is being sued in his individual capacity.

24.    Defendant **MICHAEL LOUGHRAN** was, at all times relevant to this complaint, the Chief Assistant District Attorney, acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances regulations, policies, customs, and usage of the City of Binghamton, Broome County, State of New York.  As such, he was a policymaker and decision maker for the Broome County District Attorney's Office.  He is being sued in his individual capacity.

25.    Defendant **ALYSSA CONGDON** was, at all times relevant to this complaint, a Broome County Assistant District Attorney acting under color of law pursuant to statutes, ordinances, regulations, policies, customs, and usage of the City of Binghamton, Broome County, State of New York. She is being sued in her individual capacity.

26.    Defendant **AMANDA CRONIN** was, at all times relevant to this complaint, a Broome County Assistant District Attorney acting under color of law pursuant to statutes, ordinances, regulations, policies, customs, and usage of the City of Binghamton, Broome County, State of New York.  She is being sued in her individual capacity.

27.    Defendant **JEFF J. WAGNER** was, at all times relevant to this complaint, an investigator for the Broome County Assistant District Attorney acting under color of law pursuant to statutes, ordinances, regulations, policies, customs, and usage of the City of Binghamton, Broome County, State of New York.  He is being sued in his individual capacity.

28.    At all times relevant to this complaint defendant **CITY OF BINGHAMTON** was and is a municipal corporation organized under New York State Law and having its principal office in the City of Binghamton, Broome County, New York. It operates the City of

Binghamton Police Department (herein referred to as "BPD"), which is a department or agency of defendant City responsible for the appointment, training, supervision, promotion, and discipline of police officers and supervisory police officers, including the individually named defendants herein.

29.    The individually named City of Binghamton Defendants were at all times employed by the City of  Binghamton and were acting in their capacity as City of Binghamton employees at all times relevant and pertinent to Plaintiff's Complaint.

30.    At all times relevant to this Complaint, City of Binghamton Defendants were duly appointed and acting as employees and/or agents of the City of Binghamton, acting under the color of state law, within the scope of their employment, pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of Binghamton.

31.    At all times relevant to this Complaint, the individually named and unidentified City of Binghamton employees were duly appointed and acting under color of state law, within the scope of their employment, pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of Binghamton.

32.    Defendant **JOSEPH T. ZIKUSKI** was, at all times relevant to this complaint, the Police Chief for the BPD acting under color of law pursuant to statutes, ordinances, regulations, policies, customs, and usage of the City of Binghamton, Broome County, State of New York. He is being sued in his individual capacity.

33.    Defendant **AMANDA MILLER** was, at all times relevant to this complaint, an investigator with the BPD acting under color of law pursuant to statutes, ordinances, regulations, policies, customs, and usage of the City of Binghamton, Broome County, State of New York. She is being sued in her individual capacity.

34.     Defendant **CAPTAIN CORY MINOR** was, at all times relevant to this complaint, a Captain with the BPD acting under color of law pursuant to statutes, ordinances, regulations, policies, customs, and usage of the City of Binghamton, Broome County, State of New York.  He is being sued in his individual capacity.

35.     Defendant **HAILEY DEMKOVICH** is a resident of Broome County, who at all times relevant to this Complaint was acting as a willful participant in joint activity with the State actors and/or their agents.

36.     Defendant **SAMANTHA HERCEG** is a resident of Broome County, who at all times relevant to this Complaint was acting as a willful participant in joint activity with the State actors and/or their agents.

## STATEMENT OF FACTS

### The Events of November 26-27, 2021

37.     On the evening of November 26, 2021, Mr. Rindgen met up with Yaron and Leor Kweller ("Kweller brothers") at the Stone Fox, a restaurant he co-owns, after clocking out. From there, the group left to go to Dillinger's, an establishment located on State Street in Binghamton, New York, in which Mr. Rindgen and the Kweller brothers had no ownership interest.

38.     The group arrived at Dillinger's after midnight.  At the upstairs bar in Dillinger's, a woman who was a stranger to Mr. Rindgen and the Kweller brothers bought them a round of drinks and a shot of alcohol.  This stranger was Defendant Herceg, who was at Dillinger's with some friends.  Mr. Rindgen and the Kweller brothers stayed at Dillinger's for a period of time and left at around 2:00 a.m.

39.     From Dillinger's, Mr. Rindgen and the Kweller brothers and Defendant Herceg walked back in the direction of the Stone Fox.  Once there, Mr. Rindgen went inside the

establishment, which was now closed to the public, and brought out a bottle of wine and some White Claw alcoholic beverages.

40.     The group continued to Mr. Rindgen's business office on Washington Street in Binghamton, New York, where the group remained for approximately 30-40 minutes.

41.     While at the office on Washington Street, Defendant Herceg sent text messages to her friends on a text group the members had named "UE Hoezzz."  UE stands for "Union Endicott" and "Hoezzz" is slang for promiscuous women. Defendant Demkovich was also a member of the UE Hoezzz group.

42.     According to these messages, Defendant Herceg was excited about being with Mr. Rindgen and the Kweller brothers.  Defendant Herceg took at least two photographs of Mr. Rindgen and sent it to the UE Hoezzz group.

43.      Via text, Defendant Herceg invited her friends from the UE Hoezzz text group to join her, Mr. Rindgen and the Kweller brothers at the office on Washington Street.

44.     Via video telephone call, Mr. Rindgen provided Defendant Demkovich directions to the office, and she arrived shortly thereafter.

45.     Defendant Herceg met Defendant Demkovich on the street outside of the office and the two reentered the Washington Street office together.

46.     Cameras owned and/or operated by BPD, the City of Binghamton, and various third parties captured the street and sidewalk near the Washington Street office on the night of November 26-27, 2021.

47.     The group – now consisting of Mr. Rindgen, the Kweller brothers and Defendants Herceg and Demkovich – left the office to go to the Colonial.

48.    Security camera footage captured the group arriving at the Colonial.  The security footage shows Defendants Herceg and Demkovich walking, laughing, and entering the Colonial freely and without assistance. As discussed in greater detail *infra*, this footage was provided to the Binghamton Police Department immediately after Defendants Herceg and Demkovich had accused the men of wrongdoing – months before criminal charges were filed and the case was presented to a Grand Jury.

49.    At the Colonial, Defendants Herceg and Demkovich ordered and drank shots of alcohol.  They began making out with each other at the bar.  Mr. Rindgen and the Kweller brothers were standing apart from Defendants Herceg and Demkovich and socializing together.

50.    Thereafter, Defendants Herceg and Demkovich approached Mr. Rindgen and, together, kissed him and rubbed his genitals.  Defendants Herceg and Demkovich danced together in a sexual manner, including grinding their groins and buttocks against one another. They also danced in a sexual manner with Yaron Kweller, grinding their bodies against his.

51.    Security cameras installed inside of the Colonial captured the foregoing.  As discussed in greater detail *infra*, this footage was provided to the Binghamton Police Department by Yaron Kweller promptly after he was advised that Defendants Herceg and Demkovich had accused the men of wrongdoing – months before criminal charges were filed and the case was presented to a Grand Jury.

52.    When the Colonial closed at approximately 3:00 a.m., the group of five decided to go back to Mr. Rindgen's business office on Washington Street.

53.    Once again, the security cameras outside of the Colonial captured the group's departure, and again showed Defendants Herceg and Demkovich laughing and walking freely and on their own accord.  As discussed in greater detail *infra*, this footage was also provided to

the Binghamton Police Department by Yaron Kweller promptly after he was advised that Defendants Herceg and Demkovich had accused him of wrongdoing – months before criminal charges were filed and the case was presented to a Grand Jury.

54.     Back at the office, Defendants Herceg and Demkovich asked to use the bathroom, which was in the downstairs portion of the office.

55.     The group went downstairs and Defendants Herceg and Demkovich went into the bathroom together.

56.     Defendants Herceg and Demkovich emerged from the bathroom partially undressed.  They then disrobed completely and began engaging in sexual contact with each other – making out and fondling each others' breasts and genitals – in full view of Mr. Rindgen and the Kweller brothers.

57.     Mr. Rindgen and Defendants Herceg and Demkovich did cocaine together. Defendants Herceg and Demkovich put cocaine on their own and each others' bodies and snorted it off.  They also allowed Mr. Rindgen to snort cocaine off of their bodies.

58.     Mr. Rindgen and Defendant Demkovich then began kissing and touching each other in a sexual manner.   When Yaron Kweller approached them, Defendant Demkovich initiated oral sex on Yaron Kweller.

59.     Mr. Rindgen moved away from Defendant Demkovich and Yaron Kweller. Defendant Demkovich told Yaron Kweller in sum and substance that she wanted to have unprotected sex with him and for him to ejaculate inside of her.

60.     Yaron Kweller obtained a condom. Yaron Kweller and Defendant Demkovich did not, however, have sexual intercourse.

61.     Soon thereafter – approximately forty-five minutes after the group had returned to the office for the second time – Defendants Herceg and Demkovich told Mr. Rindgen and the Kweller brothers that they were ready to go home.

62.     Defendants Herceg and Demkovich appeared to be in a good mood and were joking with Mr. Rindgen and the Kweller brothers.  Defendants Herceg or Demkovich stated in substance that, in the future, she expected not to have to wait in line to get into any of the establishments Mr. Rindgen and Yaron Kweller owned.

63.     Security cameras owned and/or operated by third parties captured Defendants Herceg and Demkovich leaving the Washington Street office and walking to a nearby parking garage.  They got into the car of a friend who was also a member of the UE Hoezzzz group.  Security footage shows Defendants Herceg and Demkovich walking on their own and entering the car without assistance.

64.     After Defendants Herceg and Demkovich left, Mr. Rindgen and the Kweller brothers returned to the Colonial where staff were cleaning up and closing the bar.  Mr. Rindgen then received a ride home.

65.     Any and all physical and sexual contact between Mr. Rindgen and Defendants was consensual.

### Mr. Rindgen Learns that Defendants Demkovich and Herceg Were Falsely Accusing Him of Rape

66.     During the afternoon or evening of November 27, 2021, Mr. Rindgen was notified that a person had called the Colonial, identifying himself as Dylan Wesco.  Mr. Wesco stated that he was Defendant Demkovich's boyfriend and that the owners of the Colonial had drugged and raped Defendant Demkovich.

67.     Shocked, Mr. Rindgen relayed this information to Yaron Kweller.

68.     After Kweller confirmed with his friend and detective with the BPD, Bob Fimbres, that a report of a sexual assault at the Colonial had been made, Mr. Rindgen retained counsel, Thomas D. Jackson, Esq.

69.     From the moment he learned of the allegations, Mr. Rindgen sought to ensure that law enforcement preserve and review all cell phone and other electronic data (including social media posts) of Defendants Herceg and Demkovich, as he felt certain that their electronic data would exonerate him of any claim of wrongdoing.

70.     Neither Defendant BCDAO nor Defendant BPD took any reasonable steps to obtain or preserve the electronic communications or data of Defendants Herceg and Demkovich. Indeed, Defendants BPD and BCDAO failed even to direct Defendants Herceg and Demkovich to preserve and/or retrieve their electronic data. This failure continued even as Defendants BPD and BCDAO became aware of contradictions, inconsistencies, and false statements made by Defendants Herceg and Demkovich and even as Defendants Herceg and Demkovich refused to consent to Defendants BPD or BCDAO's request to access to their electronic data.

71.     Defendant Herceg ultimately testified at the criminal trial in this matter that she was instructed to destroy electronic data relating to the night in question by Defendant Congdon, the lead prosecutor on the case, and that she did in fact destroy that evidence.

**Defendants Herceg and Demkovich's Electronic Communications and Data from the Night in Question and the Days Following Make Clear that Any Sexual Contact Was Consensual, but that They Believed and Agreed that a False Rape Accusation Could Benefit them Personally**

72.     Beginning on or about November 27, 2021, Defendants Herceg and Demkovich exchanged text messages between themselves and with third parties.

73.     These messages make clear that any sexual contact was consensual, that they were fully cognizant and aware of all events of the evening, and that false rape allegations to

cover up their consensual participation in sex acts with Mr. Rindgen and others could benefit them personally.  These messages include (*all typos are in original material*):

a.  November 27, 2021 – Defendant Demkovich to a Third Party: "I don't want anyone to know…." "And it was consensual. I knew what was happening. But those guys should be fucking disgusted with themselves."

b.  November 27, 2021 – Defendant Demkovich to Defendant Herceg: "And I remember saying to Jordan I was like I better not get denied at any of ur bars."

c.  November 27, 2021 – Defendant Herceg to Defendant Demkovich: "Like I can't have this get out…"

d.  November 28, 2021 – Exchange between Defendant Herceg and Defendant Demkovich (referencing Defendant Miller): "I am not gonna show her those" Herceg: "I don't think you should" Demkovich: "I am 100% not going to" Herceg: "I am worried about her calling stupid f**king Bianca"

e.  November 29, 2021 – Defendant Herceg to Defendant Demkovich and a Third Party: "I'm settling for nothing Less then a million"

f.  November 29, 2021 – Defendant Herceg to Defendant Demkovich and a Third Party: (referring to Mr. Rindgen and Yaron Kweller) "I want the Benz and the Beamer" "And both their houses"

g.  November 29, 2021 – Defendant Herceg and Defendant Demkovich and a Third Party: (referring to Mr. Rindgen and Yaron Kweller) "I want all their bars . . ."

h.  November 29, 2021 – Defendant Herceg to Defendant Demkovich: "Yup 100% but i do remember being at Alisha's and when she said we were at

Jordan's i was like wtf we were w them? And she was like yeah haikey said u guys got raped and obviously I'm still drunk I'm like whattt no way it doesn't even feel like I've had sex i don't think anything happened and Alisha was like exactly"

i.  November 30, 2021 – Defendant Demkovich to Defendant Herceg and Third Parties: "the reason i had to call 911 is because when i told my parents my dad literally got in the car and was headed straight to downtown"

j.  December 3, 2021 – Defendant Demkovich instant messages to Defendant Herceg and Third Parties: "if you guys have any photos of us drinking if u could delete them that would be good" "we can't erase everything but minimize it as much as possible" "Danayah maybe archive ur disposals of them on insta" "i might just delete any risky pics" "i need to go on my computer to delete my vsco"

k.  December 3, 2021 – Defendant Herceg instant message to Defendant Demkovich: "I've deleted all my posts and changed my user name to no lastnight and trying to delete all my republishes"

l.  December 3, 2021 from a Third Party to Defendant Demkovich, Defendant Herceg, and Third Parties: "i already deleted everything w [Herceg] in it and everything hailet sent me to delete"

m.  December 7, 2021 from a Third Party ("T.P.") to Defendant Demkovich: T.P.: "it da took me 5 mins of silence to go all the way back up to the messages that night" Demkovich.: "mad far and i don't even have them bc i think i

accidentally deleted them that night" T.P.: "yeah i deleted them all out of your phone bc u were going to dylan's [Demkovich.'s then boyfriend]"

n.  December 7, 2021 from a Third Party to Defendant Demkovich: "and then i told her that when [Herceg] came over she told me she didn't have sex but she turned the corner and saw you but thats all she could remember" "bro yeah she [Herceg] was like that whole night i would know if i got fucked i don't feel anything in my vagina but it was prob bc bitch was numb af"

o.  December 8, 2021 – Defendant Demkovich. to Defendant Herceg: "okay so i'm slightly panicking at work because i was just reading my texts from the day after the incident and i said to danayah that it was consensual and that i knew what was happening. but the whole day after the incident i was questioning if i got raped and i thought it might be classified as consensual because i didn't say no."

p.  December 8, 2021 – Defendant Herceg to Defendant Demkovich: "Trust me i was panicking too [about the text messages] Bc i said in the groupchat that night "I'd fuck"

q.  December 8, 2021 - Defendant Herceg to Defendant Demkovich: "I don't think you have anything to worry about. Bc if she did get the subpoena [for the phone messages] I'm sure she only got it from the times of like 1-4am"

r.  December 8, 2021 from Defendant Herceg to Defendant Demkovich and Third Parties: "Yes i deleted everything then made it private and changed everything"

s.  December 27, 2021 Defendant Demkovich to her mother - (after defense counsel served and filed an Order to Show Cause on December 22, 2021, requesting preservation of the Defendants Herceg and Demkovich's cell phones): "i told you i have a message of me saying it was consensual the day after, because i was confused and not in the right head space if the defense sees it, i'm done"

t.  December 27, 2021 - Defendant Demkovich to Defendant Herceg.: "and i have a message of me saying it's consensual" "the day after"

u.  December 27, 2021 - Defendant Herceg to Defendant Demkovich: "I have messages w Alisha saying I'd fuck ring ding [Jordan Rindgen]"

v.  December 27, 2021 - Defendant Demkovich to Defendant Herceg: "yeah they will take the message of me saying it's consensual and i'm done" "the lawyer tom [Saitta] needs to make it so they can't get our phones period"

w.  December 28, 2021 – Defendant Demkovich to her mother: "I told them [BPD] the next day I was questioning if what happened to me was actually rape . . . "

x.  December 28, 2021 - Defendant Demkovich to her mother: "i accidentally deleted one text it was in the group text"

y.  December 28, 2021 - text message from Defendant Demkovich to Defendant Herceg: "i told him i said it was consensual" "i'm just worried that I said more than once it was consensual" "i said something about it being consensual"

z.  January 13, 2022 - Defendant Demkovich to her mother: "I just don't want [Herceg's] parents to judge me for saying it was consensual"

aa. January 14, 2022 Defendant Demkovich to Defendant Herceg: "i really don't see why they'd still want to supoena our phones after i've provided all of That" "so fingers crossed"

bb. March 7, 2022 Defendant Herceg to Defendant Demkovich: "My parents wanted us to press charges because why tf would we not if the cops are called and we're getting fucking rape kits done. I told my mom the second i told her i didn't want the cops involved. I didn't have a choice in that matter. Whoever is telling you what you're doing is okay is enabling bad behavior that is literally gonna take a shit on you in the future, again you've already said it was consensual and now you're acting essentially like nothing happened which is exactly what the defense is gonna say. So good luck w that, trying to get you to understand is like talking to a brick wall. Maybe 30 days now hailey they have to turn in every last bit of evidence if you think they aren't watching you right now more then ever you'd be fucking dumb. I've said what i had to say to you now three times and I'm sure you'll go right behind my back and disrespect me a fourth. What you do reflects you, not me so idk what i give a fuck anyway."

cc. June 6, 2022 - Defendant Demkovich to her mother: "and the text messages i sent really fuck me up" "i didn't know because i didn't say no"

dd. June 13, 2022 Defendant Herceg to Defendant Demkovich: ". . . Fuck you hailey you're a piece of shit. You think you sit in a high horse bc you "came looking for me" that night "only one who cared" no you didn't. If you thought I was in such danger like you say then you would've called the cops you

would've brought everyone there w you to get me out. You came for what you
thought was gonna be a good time. You're a garbage human who see nothing
wrong w their actions."

ee. June 15, 2022 Defendant Herceg to a Third Party: "She [Demkovich] told
Bianca on FaceTime on her walk to "save me" that she wanted to fuck Jordan
[Ringden], she wanted to go because she wanted to sleep w Jordan. Not to
come save me" . . . "And she came for what she thought was going to be a
good time" . . . "I don't remember anything from that night" "Everything I
know is from hee [Demkovich]"

ff. July 25, 2022 - Defendant Demkovich to her mother: "i wanna drop the
charges" Demkovich's mother: "[Herceg] got a new phone…" "No access to
her old cloud" Demkovich: "and i texted [Herceg] and she got a new phone so
they didn't subpoena hers"

**BPD 's Initial Investigation Finds No Support for Defendant Herceg and Defendant
Demkovich's Allegations, Instead Uncovering Many Reasons to Doubt their
Veracity and Reliability**

74.    On November 27, 2021, Defendants Herceg and Demkovich reported a sexual

assault to the New York State Police.  In this initial and video recorded report, neither Defendant

Herceg or Demkovich stated that they said "no," or otherwise indicated a lack of consent,

resisted, or were overpowered or physically forced to engage in physical contact or sexual

intercourse with anyone on the night in question.  The New York State Police advised the

Defendants Herceg and Demkovich to contact the Binghamton Police Department given the

location of the events being reported.

75.    On November 28, 2021, Defendant BPD Investigator Amanda Miller was assigned to investigate Defendants Herceg and Demkovich's false allegation of sexual assault. Defendant Minor supervised Defendant Miller and reported to Defendant Joseph Zikuski.

76.    On November 28, 2021, Defendant Miller separately interviewed Defendant Herceg and Defendant Demkovich.

77.    Thereafter, Defendants Herceg and Demkovich and others provided Defendant Miller with photographs and text messages from the night in question.  These materials confirmed that Defendants Herceg and Demkovich voluntarily spent time with Mr. Rindgen on the night in question.

78.    The provided messages represented select, non-continuous accounts of the night in question and did not provide a complete record of the relevant period.

79.    The excluded text messages – which were sent to the entire UE Hoezzz group, between Defendants Herceg and Demkovich only, and between each of Defendants Herceg and Demkovich and third parties – included messages stating that the sexual contact between Defendants Herceg and Demkovich and Mr. Rindgen, Yaron Kweller, and/or Leor Kweller, had been consensual, as well as messages from Defendants Herceg and Demkovich to others directing that they delete electronic data, including text messages, photographs, and social media from the night in question.

80.    Defendants Herceg and Demkovich did delete certain electronic data from their phones, although on information and belief, these deletions did not remove same from other sources, including third parties who received and/or stored the locally deleted electronic data.

81.    Defendants Herceg and Demkovich explicitly refused, repeatedly, to grant Defendant Miller or anyone from BPD consensual access to their cell phones or electronic data.

82.    Defendant Miller nor anyone from BPD took any steps during the early days of the investigation to obtain or preserve Defendant Herceg or Defendant Demkovich's electronic data.  Neither Defendant Miller nor anyone from BPD advised Defendant Herceg or Defendant Demkovich to preserve their electronic data.

83.    On November 30, 2021, counsel for Yaron Kweller, F. Paul Battisti, Esq., provided Defendant Miller with security camera footage from the Colonial which covered the inside of the bar and the basement that led out of the Colonial to the employee entrance.

84.    As described *supra*, this camera footage showed Defendants Herceg and Demkovich cognizant, in control of their actions, initiating and engaging in consensual sexual contact – kissing and touching – with each other and with Mr. Rindgen, Yaron Kweller, and Leor Kweller.  Defendants Herceg and Demkovich can be seen smiling and appearing in good spirits throughout the evening.  The footage also showed them walking through the basement area of their own free will.

85.    On December 6, 2021, Defendants Minor and Miller executed a duly issued search warrant at the Washington office.  No physical evidence of any kind, including any bodily fluids, or drugs were identified.

86.    BPD also obtained footage from security cameras installed on Washington Street by third parties, including but not limited to the City of Binghamton, which showed Defendants Herceg and Demkovich exiting the Washington Street office at approximately 3:48 a.m. in the morning, and walking to a nearby parking garage.

87.    According to texts between Defendant Demkovich and her mother on December 28, 2021, Defendant Demkovich told investigators from BPD that she was questioning whether

she was, in fact, raped, or if the physical or sexual contact was consensual.  This was not recorded by Defendant Miller or anyone else from BPD.

88.    This footage materially contradicted Defendant Herceg and Defendant Demkovich's accounts of the evening insofar as they claimed to have been scared, coerced, abused, or physically overpowered by Mr. Rindgen.

89.    This footage, together with all of the other facts and circumstances, raised substantial concerns about Defendants Herceg and Demkovich's credibility and reliability.

90.    Despite this, Defendant Herceg testified that she was never shown the footage from the Colonial that materially contradicted her and Defendant Demkovich's account by either BPD or BCDAO.  The first time Defendant Herceg saw this footage was when she was cross-examined at the criminal trial.

91.    On information and belief, Defendant Demkovich was similarly not confronted by BPD or BCDAO with any of the contradictory footage.

**Despite the Lack of Any Credible Evidence Supporting Defendant Herceg and Defendant Demkovich's False Allegations, They are Leaked to the Public, Resulting in a Frenzy of Rapidly Proliferating Lies, Destroying Mr. Rindgen's Reputation and Livelihood**

92.    Within days of Mr. Rindgen learning of the false allegations against him, rumors that a sexual assault had been perpetrated by owners of the Colonial, Dos Rios, and the Stone Fox began to spread throughout the Binghamton community.  These rumors began appearing almost immediately on social media sites, including Facebook, Snapchat, Reddit, and a forum called BC Voice.  For example (*all errors contained in original*):

   a.  On November 29, 2021, a forum "Downtown Binghamton rape" was started on www.bcvoice.com, a local website.  The first post refers to a "rape that allegedly happened at a downtown Binghamton business.  One of the worst

stories I've heard in a long time."  on November 30, 2021, the original poster elaborated "[a]n undersage girl was drugged and raped at a downtown Binghamton bar.  Not going to name any names at this point." On December 7, 2021, a different user posted a photograph of The Colonial.  The site would continue to grow.

b.  On Thursday, December 8, 2021, a Facebook group originally called "Boycotting Colonial, Dos Rios, Stone Fox, etc." launched and gained more than 5,200 members within hours of its appearance.  The group changed its name to "Binghamton believes Survivors of Sexual Assault."  Members of the group falsely accused Mr. Rindgen and other owners of the Colonial, Dos Rios, and Stone Fox of sexual assault.

i. One of the earliest posts – which has since established to be false – reads:



Rory Sisson

I am absolutely disgusted by the acts happening in Downtown Binghamton over the last few months. I have never been one to go out and drink at bars downtown, but I know several people from high school and college who go regularly. In case you haven't been informed, one of the owners of the most popular bars downtown, (The Colonial, Dos Rios, etc) have been drugging and raping girls in the basement of their establishments. This is absolutely HORRIFYING. 15 girls have come forward, the youngest being 17. This is so scary, and I feel so upset for my friends from school who go regularly and may have been victims of this. If you go downtown...BRING A FRIEND!!! The owner who has been getting away with this for months, should be sitting in jail for a long time. I'm speechless.

Update: thank you ALL for sharing this, as of now there is no local news coverage!!! I received this information from MULTIPLE sources!!!

69          122 Comments  408 Shares

Like          Comment          Share

ii. As of the filing of this complaint, this Facebook group still exists and has 13,200 members. The "About this group" section of the page reads: "This group started as a means to empower the victims of sexual assault from a couple owners from the Colonial and their other restaurants. The allegations are horrific and truly terrible, but investigation is ongoing. In the midst of these stories, women have reached out to share their stories of countless other issues that have taken place in restaurants downtown and more. As a community it is

the responsibility of its citizens to set the community standard. Please join us in finding a solution to enact real change for a better future and to bring these victims peace."

93.    In addition to social media posts and rumors, local news media began reporting on the false accusations against Mr. Rindgen, and soon identified him by name.

94.    On or about December 9, 2021, a protest – publicized on social media – was announced for December 11, 2021, in downtown Binghamton in response to the sexual assault allegations.

95.    On December 9, 2021, over Mr. Rindgen's and Yaron Kweller's objection, the Colonial issued the following statement on its Facebook page (with Stone Fox and Dos Rios issuing identical statements to their Facebook pages at the same time):



**The Colonial** · View shop
5m · 🌐

We are aware of, and seriously concerned by, the rumors that are circulating in our community alleging abhorrent activities at our restaurants. These allegations are deeply disturbing, and do not, in any way, reflect the values of our employees or corporate culture of our restaurants.

We are a large and diverse group of business owners, and we pride ourselves on bringing energy and vibrancy to the downtown Binghamton restaurant scene. It is important to remember that all three restaurants have unique ownership structures. We will not condone anyone making our establishments unsafe or causing harm to those around them.

At present, no one has been charged with a crime. However, the individuals in question have been placed on leave, and we will cooperate fully with any investigations. There is absolutely nothing more important to us than the safety of our employees and guests, and our complete focus is on providing them with a safe, enjoyable experience when visiting any of our three establishments.

We are treating this matter with the utmost seriousness it deserves, and hope that the facts will be established in the near future. To that end, we will be closed until further notice while we review the matter internally and determine how we can safely resume operations. In the meantime, we sincerely appreciate your patience.



📞 Call    •••

96.    On or about December 9, 2021, Defendant BPD Police Chief Zikuski informed F. Paul Battisti, Yaron Kweller's counsel, that he had advised against filing any criminal charges

against Mr. Rindgen, Yaron Kweller and Leor Kweller, relating to Defendant Herceg and Demkovich's allegations.

      97.    On December 10, 2021, the Colonial announced it would reopen that evening at 5 p.m.  Instead, that evening, the Colonial was vandalized and did not reopen.  The restaurant was covered with flyers bearing  messages like "rape management." A dead turkey was left at its door, and the building was egged:





98.     On December 10, 2021 – notwithstanding Defendant Zikuski's prior statement that he had recommended against filing criminal charges – BPD issued a press release stating that it is investigating a November 28, 2021, incident involving the owners of the Colonial and that it is aware of additional allegations being made on social media.

99.     The same day, Defendant Korchak issued a video statement to Facebook and other channels in which he asserted that his office received "numerous" emails and phone calls regarding "several incidents that occurred recently" in Broome County.  He explained that the laws of the State of New York prevented him from discussing the details of ongoing

investigations and prosecutions and encouraged those with knowledge to contact the BCDAO or local police departments.

100.    On December 11, 2021, more than 500 protestors gathered in front of the Colonial and Dos Rios and marched to the Stone Fox.  According to the local Fox affiliate, the purpose of the gathering was "to protest and criticize the restaurant owners' handling of several sexual assault allegations that came earlier this week via social media."  *See* https://www.wicz.com/story/45425463/protestors-gather-downtown-in-front-of-restaurants-amidst-sexual-assault-allegations

101.    Rumors continue to grow, including claims that there are "far more than 15 victims" and that "every single member of the owner group" has been implicated:



emilypmotti  20h
From Create Mode ›

i'm hoping to enjoy the weekend with friends and family, and have a second to breathe. extenuating circumstances aside, i am taking a break from responding to messages. i have a few things to say before i return to normal programming:

1. in the past two days it has been made incredibly clear that the number is far more than 15 victims.

2. it has also been made incredibly clear that there are stories about every single member of the owner group. so if you find yourself asking, "well i'm friends with this one guy, was this about him?" regardless of what friend that is, it's safe to assume you cannot trust them.

3. i so appreciate the people DMing me kind and comforting words. at this point, a lot of victims are reaching out to me, and it would be helpful to not have to sift through the well wishes in order to access these stories. please hold off on DMing me unless you have information pertinent to the situation.

4. i will be the first to admit i do not trust the BPD. however, no justice will be served for the victims without speaking to detectives. if you have information or are a victim yourself, call Detective Doug Chavez at 607-772-7080. i trust him.

5. here is the facebook group that is being used for organizing, storytelling, and general information. the moderator is trying their best to share only validated information:

🔗 FACEBOOK.COM

102.    On December 27, 2021, Dos Rios was vandalized and its window broken:



103.    Another protest was scheduled for and took place on New Years Eve at 9:00 p.m., in front of the Colonial, thwarting efforts to reopen the business for the night.

104.    On January 4, 2022, the Colonial announced its reopening for the following day; once again it did not reopen.

105.    On January 13, 2022, the Colonial and Dos Rios finally reopened, with limited operating hours.  The Colonial suffered another act of vandalism when a dead chicken was left at its door:



106.    After Defendants Demkovich and Herceg's false allegations were leaked to the public, the Business's social media pages were deluged with negative reviews:



 **Binghamton Believes Survivors of Sexual Assault**
Ashley Trim · 16h · 🌐                                                              ...

From the inbox:

"The restaurants are currently not cutting it for payrolls. The community has the
power to keep applying pressure by posting negative reviews on DoorDash &
Grubhub ordering apps, on Google, on yelp, and continue to boycott. SHUT IT
DOWN."

👍❤️ 172                                                                      52 Comments

107.    As of December 22, 2021, Dos Rios Cantina and Colonial were closed and are no
longer operating.

### The Broome County District Attorney's Office Joins the Investigation into Defendants Herceg and Demkovich's Allegations

108.    As of December 7, 2021, defense counsel for Mr. Rindgen had contacted both the
BPD and BCDAO and advised those offices of their representation, asserted their clients' Fifth
Amendment rights against self-incrimination, and demanded notice of any presentation to the
Grand Jury pursuant to New York CPL § 190.50(5).

109.    On December 8, 2021, either Defendant Korchak or Defendant Loughran asked
Defendant Congdon to attend a meeting with members of BPD regarding Defendants Herceg and
Demkovich's sexual assault allegations as Bureau Chief of BCDAO's Special Victim's Bureau.

    a.  Defendant Congdon had been hired by BCDAO less than a month earlier, on
        November 15, 2021, having never been a prosecutor before.

    b.  During Defendant Congdon's interview process with BCDAO, she was
        informed that BCDAO intended to make her Bureau Chief of the Special
        Victims Bureau.

c.  Defendant Congdon indicated to BCDAO that she believed she lacked sufficient prosecutorial experience for the role of Bureau Chief of the Special Victims Bureau. Nevertheless, soon after starting at BCDAO as Senior District Attorney, Defendant Congdon was offered the position of Bureau Chief of the Special Victims Bureau. Despite knowing she was not qualified for the position; Defendant Congdon accepted this promotion.

d.  Despite Defendant Congdon's lack of prosecutorial experience and her expressed concerns about having the experience to handle the role of Bureau Chief of the Special Victims Bureau, BCDAO provided her no training whatsoever, including with respect to discovery obligations generally; identifying and disclosing *Brady* or *Giglio* information; mechanisms for obtaining evidence; the requirements for certifying discovery under CPL § 245.50; the use and application of digital discovery tools; and all other aspects of prosecutorial work.

e.  Defendant Congdon's workload, consisting of multiple serious felony cases plus supervisory and administrative responsibilities as Bureau Chief, meant that she could not conduct her work responsibly, even if she had received proper training.

f.  Despite having been a member of the Bar of the State of New York from 2012, and despite having practiced criminal defense for nearly a decade, Defendant Congdon did not understand her legal obligations as a prosecutor; she did not know what materials constituted *Brady* or *Giglio*; she was unaware of, unfamiliar with, or did not understand critical provisions of New York's

criminal law and criminal procedure law; and she did not seek to remedy any of these deficiencies during the pendency of the underlying investigation and prosecution.

g.  It is also evident that BPD had no training of its members as to *Brady, Giglio*, and discovery obligations of law enforcement officers as no one from BPD, at any meetings with members of BCDAO, ever expressed any concerns with ADA Congdon's handling of the case and the evidence received; members of BPD including Defendant Miller never interceded or suggested to anyone from BCDAO that some of the evidence they were obtaining was exculpatory and/or impeachment evidence.

110.    At the December 8, 2021, meeting, Defendants Korchak, Loughran, Congdon, Minor, and Miller discussed Defendants Herceg and Demkovich's allegations and the ongoing investigation.

111.    Defendant Loughran – who was then the Chief Assistant District Attorney – asserted that the contents of Defendants Herceg and Demkovich's phones should be obtained and asked whether they had consented to turn their phones over.  Upon information and belief, Defendants Korchak, Loughran, Congdon, Minor, and Miller discussed subpoenaing Defendants Herceg and Demkovich's phones.

112.    At or after the December 8, 2021 meeting, Defendant Korchak and/or Defendant Loughran assigned Defendant Congdon to the investigation and determined that Defendant Congdon would work with Defendant Loughran, and Defendant Korchak would be available for guidance.

113.    This assignment was made despite Defendant Congdon's lack of any relevant prosecutorial experience and lack of any training whatsoever, including by BCDAO, her new employer.

114.    Despite recognizing the evidentiary value of Defendant Herceg and Defendant Demkovich's phones, and considering subpoenaing the phones, no one from BPD or BCDAO took any steps to obtain or preserve either Defendant Herceg or Defendant Demkovich's electronic data.  Defendant Herceg and Defendant Demkovich continued to refuse consensual access to their phones by BPD or BCDAO.

115.    On December 14, 2021, Defendants Loughran, Miller, Congdon and District Attorney Investigator Anthony Diles met separately with Defendants Herceg and Demkovich. Defendant Herceg and Defendant Demkovich refused to consent to an extraction of electronic data from their respective cellular phones.

116.    Defendant Herceg ultimately testified at Mr. Rindgen and Yaron Kweller's trial that Defendant Congdon instructed her to delete her social media accounts and that she followed Defendant Congdon's instruction.

117.    On December 22, 2021, defense counsel for Mr. Rindgen, Yaron Kweller, and Leor Kweller, filed an Order to Show Cause seeking preservation of the electronic data belonging to Defendants Herceg and Demkovich, which BCDAO opposed. The Corporation Counsel's Office, on behalf of the BPD, also opposed the application.  Oral argument was heard.

118.    BCDAO and BPD opposed the motion despite their office's repeated, unsuccessful attempts to obtain Defendant Herceg and Defendant Demkovich's electronic data with their consent and the offices' recognition that the electronic data would be critical to the investigation.

119.    Even while the Order to Show Cause was pending, BCDAO continued to unsuccessfully seek Defendants Herceg and Demkovich's consent to extract their electronic data.

120.    Defendants Herceg and Demkovich retained counsel, Thomas Saitta, Esq.

121.    On January 14, 2022, Mr. Saitta emailed Defendant Congdon and informed her that he had a folder containing printouts of electronic data from Defendants Herceg and Demkovich's telephones (hereinafter, the "Saitta Folder").

122.    Defendant Congdon directed Defendant Wagner to retrieve the Saitta Folder from Mr. Saitta.

123.    Defendant Congdon informed her supervisors, including Defendant Loughran and/or Defendant Korchak about the Saitta Folder and its availability to BCDAO.

    a.  Neither Defendant Wagner, Defendant Congdon or anyone else from BCDAO or BPD ever retrieved the Saitta Folder.

    b.  Neither Defendant Congdon nor anyone else from BCDAO or BPD informed counsel for Mr. Rindgen, Yaron Kweller or Leor Kweller or the court before whom the Order to Show Cause was pending, of the existence of the Saitta Folder.

    c.  Even when Defendant Congdon learned that Defendant Wagner had not picked up the Saitta Folder as directed, she took no steps to obtain the Saitta Folder.

    d.  Neither Defendant Wagner nor Defendant Congdon was ever disciplined for failure to retrieve or turn over the Saitta Folder to the defense.

    e.  Defense counsel for Mr. Rindgen, Yaron Kweller, and Leor Kweller ultimately obtained the Saitta Folder by judicial subpoena *duces tecum* in July

2023 – at a time when neither BCDAO or BPD had obtained the folder – and discovered that it contained numerous exculpatory and impeaching text messages.

124.     During the same period – January 2022 – Defendant Loughran and Defendant Congdon agreed that they would continue to try to obtain Defendant Herceg's and Defendant Demkovich's consent to extract their electronic data.  Defendants Herceg and Demkovich continued to refuse to consent to BCDAO or BPD requests for access to their phones or electronic data.

125.     The Order to Show Cause was denied on January 21, 2022.

126.     BCDAO and BPD worked closely during the investigatory period prior to the decision to charge Mr. Rindgen, Yaron Kweller, and Leor Kweller with any crime.  In addition to the foregoing, for example, Defendant Congdon tried to assist Detective Miller in drafting a search warrant for Mr. Rindgen, Yaron Kweller, and Leor Kweller's DNA.  Defendant Congdon did not know that she could apply directly to a court to obtain a suspect's DNA and neither she, Defendant Miller, or anyone at BCDAO or BPD knew how to draft an appropriate application.  No reasonable prosecutor or  investigator in 2021-2023 would not be aware that they could apply directly to a court for an order compelling a suspect's DNA.

127.     No search warrant or motion to compel a buccal swab or a DNA sample was ever completed because Defendant Congdon and Detective Amanda Miller erroneously believed that they could not obtain a criminal defendant's DNA pre-arrest.  This mistake of law – uncorrected by supervisors Defendants Korchak, Loughran, Zikuski, and Minor – was the result of a lack of training, supervision, and proper procedures within the BCDAO and BPD.  No reasonable

prosecutor or investigator in 2021-2023 would believe that they could not lawfully obtain a DNA sample from a criminal suspect accused of a sex crime prior to arrest.

128.    Defendant Congdon also did not know how to obtain Defendant Herceg and Defendant Demkovich's electronic data.  She mistakenly believed that she did not have probable cause to believe that the phones contained evidence relating to the purported crime under investigation.  This was a mistake of law and objectively unreasonable, given that she knew that Defendants Herceg and Demkovich were using their phones and sending and receiving electronic data before, during, and after the alleged crime. This mistake of law and lack of basic knowledge of her role and responsibility as a prosecutor – uncorrected by supervisors Defendants Korchak, Loughran, Zikuski, and Minor – was the result of a lack of training, supervision, and proper procedures within the BCDAO and BPD.  No reasonable prosecutor or investigator in 2021-2023 would not know how to obtain a complaining witness's electronic data under these circumstances.

129.    Defendant Korchak, Defendant Loughran, and Defendant Congdon met multiple times to discuss the investigation between December 8, 2021, and February 22, 2022.  Despite the aforementioned issues, Defendant Congdon was provided with no meaningful supervision, training, correction or instruction regarding proper investigatory or prosecutorial procedures.

130.    During the period of November of 2021, through February of 2022, Defendant Korchak, Defendant Loughran, and Defendant Congdon were aware that the reports issued by traditional media and claims posted on social media were false, and that these false claims were leading to the destruction of Mr. Rindgen's reputation and businesses.  Nevertheless, they took no steps to correct that information or otherwise temper the public outrage over false rape accusations against Mr. Rindgen and others.

131.    Beginning in December 2021, Defendant Korchak and Defendant Loughran ceded ultimate decision-making authority over the investigation to Defendant Congdon, whom they knew lacked the necessary prosecutorial experience, knowledge, and training to handle a serious felony investigation, and who repeatedly expressed concern to them, as her supervisors, that she was being given more responsibility than she could handle.  Indeed, Defendant Congdon had never before handled a criminal investigation from start to finish.  No reasonable supervising prosecutor, or elected District Attorney, in 2021-2023, would believe it reasonable to cede authority for a high-profile felony sex crimes investigation to an untrained, novice prosecutor.

**Mr. Rindgen Is Arrested Without Probable Cause**

132.    In or about February 2022, because neither ADA Congdon, nor anyone else at BCDAO or BPD seemingly knew how to gain  access to Defendant Herceg and Demkovich's electronic data or the DNA of any of the accused, Defendant Congdon mistakenly believed that the investigation had reached a dead end.

133.    Defendant Amanda Cronin was hired by the BCDAO from another prosecuting agency where she had served as a sex crimes prosecutor for a number of years.  She was also assigned to the instant case and worked together with Defendant Congdon and under the supervision of Defendants Korchak and Loughran.

134.    Because of her incorrect, erroneous, and unreasonable beliefs, Defendant Congdon decided that Mr. Rindgen, Yaron Kweller, and Leor Kweller should be arrested and charged in local court. The arrest was effectuated and processed by members of BPD.

135.    The decision to arrest was not based on a determination that probable cause existed to arrest Mr. Rindgen, Yaron Kweller, and Leor Kweller; rather it was based on

Defendant Congdon's mistake of law and mistaken belief that their arrest would give Defendant Congdon and the BCDAO the ability to gather more evidence to advance the investigation.

136.    Indeed, no probable cause existed to arrest Mr. Rindgen.

137.    Despite there being no probable cause to charge Mr. Rindgen, Defendant Congdon met with BPD on or about February 22, 2022, and decided with BPD to file criminal charges against Mr. Rindgen, Yaron Kweller, and Leor Kweller in local court.  Each of the accused asserted their innocence and pleaded not guilty.

138.    On February 22, 2022, BPD notified Mr. Rindgen's attorney that he would have to appear to be arrested, charged and arraigned.  Counsel for Mr. Rindgen produced him on the same date.

139.    On information and belief, representatives of the press were informed in advance that Mr. Rindgen, Yaron Kweller, and Leor Kweller were being charged and arrested and were present at the BPD and the local courthouse to cover the event.  Numerous stories were published in traditional media as well as social media about the arrest and charging of Mr. Rindgen, Yaron Kweller, and Leor Kweller

140.    Mr. Rindgen was charged with Criminal Sale of a Controlled Substance in the Third Degree, in violation of New York Penal Law § 220.39, and Criminal Sale of a Controlled Substance in the Fifth Degree in violation of New York Penal Law § 220.31.

141.    Mr. Rindgen, prior to his arrest and after his arrest, pressed the BPD and BCDAO to retrieve the texts, messages, images, and other electronic data from Defendants Herceg's and Demkovich's phones knowing that it would likely contain exculpatory evidence. For example:

   a.    On or about December 22, 2021, defense counsel filed an Order to Show Cause pursuant to C.P.L. § 245.50(3) to ensure that evidence was not lost or

destroyed, which was opposed by BPD and BCDAO and then denied on or about January 21, 2022, because no criminal action was then pending;

b. On or about March 10, 2022, following his arrest on the Criminal Court Complaint, defense counsel filed a motion pursuant to C.P.L. § 245.50(3) seeking to compel preservation and disclosure of forensic images of Defendants Herceg's and Demkovich's cell phones, which was opposed by BPD and BCDAO and denied on or about March 15, 2022, based, in part, on the allegedly speculative nature of Mr. Rindgen's arguments that the phones would contain relevant, material, admissible evidence, and due in part to the lack of jurisdiction over what was at that time a local court matter;

c. In or around July 2022, defense counsel made a motion to compel production of Defendants Herceg's and Demkovich's cell phones and also issued several subpoenas to cell phone carriers and social media platforms to try to independently obtain the sought after material.

142.   The Defendants utterly failed to quickly and timely obtain or provide the requested material.

143.   Even when Defendants Herceg's and Demkovich's attorney, Thomas Saitta, notified BCDAO that he had obtained text messages and other material that was relevant to the investigation well before Mr. Rindgen's arrest, Defendants refused and failed to obtain that material and never told Mr. Rindgen's defense counsel of its existence.

144.   Defense counsel for Mr. Rindgen, Yaron Kweller, and Leor Kweller previously provided video footage from security cameras he had access to that established the falsity of Defendants Herceg and Demkovich's claims.  However, on information and belief, neither

Defendant Herceg nor Defendant Demkovich were ever confronted with that footage or asked to explain why their report differed from the objective evidence in material ways.

145. Defendants obtained other security camera footage which also established the falsity of Defendants Herceg and Demkovich's claims.

146. During the course of the investigation, the Defendants obtained no evidence supporting or corroborating the allegations of Defendants Herceg and Demkovich.

**The Baseless Prosecution Proceeds**

147. The Defendants nevertheless continued with the prosecution of Mr. Rindgen in the absence of probable cause.

148. The Defendants all continued with the prosecution of Mr. Rindgen despite being in possession of exculpatory evidence which they suppressed from Mr. Rindgen and his co-defendants, Yaron and Leor Kweller.

149. In addition to the Saitta Folder materials and the full set of electronic data on Defendants Herceg and Demkovich's cellular phones, at some point during the investigation or prosecution, Defendant Demkovich informed Defendant Congdon and others at BCDAO that she never said "no" or physically resisted any sex acts. Neither Defendant Congdon nor Defendants Korchak, Loughran, Cronin or anyone else at BCDAO recognized the exculpatory nature of this information and did not disclose it to the defense. That Defendant Congdon did not recognize the exculpatory nature of this information and her obligation to turn it over to the defense further reflects the lack of training, supervision, policies and procedures within BCDAO.

150. Once Mr. Rindgen was arrested, his attorneys sought the discovery to which he was legally entitled.

151.    Defendant Congdon was unfamiliar with New York's discovery laws and her obligations as a prosecutor under those laws.  Neither Defendant Korchak nor Defendant Loughran, as supervisors, provided Defendant Congdon any training or direct supervision regarding BCDAO's obligations to provide criminal defendants discovery pursuant to New York law, as well as the New York State and federal constitutions.

152.    Defendant Congdon, again mistaken about the law, believed that she had a limited amount of time to share discovery before she had to indict the case.  Neither Defendant Korchak nor Defendant Loughran, as supervisors, provided Defendant Congdon any training or direct supervision regarding how and when to indict a criminal case.  Defendant Cronin did not intervene to ensure that Mr. Rindgen received the material to which he was legally entitled, nor did Defendant Cronin correct Defendant Congdon's mistaken apprehension of the law.

153.    Overwhelmed by the amount of discovery and having still not reviewed all of the materials available to her and BCDAO, and having still not obtained the Saitta File, Defendant Congdon instead decided to present the case to the grand jury at the end of March 2022.  No new information was available to Defendant Congdon or BCDAO since the time of Mr. Rindgen's arrest.

154.    Defendants Congdon and Cronin kept exculpatory information from the Grand Jury.  For example, the Grand Jury did not learn that Defendant Demkovich had reported that she was questioning whether a rape had occurred and that she believed and told numerous people that any contact had been consensual, nor did the Grand Jury learn of the exculpatory DNA results that were learned after its indictment was returned.

155.    Defendant Loughran, Defendant Cronin, and Defendant Congdon presented the case to the Grand Jury, with Defendant Congdon – who had almost no experience presenting a

case to the Grand Jury – as the lead prosecutor.  Defendant Korchak supervised the attorneys and the presentation to the Grand Jury.

  a. The instructions provided to the grand jury included inaccurate statements of the law, which were later criticized in a June 13, 2023, Decision and Order issued by Hon. Carol A. Cocchiola;

  b. The materials presented to the Grand Jury necessarily did not include the exculpatory and impeachment material that had either been suppressed or not obtained as of the date of the presentation.

156. The Grand Jury returned an indictment as to Mr. Rindgen, charging him with two counts of Criminal Sale of a Controlled Substance (Penal Law § 220.39), Criminal Possession of a Controlled Substance in the Third Degree (Penal Law § 220.16), two counts of Criminal Facilitation in the Fourth Degree (Penal Law § 115.00), Sexual Abuse in the First Degree (Penal Law § 130.65), Criminal Sexual Act in the First Degree (Penal Law § 130.50), and Unlawfully Dealing With a Child in the First Degree (Penal Law § 260.20).

157. On March 31, 2022, Mr. Rindgen was arraigned in Broome County Court and pleaded not guilty to all charges.

158. Critically, the Grand Jury testimony did not elicit or establish any evidence of forcible compulsion, an element of Sexual Abuse in the First Degree (Penal Law § 130.65), and Criminal Sexual Act in the First Degree (Penal Law § 130.50).  There was no evidence presented to the Grand Jury of the use of physical force and no evidence of express or implied threats that placed the complainants in fear of immediate death or physical injury or that either were in fear the other would be immediately kidnapped or physically harmed.

159.    Additionally, there was no independent corroboration that Mr. Rindgen sold or possessed cocaine. Notably, complainants' voluntarily used cocaine just two days prior to the alleged incident, which was not revealed until a May 10, 2023, disclosure from the BCDAO and ADA Congdon. Neither BPD nor BCDAO questioned Demkovich or Herceg about their prior and habitual drug use before arresting and prosecuting Mr. Rindgen.

160.    Despite not having obtained all of the available evidence, including the exculpatory and impeachment evidence in the Saitta Folder and exculpatory DNA test results, Defendants Congdon and Cronin supervised by Defendants Korchak and Loughran, filed a Certificate of Compliance as required by New York Criminal Procedure Law §245.50 at Mr. Rindgen's arraignment.  This statute requires that a prosecutor certify that they have exercised due diligence and made reasonable inquiries to ascertain the existence of material and information subject to discovery, and after so doing, has disclosed and made available all known material and information subject to discovery.  As described *supra*, such representations were inaccurate and false given the many failings by Defendants Korchak, Loughran, Congdon, and Cronin to identify and obtain information that existed and was available to them.

161.    In June 2022, Leor Kweller consented to having his DNA obtained via buccal swab and in July 2022, he was excluded as a contributor to the two-male DNA profile mixture obtained from Defendant Herceg.

a. Both Defendants Herceg and Demkovich underwent forensic rape examinations immediately after the night in question.  Material thereby obtained for Defendant Demkovich was unsuitable for testing, while material obtained from Defendant Herceg revealed a mixture of two male DNA profiles.

b.  This result was inconsistent with Defendants Herceg and Demkovich's account to Defendants Miller and Congdon, insofar as Herceg denied having intercourse for more than a month and Defendant Demkovich described only seeing Defendant Herceg with one man, Leor Kweller – an allegation Leor Kweller consistently denied.

c.  Ultimately, Leor Kweller was excluded as a contributor to the DNA-mixture obtained from Defendant Herceg's rape kit, thus establishing that Defendant Herceg provided false information to BPD and Defendant Miller that she stated that she had not had sexual intercourse for a month and a half before the night in question.

d.  At some point during the investigation, Defendant Herceg changed her account and revealed a potential consensual sexual partner from the relevant time period to BCDA.  After testing, that potential partner was excluded as a contributor to the two-profile DNA mixture.  Defendants Korchak, Loughran, Cronin, and Congdon failed to disclose Defendant Herceg's changed account concerning the potential consensual sexual partner for six weeks — until the DNA results, which excluded the newly disclosed partner as a contributor, came back.

e.  Because the method of testing applied to Leor Kweller's biological material was Y-STR, Yaron Kweller, as his biological brother, was also excluded as a contributor to the material obtained from Defendant Herceg.

162.  As of early July 2022, when Yaron Kweller and Leor Kweller were excluded as contributors to the material obtained from Defendant Herceg, neither BCDAO nor BPD had

obtained forensic images of the cell phones of Defendant Herceg or Defendant Demkovich, both of whom continued to refuse to consent to any search of their cell phones.   Neither Defendant Congdon, Defendant Cronin, Defendant Loughran, or Defendant Korchak took any steps to preserve or ensure the preservation of Defendant Herceg's and Defendant Demkovich's cell phones.

163.    On June 23, 2023, in response to Mr. Rindgen's defense counsel's Omnibus Motion seeking dismissal of the indictments pursuant to CPL § 210.30, Hon. Judge Carol A. Cocchiola of Broome County Court dismissed both counts of Criminal Sale of a Controlled Substance, and the lone count of Criminal Possession of a Controlled Substance in the Third Degree for a multitude of reasons, including, but not limited to, the prosecutors failure to issue proper grand jury instructions regarding accomplice corroboration and failure to present any sufficient independent corroborating evidence whatsoever.

164.    In the same Decision and Order, Hon. Cocchiola also dismissed both counts of Criminal Facilitation in the Fourth Degree because the evidence submitted to the grand jury was simply not legally sufficient.

165.    Mr. Rindgen would stand trial on the remaining three charges of Sexual Abuse in the First Degree (Penal Law § 130.65), Criminal Sexual Act in the First Degree (Penal Law § 130.50), and Unlawfully Dealing with a Child in the First Degree (Penal Law § 260.20), before being acquitted on October 31, 2023.

### A Forensic Image of Defendant Demkovich's Phone – and its Exculpatory Contents – is Finally Produced

166.    On July 11, 2022, counsel for Mr. Rindgen, Yaron and Leor Kweller, filed a Request to Preserve, and a Motion to Compel Production of Defendants Herceg and Demkovich's Cellular Phones.

167.    On August 5, 2022, Defendant Congdon notified the Defense that Defendants Herceg and Demkovich agreed to the imaging of their cellular phones, which was conducted by BCDAO and BPD.

168.    On November 10, 2022, BCDAO received a hard drive with the extractions of the cell phones of Defendants Herceg and Demkovich (hereinafter, the "Hard Drive").

169.    Due to a lack of training, supervision, procedures, or protocols, and due to Defendants Congdon's and Cronin's lack of experience, and due to the fact that Defendant Congdon's work load did not permit her to devote the necessary time to the instant case, neither Defendant Congdon, Cronin, Loughran, Korchak, Miller, Minor, Zikuski, or anyone else from BCDAO or BPD reviewed the contents of the Hard Drive – notwithstanding the fact that they had been trying to obtain the materials for nearly a year and counsel for Mr. Rindgen, Yaron Kweller and Leor Kweller, insistence that exculpatory material could be found there.

170.    On November 17, 2022, BCDAO purportedly granted access to the Hard Drive to counsel for Mr. Rindgen, Yaron Kweller and Leor Kweller.  However, the conditions of the review – including that the review be conducted at BCDAO's office which did not have the appropriate hardware or software – made it impossible for counsel for the accused to actually review the materials.

171.    Counsel for Mr. Rindgen, Yaron Kweller and Leor Kweller, repeatedly requested access to the hard drive materials, but BCDAO would only agree to its production if a protective agreement was executed.  Counsel for Mr. Rindgen, Yaron Kweller and Leor Kweller agreed to the protective order, but, as of January 2023, BCDAO still did not produce the materials, despite repeated requests from the accused.

172.    Counsel for Mr. Rindgen, Yaron Kweller and Leor Kweller again sought judicial intervention and on January 13, 2023, the presiding court ordered Defendants Congdon and Cronin and the BCDAO to provide the Hard Drive to the accused on or before February 13, 2023.

173.    The agreed-to protective order was executed and Defendants Congdon, Cronin and BCDAO timely turned over a working Cellebrite report of Defendant Demkovich's cellular phone (the "Cellebrite Material").

174.    However, a working copy of the forensic image of Defendant Herceg's cellular phone from the time of the alleged incident was never produced, because in March 2022 — more than three months after the defense's first request for preservation — Defendant Herceg obtained a new phone and a new iCloud account. Consequently, none of Defendant Herceg's communications from November 27, 2021, through March 2022 were present on the Cellebrite report that was provided to the accused.

175.    On February 14, 2023, Counsel for Mr. Rindgen, Yaron Kweller and Leor Kweller commenced the review of Defendant Demkovich's cellular phone. Within the first 36 hours, counsel unearthed relevant and exculpatory material from cellular communications between the Defendant Demkovich and Defendant Herceg and between the Defendant Demkovich and Defendant Herceg and third parties described *supra*. Over the next several days, Counsel for Mr. Rindgen, Yaron Kweller and Leor Kweller uncovered even more relevant and exculpatory evidence that indicated that not only was the November 27 encounter consensual, but that the Defendant Demkovich  advised Defendant Congdon of same, before testifying in the Grand Jury. Additionally, these communications indicated that complainant Defendant Herceg

was certain that she did not have intercourse on the night in question, which was inconsistent with her testimony in the Grand Jury.

176.    The Cellebrite Material made clear that Defendant Demkovich was "questioning it" was in the possession of Defendants Korchak, Loughran, Congdon, and Cronin prior to Mr. Rindgen's arrest and prior to the Grand Jury presentation. Yet, the messages and the underlying information were never identified and disclosed to the Counsel for Mr. Rindgen, Yaron Kweller and Leor Kweller by Defendant Korchak, Loughran, Congdon, or Cronin or anyone at BCDA. Instead, Counsel for Mr. Rindgen, Yaron Kweller and Leor Kweller unearthed it independently by reviewing the Cellebrite Materials in February 2023, almost one year after the arrests of the defendants on felony complaints.

177.    During the course of counsel's February 2023 review of the Cellebrite Material, Counsel for Mr. Rindgen, Yaron Kweller and Leor Kweller learned that Thomas Saitta had been retained by Defendant Herceg and Defendant Demkovich and that they had provided him with copies of their electronic communication from the relevant period.  Defendant Herceg and Defendant Demkovich exchanged messages to the effect that Mr. Saitta was going to review and turn over their communications to BCDAO on Defendant Herceg and Defendant Demkovich's behalf.

178.    Soon thereafter, in February 2023, defense counsel attorney attempted to speak to Mr. Saitta to learn more about the materials and whether they had in fact been turned over to BCDAO.

179.    In fact, the BCDAO had still not collected the Saitta Folder and would not do so even as late as June 22, 2023.

180.    On February 24, 2023, Mr. Rindgen, Yaron Kweller and Leor Kweller filed a joint omnibus motion, seeking, *inter alia* the dismissal of charges against all clients. On May 31, 2023, Hon. Judge Carol A. Cocchiola of the Broome County Court dismissed the charges against Leor Kweller. Specifically, Judge Cocchiola found that the complainants' testimony, together with contemporaneous video recordings of Defendant Herceg engaging in various, complex activities during the relevant time period, rendered impossible the prosecution's theory that Defendant Herceg was unable to consent by reason of physical helplessness.

181.    The charges against Mr. Rindgen and Yaron Kweller were not dismissed. However, the Court did not have before it those exculpatory text messages contained in the Saitta Folder or the contradictory, inconsistent, and incredible testimony Defendants Herceg and Demkovich provided at trial, which was rejected, in its entirety, by the jury that acquitted Mr. Rindgen and Yaron Kweller.

182.    On June 22, 2023, defense counsel informed the trial court about the missing Saitta Folder and sought and received a subpoena for the records in Mr. Saitta's possession. Thereafter, defense counsel called Mr. Saitta and advised him to expect a judicial subpoena for the records.  Mr. Saitta advised that the Saitta Folder and its original contents were never picked up by the BCDAO and that Mr. Saitta would provide it to the Court upon receipt and review of the subpoena.

183.    The trial court issued a subpoena for the records on July 5, 2023, and the records – which contained numerous new, exculpatory records not contained in the Cellebrite Material – were provided to defense counsel.

**The Case Against Mr. Rindgen and Yaron Kweller Proceeds to Trial, Despite All of the Evidence Exonerating Them and Revealing the Falsity of Defendant Herceg and Defendant Demkovich's Allegation, and They are Promptly Acquitted**

184.    On October 23, 2023, jury selection began in the prosecution of Mr. Rindgen and Yaron Kweller.

185.    On October 31, 2023, Mr. Rindgen and Yaron Kweller were acquitted of all charges after the jury deliberated for only two hours before returning a not guilty verdict.  The two hours of deliberation included readbacks of some testimony.

186.    No reasonable prosecutor or law enforcement officer would proceed with a prosecution for rape with the foregoing material in hand.

187.    Nevertheless, Defendants did proceed with the prosecution out of malice; recklessness; willful blindness; and for ulterior motives including their own promotion, publicity, and appeasement of public pressure.

188.    Defendants proceeded with the prosecution of Mr. Rindgen without probable cause.

## DAMAGES

189.    The defendants' unlawful, intentional, willful, purposeful, deliberately indifferent, reckless, bad-faith and/or malicious acts, misdeeds, and omissions caused Mr. Rindgen to be falsely arrested, maliciously prosecuted, unfairly tried, and to endure over one and a half years of prosecution.

190.    Mr. Rindgen was falsely labeled as a rapist causing his restaurants - Dos Rios Cantina and the Colonial - to be shuttered and vandalized and his reputation within the community to be irreparably destroyed.

191.    As a direct and proximate result of the acts of the Defendants, the injuries and damages sustained by Mr. Rindgen from the deprivation of civil rights include: violation of his

clearly established rights under the Fourth and Fourteenth Amendments to the United States Constitution; personal injuries; pain and suffering; severe mental anguish; emotional distress; extreme fear; economic damages including loss of income and business; infliction of physical illness and injury resulting from confinement; humiliation, indignities, and embarrassment; degradation; egregious injury to reputation; public humiliation; permanent loss of natural psychological development; and restrictions on all forms of personal freedom and physical liberty including but not limited to diet, sleep, personal fulfillment, family relations, reading, television, movies, travel, enjoyment, and expression.  As a direct result of his unjust prosecution, many of these injuries and damages sustained will plague Mr. Rindgen for the rest of his life.

192.    Mr. Rindgen continues to suffer physical, emotional, mental and psychological damage as a result of Defendants' egregious and unconstitutional conduct.

193.    The injuries and damages to Mr. Rindgen were foreseeable to Defendants at the time of their acts and omissions.

194.    All of the alleged acts, misdeeds and omissions committed by the individual defendants described herein for which liability is claimed were done intentionally, willfully, purposefully, knowingly, unlawfully, maliciously, wantonly, recklessly, and/or with bad faith, and said proscribed conduct of the individual defendants meets all of the standards for imposition of punitive damages.

## **FEDERAL CLAIMS**

### **First Cause of Action**
**42 U.S.C. § 1983 Malicious Prosecution and False Arrest**
**in violation of the Fourth and Fourteenth Amendments**
*Against Defendants Korchak, Congdon, Cronin, Minor, Zikuski and Miller*

195.    Plaintiff hereby incorporates by reference all of the foregoing paragraphs and

further alleges as follows:

196.    Defendants, acting deliberately and with malice, initiated and took steps to procure false testimony and continue the criminal prosecution of Mr. Rindgen without probable cause or other legal justification, by fabricating evidence and false testimony, by concealing and destroying exculpatory evidence, by refusing to perform a constitutionally adequate investigation, by eliciting and presenting as true knowingly false testimony that Mr. Rindgen committed a criminal sex act; by failing to seize and test controlled substances; and by acting in complete and utter disregard of favorable and exculpatory evidence proving Mr. Rindgen's innocence.

197.    There was no arguable or legal basis to arrest and prosecute Mr. Rindgen for drug and sex crimes.

198.    The prosecution ultimately terminated in Mr. Rindgen's favor when he was acquitted on October 31, 2023, after a jury trial.

199.    Defendants performed the above-described acts under color of state law, intentionally, with reckless disregard for the truth, and with deliberate indifference to Mr. Rindgen's clearly established constitutional rights.  No reasonable officer, investigator, Police Chief, District Attorney, or Assistant District Attorney in 2021-2023 would have believed this conduct was lawful.

200.    The acts and omissions of the Defendants violated Mr. Rindgen's clearly established rights under the Fourth and Fourteenth Amendments and were a direct and proximate cause of Mr. Rindgen's ongoing injuries and damages set forth above.

**<u>Second Cause of Action</u>:**
**42 U.S.C. § 1983**
**Fourteenth Amendment Deprivation of Liberty Without Due Process of Law and Denial of a Fair Trial by Fabricating Evidence, Withholding Material Exculpatory and**

**Impeachment Evidence, and Deliberately Failing to Conduct a Constitutionally Adequate Investigation**
*Against Defendants Korchak, Congdon, Cronin, Minor, Zikuski and Miller*

201.    Plaintiff hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows:

202.    Defendants acting individually and in concert deliberately fabricated evidence and false testimony to violate Mr. Rindgen's constitutional rights, under the Fourteenth Amendment.

203.    Defendants refused to acknowledge Mr. Rindgen's innocence or to investigate evidence demonstrating his innocence.

204.    These defendants deprived Mr. Rindgen of his right to fair trial by deliberately failing to conduct a constitutionally adequate investigation; fabricating inculpatory evidence in reports, statements, and pretrial communications with the prosecution, including the statements of Demkovich and Herceg; failing to search the complainants' phones; failing to seize and test controlled substances; concealing and destroying exculpatory evidence; and in intentionally or with deliberate indifference failing to comply with their duty to disclose *Brady* material through the prosecution.

205.    Defendant Demkovich was a willful participant, acting jointly with the other Defendants, who lied, and provided false testimony.

206.    Defendant Herceg was a willful participant, acting jointly with the other Defendants, who lied, and provided false testimony.

207.    Defendants had Demkovich and Herceg misrepresent the actual facts and truth in their perjurious grand jury and trial testimony.

208.    This fabrication of evidence violated Mr. Rindgens's clearly established Fourteenth Amendment rights to a fair trial and not to be deprived without due process of law.

209.    Defendants performed the above-described acts under color of state law, intentionally, with reckless disregard for the truth, and with deliberate indifference to Mr. Rindgen's clearly established constitutional rights.  No reasonable officer, investigator, District Attorney, or Assistant District Attorney in 2021-2023 would have believed this conduct was lawful.

210.    As a direct and proximate result of the Defendants' fabrications, Mr. Rindgen was wrongly arrested, indicted, prosecuted, and tried, and suffered all of the ongoing injuries and damages set forth above.

### Third Cause of Action:
### 42 U.S.C. § 1983 Failure to Intervene
*Against Defendants Broome County, City of Binghamton,*
*Korchak, Loughran, Congdon, Cronin, Minor, Miller and Zikuski*

211.    Plaintiff hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows:

212.    By their conduct and under color of state law, Defendants, acting within the scope of their employment, had opportunities to intervene on behalf of Mr. Rindgen to prevent his malicious prosecution and deprivation of liberty without due process of law, but with deliberate indifference, declined to do so.

213.    The Defendants' failures to intervene violated Mr. Rindgen's clearly established constitutional right not to be deprived of liberty without due process of law as guaranteed by the Fourteenth Amendment. No reasonable police or prosecutor at the times relevant to this complaint would have believed that failing to intervene to prevent these Defendants from fabricating inculpatory evidence or causing Mr. Rindgen to be arrested and prosecuted without probable cause, were lawful.

214.    The Defendants' acts and omissions, as described in the preceding paragraphs, were the direct and proximate cause of Mr. Rindgen's injuries.  Defendants knew, or should have known, that their conduct would result in Mr. Rindgen's wrongful arrest, and prosecution.

215.    Mr. Rindgen is completely innocent of the rape and drug charges brought against him, and the prosecution ultimately terminated in his favor when he was acquitted on October 31, 2023, after a jury trial.

216.    As a direct and proximate result of the Defendants' actions, Mr. Rindgen was wrongly arrested, indicted, prosecuted, and tried, and suffered all of the ongoing injuries and damages set forth above.

**Fourth Cause of Action:**
**42 U.S.C. § 1983 Civil Rights Conspiracy**
*Against All Defendants*

217.    Plaintiff hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows:

218.    Defendants, acting within the scope of their employment and under color of law and/or as an agent of state actors, or in joint activity with state actors and/or their agents, shared a common unlawful goal and agreed act in concert to deprive Mr. Rindgen of his clearly established constitutional rights, including the right to be free from malicious prosecution, the right not to be deprived of liberty without due process of law, and the right to a fair trial.

219.    Overt acts in furtherance of this conspiracy to violate Mr. Rindgen's civil rights include, without limitation, the following:

      a.    Charging Mr. Ringden with drug and sex crimes that were legally insufficient and lacked probable cause;

      b.    Falsely arresting Mr. Ringden knowing that they lacked probable cause;

c.      Fabricating inculpatory evidence in reports, statements, and pretrial communications with the prosecution, including the statements of Hailey Demkovich and Samantha Herceg;

d.      Concealing and destroying exculpatory evidence;

e.      Committing, suborning, and failing to correct perjury during grand jury and trial;

f.      Intentionally or with deliberate indifference failing to perform an adequate investigation;

g.      Failing to provide adequate training, supervision, and discipline to their employees;

h.      Intentionally or with deliberate indifference failing to comply with their duty to disclose *Brady* material during the prosecution.

220.    The overt acts the Defendants took in furtherance of the conspiracy continued throughout the investigatory phase and prosecution of Mr. Rindgen before he was acquitted by a jury on October 31, 2023.

221.    As a direct and proximate result of this conspiracy to violate his constitutional rights, Mr. Rindgen was wrongly arrested, indicted, prosecuted, and tried, and suffered all of the ongoing injuries and damages set forth above.

**Fifth Cause of Action**:
**42 U.S.C. § 1983 Supervisory liability**
*Against Defendants Korchak, Loughran, Minor, and Zikuski*

222.    Plaintiff hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows:

223.    Supervisory Defendants, including DA Korchak and Police Chief Zikuski, acted deliberately, and recklessly and under color of law, were, at the relevant times, supervisory personnel with oversight responsibility for training, hiring, screening, instruction, supervision, and discipline of Defendant Investigators and/or prosecutors and/or John Doe Defendants who deprived Mr. Rindgen of his clearly established constitutional rights.

224.    Defendant supervisors were personally involved in both the deprivation of Mr. Rindgen's constitutional rights and in creating or condoning the policy or custom of failing to take preventative and remedial measures to guard against such constitutional deprivations.

225.    Defendant supervisors were reckless in their failure to supervise Defendants, and either knew or should have known that Defendants were falsely arresting and maliciously prosecuting Mr. Rindgen, failing to investigate exculpatory evidence, fabricating and coercing complainants' testimony, suppressing and destroying exculpatory evidence, and depriving Mr. Rindgen of due process of law.

226.    These supervisory Defendants knew or in the exercise of due diligence would have known that the conduct of the named and John Doe Defendants against Mr. Rindgen was likely to occur.

227.    The failure of these supervisory defendants to train, supervise and discipline the named individual defendants and John Does amounted to gross negligence, deliberate indifference or intentional misconduct, which directly caused the injuries and damages set forth above.

228.    Mr. Rindgen is completely innocent of the rape and drug charges brought against him, and the prosecution ultimately terminated in his favor when he was acquitted on October 31, 2023, after a jury trial.

229.    As a direct and proximate result of Defendants' actions, Mr. Rindgen was wrongly arrested, indicted, prosecuted, and tried, and suffered all of the ongoing injuries and damages set forth above.

**<u>Sixth Cause of Action:</u>**
**42 U.S.C. § 1983 *Monell* Claim for Unconstitutional Custom or Policy**
**and Failure to Supervise and Train**
*Against Defendants Broome County, Korchak, Loughran, Congdon, Cronin, City of*
*Binghamton, Zikuski, Miller and Minor*

230.    Plaintiff hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows:

231.    Broome County and/or City of Binghamton by and through its final policymakers, had in force and effect during the Rindgen investigation and prosecution a policy, practice or custom of conducting constitutionally inadequate investigations; instructing the grand jury on improper law; of permitting investigations and/or prosecutions based upon the fabrication of inculpatory evidence; of fabricating incriminating statements from witnesses; of failing to obtain probable cause to ensure that suspects would not be falsely arrested and/or maliciously prosecuted; of suppressing and destroying exculpatory and/or impeachment evidence; ignoring evidence that suggests the innocence of suspects; and of failing to follow the duties imposed by *Brady v. Maryland*.

232.    Broome County and/or City of Binghamton systemically failed to adequately train its police officers, detectives, investigators, and prosecutors to conduct constitutionally adequate investigations; to not violate the law; to not fabricate evidence; to not withhold exculpatory *Brady* evidence; to not destroy evidence; to not improperly instruct the grand jury; and to obtain probable cause to ensure that suspects would not be falsely arrested and/or maliciously prosecuted.

233.    Broome County and/or City of Binghamton, by and through its final policymakers, failed to adequately discipline their investigators and prosecutors for investigative and/or prosecutorial wrongdoing, though it was foreseeable that constitutional violations of the type Mr. Rindgen suffered would be predictable result of such failures.

234.    The police and prosecution were constitutionally required to disclose *Brady* material as soon as reasonably possible regardless of whether the defense had made a specific request for it.

235.    The police and prosecution were constitutionally required to find out about and disclose such information, whether it was in its actual possession or in the possession of any police department that had been involved in the investigation or prosecution of the matter.

236.    As set forth above, final policymakers for the Broome County and/or City of Binghamton had actual or constructive notice of such failures to train, supervise, and provide policy to its employees, and failed to provide training or supervision despite an obvious need that such training and supervision was required, where Defendants knew that it was foreseeable that investigators and prosecutors would predictably confront these situations and as a result of the failure to train and supervise, constitutional violations would result.

237.    More specifically, BCDAO failed to implement policies and procedures including training and supervision to ensure that criminal defendants like Mr. Rindgen who are being investigated and charged by or through their offices would not have their constitutional rights violated.

238.    BCDAO had unconstitutionally infirm policies and procedures that led to assistant district attorneys not knowing their obligations under Brady, Giglio, and discovery; or knowing the law as to obtaining critical evidence that went to the heart of an ongoing investigation.

239.    For example, BCDAO allowed Defendant Congdon to become the Bureau Chief of the Special Victims Bureau despite her having zero experience and competence to handle this position.

240.    Even when Defendant Congdon warned Defendant Korchak, Defendant Loughran, and the BCDAO that she was utterly unprepared and lacked the knowledge and training to handle the position, her protestations were ignored and Defendant Korchak, Defendant Loughran, and the BCDAO took no steps whatsoever to ensure that Defendant Congdon's lack of knowledge and experience did not lead to the violation of the constitutional rights of criminal defendants, including Plaintiff.

241.    Defendant Congdon should have declined the assignment but failed to do so, continuing the infirm policy in doing so.

242.    Then, Defendants Korchak and Loughran assigned her to investigate and try Mr. Rindgen's case even though it was reasonably foreseeable that she may violate his constitutional rights due to her lack of training and experience.

243.    And that is exactly what happened. Congdon should have declined the assignment of this case but did not, continuing the infirm policy by doing so.

244.    Mr. Rindgen's Constitutional rights were then violated as described above  due to the failure of BCDAO and Defendants Korchak and Loughran to train, supervise and intervene.

245.    Such failures to train, supervise and discipline, and such unconstitutional municipal customs, practices and/or policies, were the moving force behind Mr. Rindgen's arrest, prosecution, and trial, as well as the ongoing injuries and damages set forth above.

### STATE LAW CAUSES OF ACTION

**Seventh Cause of Action:**
**Malicious Prosecution and False Arrest**

*Against All Defendants*

246.    Plaintiff hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows:

247.    The Defendants, lacking probable cause, intentionally, recklessly, and with malice, caused Mr. Rindgen to be arrested, prosecuted and tried.

248.    The Defendants intentionally withheld and misrepresented facts vitiating probable cause against Mr. Rindgen.

249.    Defendants Demkovich and Herceg played active roles in the arrest and prosecution of Mr. Rindgen.

250.    Defendants Demkovich and Herceg provided false evidence, statements and testimony in the arrest and prosecution of Mr. Rindgen.

251.    Defendants Demkovich and Herceg, withheld exculpatory evidence during the arrest and prosecution of Plaintiff.

252.    Defendants Demkovich and Herceg, by providing false information to the government, importuned the government defendants to act and caused the arrest and prosecution of Mr. Rindgen.

253.    From the time they made their false complaint against Mr. Rindgen up until the time of his arrest, Defendants Demkovich and Herceg were engaged in pressuring and importuning the government defendants to arrest and prosecute Mr. Ringden.

254.    In furtherance of their drive to cause Mr. Rindgen to be arrested and prosecuted for crime she did not commit, Defendants Demkovich and Herceg filed false police statements, withheld evidence, and committed perjury.

255.    Defendants Demkovich and Herceg did all the foregoing intentionally, maliciously, knowingly, and/or in reckless disregard of the truth.

256.    Mr. Rindgen is completely innocent of the rape and dug charges. The prosecution terminated in Mr. Rindgen's favor on October 31, 2023, when the jury acquitted him after trial.

257.    As a direct and proximate result of the Defendants' actions, Mr. Rindgen was wrongly arrested, indicted, prosecuted, and tried, and suffered all of the ongoing injuries and damages set forth above.

## Eighth Cause of Action
## Abuse of Process
*Against Defendants Broome County, City of Binghamton, Korchak and Zikuski*

258.    Plaintiff hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows:

259.    The Defendants, lacking probable cause, intentionally, recklessly, and with malice, caused Mr. Rindgen to be arrested, prosecuted and tried.

260.    The Defendants intentionally withheld and misrepresented facts vitiating probable cause against Mr. Rindgen.

261.    The criminal complaints and indictments were improperly used and obtained by Defendants not to serve interests of justice or to even properly prosecute Mr. Rindgen but rather to serve collateral objectives to quell public pressure mounting for his arrest and prosecution and bolster DA Korchak's re-election chances in the upcoming year.

262.    Despite their effort to quell the public outcry and bolster DA Korchak's chances at re-election, the prosecution terminated in Mr. Rindgen's favor on October 31, 2023, when a jury acquitted him.

## Ninth Cause of Action:
## Intentional, Reckless or Negligent Infliction of Emotional Distress
*Against All Defendants*

263.    Plaintiff hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows:

264. The deliberate conduct of Defendants in fabricating false testimony and evidence, refusal to investigate exculpatory evidence, their cover-up of the truth, conscious and deliberate avoidance of the truth, perpetuated in public statements, constitutes the intentional infliction of emotional distress.

265. In the alternative, the conduct of Defendants breached a duty of care owed to Mr. Rindgen as a citizen, which unreasonably endangered his physical safety, his family's safety, or caused him to fear for his own safety and that of his family, constituting the negligent infliction of emotional distress.

266. Defendants' conduct subjected him to public stigma to this day notwithstanding the acquittal of charges against him, caused Mr. Rindgen to suffer ongoing, unimaginable emotional distress and traumatic psychological sequalae.

<u>Tenth Cause of Action</u>:
**Negligent Hiring, Training and Retention**
*Against Defendants Broome County, City of Binghamton, Korchak, Loughran and Zikuski*

267. Plaintiff hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows:

268. Defendants owed a duty of care to plaintiff to prevent the conduct alleged, because under the same or similar circumstances a reasonable, prudent, and careful person should have anticipated that injury to plaintiff would result from the foregoing conduct.

269. The individually named defendants were unfit and incompetent for their positions.

270. Defendants knew or should have known through the exercise of reasonable diligence that the individual defendants were dangerous.

271.    Defendants' negligence in screening, hiring, training, disciplining, and retaining the individually named defendants proximately caused Mr. Rindgen's ongoing injuries and damages.

272.    As a direct and proximate result of defendants' actions, Mr. Rindgen was wrongly arrested, indicted, prosecuted, and tried, and suffered all of the ongoing injuries and damages set forth above.

**Eleventh Cause of Action:**
**Article I, §§ 6 and 12 of the New York State Constitution**
*Against All Defendants*

273.    Plaintiff hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows:

274.    The conduct of Defendants, described above, also violated Mr. Rindgen's rights under the New York State Constitution, Article I, §§ 6 and 12, to due process of law and to be free from unreasonable searches and seizures.

275.    Mr. Rindgen is completely innocent of the rape and dug charges. The prosecution terminated in Mr. Rindgen's favor on October 31, 2023, when the jury acquitted him after trial.

276.    As a direct and proximate result of defendants' actions, Mr. Rindgen was wrongly arrested, indicted, prosecuted, and tried, and suffered all of the ongoing injuries and damages set forth above.

**Twelfth Cause of Action:**
**Respondeat Superior**
*Against City of Binghamton and Broome County*

277.    Plaintiff hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows:

278.    Defendants were, at all times material to this complaint, employees of the BPD and BCDAO and acted within the scope of their employment in committing the misconduct described above.

279.    Defendants' tortious conduct was undertaken while carrying out routine investigative, law enforcement and prosecutorial functions, of the City of Binghamton and Broome County. The conduct was reasonably expected by, and in fact foreseen by, Defendants' employer.

280.    Defendants are liable as principal for all intentional and negligent state law torts committed by its agents.

**WHEREFORE,** Plaintiff Jordan Rindgen prays as follows:

A.  That the Court award compensatory damages to him and against the defendants, jointly and severally, in an amount to be determined at trial;

B.  That the Court award punitive damages to him, and against all individual defendants, in an amount to be determined at trial, that will deter such conduct by defendants in the future;

C.  For a trial by jury;

D.  For pre-judgment and post-judgment interest and recovery of his costs, including reasonable attorneys' fees pursuant to 42 U.S.C. § 1988 for all 42 U.S.C. § 1983 claims; and

E.  For any and all other relief, which Plaintiff may be entitled.

DATED:  October 30, 2024

MICHAEL D. BROWN, ESQ.
ZIFF LAW FIRM, LLP

*Attorney for Plaintiff*
303 William St., P.O. Box 1338
Elmira, NY 14901-1338
Telephone:  (607) 733-8866