**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

JORDAN RINDGEN,

               Plaintiff,

                                         3:24-CV-1325 (AJB/ML)

      -v-

The COUNTY OF BROOME et al,

               Defendants.

**Hon. Anthony Brindisi, U.S. District Judge:**

<u>**DECISION and ORDER**</u>

## I.      INTRODUCTION

On October 30, 2024, plaintiff Jordan Rindgen filed this 42 U.S.C. § 1983 action against defendants Hailey Demkovich, Samantha Herceg, the City of Binghamton (the "City"), Binghamton Police Chief Joseph Zikuski ("Chief Zikuski"), Binghamton Police Captain Cory Minor ("Captain Minor"), Binghamton Police Investigator Amanda Miller ("Investigator Miller"), unidentified City of Binghamton employees Jane/John Does #1-10, the County of Broome (the "County"), the Broome County District Attorney's Office, Broome County District Attorney Michael Korchak ("DA Korchak"), Broome County Chief Assistant District Attorney Mark Loughran ("Chief ADA Loughran"), Broome County Assistant District Attorneys Alyssa Congdon ("ADA Congdon") and Amanda Cronin ("ADA Cronin"), Broome County DA Investigator Jeff Wagner ("BCDA Investigator Wagner"); and unidentified Broome County employees Jane/John Does #1–10. Dkt. No. 1.

In short, plaintiff alleges that Hailey Demkovich and Samantha Herceg falsely accused him of providing them with illicit drugs and sexually assaulting them, the Binghamton Police

Department ("BPD") inadequately investigated those false allegations, and the Broome County District Attorney's Office (the "BCDA") deliberately disregarded exculpatory evidence, electing to prosecute him anyway. *See generally* Dkt. No. 1. Broome County Court Judge Carol A. Cocchiola dismissed the facilitation and drug-related charges prior to trial, and plaintiff was ultimately acquitted of the remaining charges after a jury trial. *Id.*

The twelve-count complaint asserts Section 1983 claims for False Arrest and Malicious Prosecution (Count I), Due Process and Denial of the Right to a Fair Trial (Count II), Failure to Intervene (Count III), Civil Conspiracy (Count IV), Supervisory Liability (Count V), *Monell* Liability for Unconstitutional Custom or Police and Failure to Supervise and Train (Count VI), as well as related state law claims for False Arrest and Malicious Prosecution (Count VII), Abuse of Process (Count VIII), Intentional, Reckless, or Negligent Infliction of Emotional Distress (Count IX), Negligent Hiring, Training, and Retention (Count X), violations of Article I, Sections 6 and 12 of the New York State Constitution (Count XI), and *respondeat superior* (Count XII). Dkt. No. 1, ¶¶ 195–280.[1]

Defendants Hailey Demkovich and Samantha Herceg answered the complaint. Dkt. Nos. 44 & 45. Chief Zikuski, Captain Minor, Investigator Miller, the City employee Doe defendants, the City (collectively, the "BPD defendants"), ADA Congdon, DA Korchak, and Chief ADA Loughran moved to dismiss all claims against them pursuant to Federal Rule of Civil Procedure ("Rule") 12(b)(6). Dkt. Nos. 46, 54, 63. ADA Cronin, BCDA Investigator Jeff Wagner, the County employee Doe defendants, the BCDA, and the County initially answered plaintiff's

---

[1] The complaint is sequentially numbered by line. Accordingly, citations to the pleading correspond with that document's internal pagination.

complaint. Dkt. No. 50. Afterwards, ADA Cronin moved for a judgment on the pleadings pursuant to Rule 12(c).[2] Dkt. No. 69.

The motions filed by the BPD defendants, ADA Congdon, DA Korchak, Chief ADA Loughran, and ADA Cronin have been fully briefed,[3] *see* Dkt. Nos. 46, 54, 63, 69, 74, 82, 86–89, and will be considered on the basis of the submissions, without oral argument.

## II.    BACKGROUND

The following facts are taken from the complaint and will be assumed true for the purpose of assessing defendants' motions to dismiss.

Plaintiff Jordan Rindgen is a Broome County resident who co-owns restaurants in downtown Binghamton, including the Stone Fox, with business partner Yaron Kweller ("Yaron"). Dkt. No. 1. ("Compl.") ¶ 37.

On the night of November 26, 2021, plaintiff met up with Yaron and Yaron's brother, Leor Kweller ("Leor"), upon finishing a shift as general manager of the Stone Fox. *Id.* ¶ 37. After plaintiff clocked out, he and the Kweller brothers went to Dillinger's, a nearby bar not owned by plaintiff or Yaron. *Id.* While at Dillinger's, the group was approached by an unknown woman, who they later learned was Samantha Herceg ("Herceg"). *Id.* ¶ 38. Herceg bought plaintiff and the Kweller brothers a round of alcoholic beverages and shots of alcohol. *Id.* Plaintiff, Herceg, and the Kweller brothers stayed at Dillinger's until approximately 2:00 a.m. *Id.*

---

[2] The Court acknowledges that the County employee Doe defendants, the BCDA, the County and BCDA Investigator Jeff Wagner also moved to dismiss plaintiff's complaint pursuant to Rule 12(c). Dkt. Nos. 92 & 96. Because those motions are not yet fully briefed, the Court does not address them at this time. Accordingly, this Order applies only to DA Korchak, Chief ADA Loughran, ADA Congdon, ADA Cronin, Chief Zikuski, Captain Minor, Investigator Miller, the City employee Doe defendants, and the City.

[3] Briefing pagination corresponds to the electronically generated CM/ECF headers.

Around 2:00 a.m., the four left Dillinger's and walked back towards the Stone Fox. Compl. ¶ 39.  Plaintiff went inside the Stone Fox, which had since closed, and retrieved a bottle of wine and canned alcoholic seltzers.  *Id.*  The group continued to plaintiff's business office, which was located nearby.  *Id.*  ¶ 40.  While at plaintiff's office, Herceg texted her friends in a group message, inviting them to come to plaintiff's office.  *Id.* ¶¶ 41–43.  Among those invited was Hailey Demkovich ("Demkovich"), who agreed to join.  *Id.* ¶ 44.  Plaintiff gave Demkovich directions to his office via video call, and she arrived there a short time later.  *Id.*

The group—now consisting of plaintiff, Herceg, Demkovich, and the Kweller brothers— left plaintiff's office and headed towards the Colonial, another local establishment owned by plaintiff and Yaron.  Compl. ¶ 47.  At the Colonial, Herceg and Demkovich (the "complainants") ordered shots of alcohol, then began kissing each other.  *Id.* ¶ 49.  The complainants "approached [plaintiff] and, together, kissed him and rubbed his genitals."  *Id.* ¶ 50.  The complainants then "danced together in a sexual manner," and "also danced in a sexual manner with Yaron."  *Id.* Surveillance cameras inside the Colonial captured footage of these events.  *Id.* ¶ 51.

Around 3:00 a.m., the Colonial closed for the night, and the five returned to plaintiff's office.  Compl. ¶ 52.  The complainants went into the downstairs bathroom together, emerging partially undressed before disrobing completely and engaging in sexual contact with one another in front of plaintiff and the Kweller brothers.  *Id.* ¶¶ 55–56.  Then, plaintiff and the complainants used cocaine together.  *Id.* ¶ 57.

After that, plaintiff and Demkovich "began kissing and touching each other in a sexual manner."  Compl. ¶ 58.  Yaron approached the two, and "Demkovich initiated oral sex on Yaron."  *Id.*  Plaintiff moved away from Yaron and Demkovich.  *Id.* ¶ 59.  Demkovich "told

Yaron . . . in sum and substance that she wanted to have unprotected sex with him." *Id.* Yaron

obtained a condom, but "did not, however, have sexual intercourse" with Demkovich. *Id.* ¶ 60.

Approximately 45 minutes after the group had returned to plaintiff's office, the

complainants told Rindgen that they were ready to go home. Compl. ¶ 61. Either Herceg or

Demkovich also joked that "in the future, she expected not to have to wait in line to get into any

of the establishments" plaintiff and Yaron owned. *Id.* ¶ 62. The complainants were seen on

surveillance cameras leaving plaintiff's office and walking toward a nearby parking garage at

3:48 a.m. on November 27, 2021. *Id.* ¶¶ 63, 86. After the complainants left, plaintiff and the

Kweller brothers returned to the Colonial where staff members cleaned and closed the bar. *Id.* ¶

64. Plaintiff got a ride home from the Colonial. *Id.*

Later that day, the complainants reported to the New York State Police that they had been

sexually assaulted and underwent rape examinations. Compl. ¶¶ 69, 161(a). The State Police

advised the complainants to contact the Binghamton Police Department. *Id.* ¶ 71. That evening,

Demkovich's boyfriend called the Colonial, where plaintiff also worked as a manager, and

reported that the owners had drugged and raped Demkovich the night before. *Id.* ¶ 57.

"Shocked, [plaintiff] relayed this information to Yaron." *Id.* ¶ 67. Yaron contacted a friend and

member of BPD, Detective Bob Fimbres, who confirmed that a sexual assault was reported. *Id.*

¶ 68. Both Yaron and plaintiff retained counsel. *Id.* ¶¶ 68, 83.

On November 28, 2021, BPD assigned Investigator Miller to investigate the

complainants' allegations. Compl. ¶ 75. That day, Investigator Miller separately interviewed the

complainants, who restated their accusations against plaintiff and the Kweller brothers. *Id.* ¶ 76.

The complainants provided Investigator Miller with text messages and photographs from the

night of the alleged assault. *Id.* ¶¶ 76–77. Demkovich also allegedly told Investigator Miller that

she was questioning whether she was, in fact, raped, or if the physical or sexual contact was consensual, but this statement was never recorded. *Id.* ¶¶ 73(o), 87.

On November 30, 2021, Yaron's attorney provided Investigator Miller with surveillance footage from inside the Colonial. Compl. ¶ 83. A week later, Investigator Miller and her supervisor, Captain Minor, executed a search warrant at plaintiff's office—the scene of the alleged sexual assault—but they did not recover any physical evidence. *Id.* ¶ 85. BPD also obtained surveillance footage from third parties that covered the street area surrounding plaintiff's office. *Id.* ¶ 86.

On December 8, 2021, newly hired ADA Congdon attended a meeting with DA Korchak, Chief ADA Loughran, Captain Minor, and Investigator Miller to discuss the complainants' allegations and the ongoing investigation. Compl. ¶¶ 109–110. Chief ADA Loughran allegedly suggested that BPD and the BCDA attempt to obtain the complainants' phones. *Id.* ¶ 111. After the meeting, DA Korchak and Chief ADA Loughran assigned ADA Congdon to the investigation. *Id.* ¶ 112. ADA Congdon had been a criminal defense attorney for nearly a decade, but had never worked as a prosecutor. *Id.* ¶ 109(a), (f).

On December 9, 2021, BPD Chief Zikuski allegedly told Yaron's attorney, F. Paul Battisti, that he had advised against filing criminal charges against plaintiff and the Kweller brothers. Compl. ¶ 96. However, a day later, BPD issued a press release stating that "it [was] investigating a November 28, 2021, incident involving the owners of the Colonial and that it [was] aware of additional allegations being made on social media." *Id.* ¶ 98. DA Korchak released a similar statement on December 10, 2021, indicating that the BCDA was aware of the allegations and encouraging those with information to contact the BCDA or local police. *Id.* ¶ 99.

Meanwhile, rumors of the complainants' allegations spread throughout the Binghamton community.  Compl. ¶ 92.  Public outrage intensified as local news outlets picked up the story, and other putative victims came forward with allegations against plaintiff and other owners of the Colonial and the Stone Fox.  *Id.*  On December 11, 2021, "more than 500 protestors gathered in front of the Colonial . . . and marched to the Stone Fox . . . 'to protest and criticize the restaurant owners' handling of several sexual assault allegations that came earlier [that] week via social media.'"  *Id.* ¶ 100.

On December 14, 2021, Chief ADA Loughran, Investigator Miller, and ADA Congdon met separately with the complainants, seeking consent to access their electronic data, but the complainants refused.  Compl. ¶ 115.  A week later, counsel for plaintiff, Yaron, and Leor sought an order to show cause in county court, requesting preservation of the complainants' cell phone data.  *Id.* ¶ 117.  The BCDA opposed this motion, but continued their own attempts to obtain the complainants' consent to an extraction of their electronic data.  *Id.* ¶¶ 118–19.  The motion for a show cause order was denied on January 21, 2022.  *Id.* ¶ 125.

Sometime during the investigation, the complainants retained attorney Thomas Saitta ("Saitta").  Compl. ¶ 120.  On January 14, 2022, Saitta informed ADA Congdon that he had a folder containing printouts of the complainants' electronic data (the "Saitta folder").  *Id.* ¶ 121.  ADA Congdon directed BCDA Investigator Jeff Wagner to pick up the folder, but it was never retrieved.  *Id.* ¶¶ 122–23.  Throughout January 2022, ADA Congdon and Chief ADA Loughran continued to request the complainants' consent to an extraction of electronic data from their phones.  *Id.* ¶ 124.  Those efforts were unsuccessful.  *Id.*

Though ADA Congdon held "ultimate decision-making authority" over the investigation, she met with DA Korchak and Chief ADA Loughran multiple times between November 2021

and February 2022.  Compl. ¶¶ 129, 131.  ADA Congdon also worked closely with BPD during the investigation.  Compl. ¶ 126.  For instance, she worked with Investigator Miller to draft a search warrant for plaintiff's DNA.  *Id.*  According to the complaint, "[ADA] Congdon did not know that she could apply directly to a court to obtain a suspect's DNA and neither she, . . . [Investigator] Miller, or anyone at BCDA[] or BPD knew how to draft an appropriate application."  *Id.*  Consequently, "[n]o search warrant or motion to compel a buccal swab or a DNA sample was ever completed."  *Id.* ¶ 127.

Eventually, on February 22, 2022, ADA Congdon met with BPD officers and decided to file criminal charges against plaintiff and the Kweller brothers in local court.  Compl. ¶ 137.  Members of the press were present at the courthouse when the three appeared to be arrested and charged.  *Id.* ¶ 139.  Plaintiff was charged with "Criminal Sale of a Controlled Substance in the Third Degree, in violation of New York Penal Law § 220.39, and Criminal Sale of a Controlled Substance in the Fifth Degree in violation of New York Penal Law § 220.31."  *Id.* ¶ 140.  He pleaded not guilty to all charges.  *Id.* ¶ 137.

At some point, the BCDA hired ADA Cronin to assist ADA Congdon with plaintiff's prosecution.  Compl. ¶ 133.  By that time, ADA Cronin had worked as a sex crimes prosecutor for several years.  *Id.*

Even after his arrest, plaintiff continued to urge members of BPD and the BCDA to obtain the complainants' electronic data.  Compl. ¶ 141.  On or around March 10, 2022, plaintiff "filed a motion pursuant to C.P.L. § 245.50(3) seeking to compel preservation and disclosure of forensic images of [the complainants'] cell phones."  *Id.* ¶ 141(b).  But BPD and the BCDA opposed, and plaintiff's motion was denied, "based, in part, on the allegedly speculative nature of [plaintiff]'s arguments that the phones would contain relevant, material, admissible evidence

and due in part to the lack of jurisdiction over what was at that time a local court matter." *Id.* Plaintiff also subpoenaed cell phone carriers and social media companies in an attempt to independently obtain the complainants' electronic data. *Id.* ¶ 141(c). Unbeknownst to plaintiff at the time, Herceg had obtained a new phone and iCloud account sometime in March 2022. *Id.* ¶ 174.

At the end of March 2022, ADA Congdon presented the case to the grand jury with assistance from Chief ADA Loughran and ADA Cronin. *Id.* ¶¶ 153, 155. According to plaintiff, the instructions provided to the grand jury included inaccurate statements of the law. *Id.* ¶ 155(a). The grand jury returned an indictment as to plaintiff, charging him with:

> two counts of Criminal Sale of a Controlled Substance (Penal Law § 220.39), Criminal Possession of a Controlled Substance in the Third Degree (Penal Law § 220.16), two counts of Criminal Facilitation in the Fourth Degree (Penal Law § 115.00), Sexual Abuse in the First Degree (Penal Law § 130.65), Criminal Sexual Act in the First Degree (Penal Law § 130.50), and Unlawfully Dealing With a Child in the First Degree (Penal Law § 260.20).

Compl. ¶ 156. Plaintiff was arraigned in Broome County Court and pleaded not guilty to all charges on March 31, 2022. Compl. ¶ 157.

In June 2022, Leor Kweller consented to buccal DNA swab. Compl. ¶ 161. His DNA was compared only with the material obtained during Herceg's rape examination, as the material obtained from Demkovich's rape examination was unsuitable for testing. *Id.* ¶ 161(a). A two-male DNA profile mixture was obtained from Herceg's sample, despite her earlier claim that she had not had any other sexual partners for more than a month prior to the alleged assault. *Id.* ¶ 161(b). At some point during the investigation, though, Herceg informed authorities of a possible consensual sexual partner from the relevant time period, but that person was excluded as a contributor. *Id.* ¶ 161 (d). Leor was also excluded as a contributor to the mixture obtained from Herceg's rape kit. *Id.* ¶ 161.

On July 11, 2022, counsel for plaintiff and the Kweller brothers moved to compel production of the complainants' phones. Compl. ¶ 166. On August 5, 2022, while the motion to compel was still pending, ADA Congdon notified the defense that the complainants agreed to imaging of their phones by BPD. *Id.* ¶ 167. Three months later, the BCDA received a hard drive with the extractions of the complainants' electronic data. *Id.* ¶ 168. The BCDA insisted that plaintiff's counsel review the data at BCDA's office, despite lacking the technology needed to review the materials in an efficient manner. *Id.* ¶ 170. Plaintiff's counsel repeatedly requested access to the hard drive, but the BCDA refused to do so absent a protective order. *Id.* ¶ 171.

In January 2023, plaintiff's counsel sought court intervention, and the presiding judge ordered ADA Congdon and ADA Cronin to turn over the hard drive. Compl. ¶ 172. The parties executed a protective order, and ADA Congdon turned over a report containing the data extracted from Demkovich's phone (the "BCDA report"). *Id.* ¶ 173. Plaintiff never received a copy of the relevant data from Herceg's phone because she had obtained a new phone and iCloud account in March 2022. *Id.* ¶ 174.

On February 14, 2023, plaintiff's attorney and private investigators began reviewing the BCDA report. Compl. ¶ 175. They discovered relevant exculpatory and impeaching text messages. *Id.* They also learned that both complainants turned over their electronic data from the relevant period to their attorney, Saitta, before Herceg obtained a new cell phone. *Id.* ¶ 177. For some reason, though, the BCDA still had not retrieved the Saitta folder. *Id.* ¶ 179.

On February 24, 2023, counsel for plaintiff, Yaron, and Leor filed a joint motion seeking dismissal of all charges. Compl. ¶ 180. The motion was granted in part, and the Broome County Court "dismissed both counts of Criminal Sale of a Controlled Substance, and the lone count of Criminal Possession of a Controlled Substance in the Third Degree for . . . prosecutors['] failure

to issue proper grand jury instructions . . . and failure to present any sufficient independent corroborating evidence." *Id.* ¶ 163. The court also "dismissed both counts of Criminal Facilitation in the Fourth Degree because the evidence submitted to the grand jury was . . . not legally sufficient." *Id.* ¶ 164. The court dismissed all charges against Leor. *Id.* ¶ 178.

On June 22, 2023, plaintiff's counsel sought a judicial subpoena for the Saitta folder. Compl. ¶ 182. The court issued a subpoena on July 5, 2023, and Saitta provided the records to plaintiff's counsel. *Id.* ¶ 183. The records contained new exculpatory material not contained in the BCDA report. *Id.*

Plaintiff obtained the following text messages from the BCDA report and the Saitta folder:[4]

a. November 27, 2021 - Defendant Demkovich to a Third Party: "I don't want anyone to know…." "And it was consensual. I knew what was happening. But those guys should be fucking disgusted with themselves."

b. November 27, 2021 - Defendant Demkovich to Defendant Herceg: "And I remember saying to Jordan I was like I better not get denied at any of ur bars."

c. November 27, 2021 - Defendant Herceg to Defendant Demkovich: "Like I can't have this get out…"

d. November 28, 2021 - Exchange between Defendant Herceg and Defendant Demkovich (referencing Defendant Miller): "I am not gonna show her those" Herceg: "I don't think you should" Demkovich: "I am 100% not going to" Herceg: "I am worried about her calling stupid f**king Bianca"

e. November 29, 2021 - Defendant Herceg to Defendant Demkovich and a Third Party: "I'm settling for nothing Less then a million"

f. November 29, 2021 - Defendant Herceg to Defendant Demkovich and a Third Party: (referring to Plaintiff and Mr. Rindgen) "I want the Benz and the Beamer" "And both their houses"

g. November 29, 2021 - Defendant Herceg and Defendant Demkovich and a Third Party: (referring to Plaintiff and Mr. Rindgen) "I want all their bars . . ."

---

[4] Plaintiff does not distinguish the messages contained in the BCDA report from those in the Saitta folder. Compl. ¶ 73.

h. November 29, 2021 - Defendant Herceg to Defendant Demkovich: "Yup 100% but i do remember being at Alisha's and when she said we were at Jordan's i was like wtf we were w them? And she was like yeah haikey said u guys got raped and obviously I'm still drunk I'm like whatt no way it doesn't even feel like I've had sex i don't think anything happened and Alisha was like exactly"

i. November 30, 2021 - Defendant Demkovich to Defendant Herceg and Third Parties: "the reason i had to call 911 is because when i told my parents my dad literally got in the car and was headed straight to downtown"

j. December 3, 2021 - Defendant Demkovich instant messages to Defendant Herceg and Third Parties: "if you guys have any photos of us drinking if u could delete them that would be good" "we can't erase everything but minimize it as much as possible" "Danayah maybe archive ur disposals of them on insta" "i might just delete any risky pics" "i need to go on my computer to delete my vsco"

k. December 3, 2021- Defendant Herceg instant message to Defendant Demkovich: "I've deleted all my posts and changed my user name to no lastnight and trying to delete all my republishes"

l. December 3, 2021 from a Third Party to Defendant Demkovich, Defendant Herceg, and Third Parties: "i already deleted everything w [Herceg] in it and everything hailet sent me to delete"

m. December 7, 2021 from a Third Party ("T.P.") to Defendant Demkovich: T.P.: "it da took me 5 mins of silence to go all the way back up to the messages that night" Demkovich.: "mad far and i don't even have them bc i think i accidentally deleted them that night" T.P.: "yeah i deleted them all out of your phone bc u were going to dylan's [Demkovich.'s then boyfriend]"

n. December 7, 2021 from a Third Party to Defendant Demkovich: "and then i told her that when [Herceg] came over she told me she didn't have sex but she turned the corner and saw you but thats all she could remember" "bro yeah she [Herceg] was like that whole night i would know if i got fucked i don't feel anything in my vagina but it was prob bc bitch was numb af"

o. December 8, 2021 - Defendant Demkovich. to Defendant Herceg: "okay so i'm slightly panicking at work because i was just reading my texts from the day after the incident and i said to danayah that it was consensual and that i knew what was happening. but the whole day after the incident i was questioning if i got raped and i thought it might be classified as consensual because i didn't say no."

p. December 8, 2021 - Defendant Herceg to Defendant Demkovich: "Trust me i was panicking too [about the text messages] Bc i said in the groupchat that night "I'd fuck""

q.  December 8, 2021 - Defendant Herceg to Defendant Demkovich: "I don't think you have anything to worry about. Bc if she did get the subpoena [for the phone messages] I'm sure she only got it from the times of like 1-4am"

r.  December 8, 2021 - from Defendant Herceg. to Defendant Demkovich and Third Parties: "Yes i deleted everything then made it private and changed everything"

s.  December 27, 2021 Defendant Demkovich to her mother - (after defense counsel served and filed an Order to Show Cause on December 22, 2021, requesting preservation of the Defendants Herceg and Demkovich's cell phones): "i told you i have a message of me saying it was consensual the day after, because i was confused and not in the right head space if the defense sees it, i'm done"

t.  December 27, 2021 - Defendant Demkovich. to Defendant Herceg.: "and i have a message of me saying it's consensual" "the day after"

u.  December 27, 2021 - Defendant Herceg to Defendant Demkovich: "I have messages w Alisha saying I'd fuck ring ding [Jordan Rindgen]"

v.  December 27, 2021 - Defendant Demkovich. to Defendant Herceg: "yeah they will take the message of me saying it's consensual and i'm done" "the lawyer tom [Saitta] needs to make it so they can't get our phones period"

w.  December 28, 2021 - Defendant Demkovich to her mother: "I told them [BPD] the next day I was questioning if what happened to me was actually rape . . . "

x.  December 28, 2021 - Defendant Demkovich to her mother: "i accidentally deleted one text it was in the group text"

y.  December 28, 2021 - text message from Defendant Demkovich to Defendant Herceg: "i told him i said it was consensual" "i'm just worried that I said more than once it was consensual" "i said something about it being consensual"

z.  January 13, 2022 - Defendant Demkovich to her mother: "I just don't want [Herceg's] parents to judge me for saying it was consensual"

aa. January 14, 2022 - Defendant Demkovich to Defendant Herceg: "i really don't see why they'd still want to supoena our phones after i've provided all of That" "so fingers crossed"

bb. March 7, 2022 - Defendant Herceg to Defendant Demkovich: "My parents wanted us to press charges because why tf would we not if the cops are called and we're getting fucking rape kits done. I told my mom the second i told her i didn't want the cops involved. I didn't have a choice in that matter. Whoever is telling you what you're doing is okay is enabling bad behavior that is literally gonna take a shit on you in the future, again you've already said it was

consensual and now you're acting essentially like nothing happened which is exactly what the defense is gonna say. So good luck w that, trying to get you to understand is like talking to a brick wall. Maybe 30 days now hailey they have to turn in every last bit of evidence if you think they aren't watching you right now more then ever you'd be fucking dumb. I've said what i had to say to you now three times and I'm sure you'll go right behind my back and disrespect me a fourth. What you do reflects you, not me so idk what i give a fuck anyway."

cc. June 6, 2022 - Defendant Demkovich to her mother: "and the text messages i sent really fuck me up" "i didn't know because i didn't say no"

dd. June 13, 2022 - Defendant Herceg to Defendant Demkovich: ". . . Fuck you hailey you're a piece of shit. You think you sit in a high horse bc you "came looking for me" that night "only one who cared" no you didn't. If you thought I was in such danger like you say then you would've called the cops you would've brought everyone there w you to get me out. You came for what you thought was gonna be a good time. You're a garbage human who see nothing wrong w their actions."

ee. June 15, 2022 - Defendant Herceg to a Third Party: "She [Demkovich] told Bianca on FaceTime on her walk to "save me" that she wanted to fuck Jordan [Rindgen], she wanted to go because she wanted to sleep w Jordan. Not to come save me" . . . "And she came for what she thought was going to be a good time" . . . "I don't remember anything from that night" "Everything I know is from he[r] [Demkovich]"

ff. July 25, 2022 - Defendant Demkovich to her mother: "i wanna drop the charges" Demkovich's mother: "[Herceg] got a new phone…" "No access to her old cloud" Demkovich: "and i texted [Herceg] and she got a new phone so they didn't subpoena hers"

Compl. ¶ 73(a)–(ff) (errors in original).

On October 23, 2023, plaintiff and Yaron took the case to trial. Compl. ¶ 184. The remaining charges against plaintiff were "Sexual Abuse in the First Degree (Penal Law § 130.65), Criminal Sexual Act in the First Degree (Penal Law § 130.50), and Unlawfully Dealing with a Child in the First Degree (Penal Law § 260.20)." *Id.* ¶ 165.

At some point during the trial, Herceg testified "that she was instructed to destroy electronic data relating to the night in question by . . . Congdon, the lead prosecutor on the case, and that she did in fact destroy that evidence." Compl. ¶ 71. She also revealed that she was never shown any of the surveillance footage throughout the investigation. *Id.* ¶¶ 90–91. The

jurors deliberated for around two hours before returning a verdict. *Id.* ¶ 185. Plaintiff and Yaron were acquitted of all charges on October 31, 2023. *Id.*

## III.   LEGAL STANDARD

### A.   Rule 12(b)(6)

The Federal Rules of Civil Procedure permit a party to move to dismiss a pleading for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To survive dismissal, "a complaint must contain sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*; *see also Ginsburg v. City of Ithaca*, 839 F. Supp. 2d 537, 540 (N.D.N.Y. 2012) ("[T]he '[f]actual allegations must be enough to raise a right to relief above the speculative level.'") (quoting *Twombly*, 550 U.S. at 555).

To assess this facial plausibility requirement, a court "must accept as true all of the factual allegations contained in the complaint," *Erickson v. Pardus*, 551 U.S. 89, 94 (2007), and draw all reasonable inferences in favor of the plaintiff, *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002). In doing so, a court generally confines itself to the facts alleged in the pleading, documents attached to the complaint or incorporated into it by reference, and matters of which judicial notice may be taken. *Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016).

### B.   Rule 12(c)

"After the pleadings are closed[,]but early enough not to delay trial[,] a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). "In deciding a Rule 12(c) motion, [courts] 'employ[ ] the same standard applicable to dismissals pursuant to [Fed. R. Civ. P.]

12(b)(6).'" *Hayden v. Paterson*, 594 F.3d 150, 160 (2d Cir. 2010) (quoting *Johnson v. Rowley*, 569 F.3d 40, 43 (2d Cir. 2009)).

## IV.    DISCUSSION

Chief Zikuski, Captain Minor, Investigator Miller, the City employee Doe defendants, DA Korchak, Chief ADA Loughran, ADA Cronin, ADA Congdon, and the City (collectively, the "moving defendants") have moved to dismiss all of plaintiff's claims against them. *See* Dkt. Nos. 46, 54, 63, 69.

Plaintiff asserts a number of Section 1983 claims against the moving defendants including:

(1) False Arrest against Chief Zikuski, Captain Minor, Investigator Miller (collectively, the "individual BPD defendants"), DA Korchak, ADA Cronin, and ADA Congdon, Compl. ¶¶ 195–200;

(2) Malicious Prosecution against the individual BPD defendants, DA Korchak, ADA Cronin, and ADA Congdon, *id.*;

(3) Due Process and Denial of the Right to a Fair Trial against the individual BPD defendants, DA Korchak, ADA Cronin, and ADA Congdon, *id.* ¶¶ 201–210;

(4) Failure to Intervene against the individual BPD defendants, DA Korchak, Chief ADA Loughran, ADA Cronin, ADA Congdon (the "individual BCDA defendants"), and the City, *id.* ¶¶ 211–216;

(5) Civil Rights Conspiracy claims against the individual BPD defendants, the individual BCDA defendants, and the City, *id.* ¶¶ 217–221;

(6) Supervisory Liability against Chief Zikuski, Captain Minor, DA Korchak, and Chief ADA Loughran, *id.* ¶¶ 222–29; and

(7) Municipal Liability against the individual BPD defendants, the individual BCDA defendants, and the City, *id.* ¶¶ 230–245.

Along with his Section 1983 claims, plaintiff brings several related state law claims against the moving defendants, including:

(1) False Arrest against the individual BPD defendants, the individual BCDA defendants, and the City, Compl. ¶¶ 246–257;

- 16 -

(2) Malicious Prosecution against the individual BPD defendants, the individual BCDA defendants, and the City, *id.*;

(3) Abuse of Process against Chief Zikuski, DA Korchak, and the City, *id.* ¶¶ 258–262;

(4) Intentional, Reckless, or Negligent Infliction of Emotional Distress against the individual BPD defendants, the individual BCDA defendants, and the City, *id.* ¶¶ 263–66;

(5) Negligent Hiring, Training, and Retention against Chief Zikuski, DA Korchak, Chief ADA Loughran, and the City, *id.* ¶¶ 267–272;

(6) Violations of Article I, Sections 6 and 12 of the New York State Constitution against the individual BPD defendants, the individual BCDA defendants, and the City, *id.* ¶¶ 273–76; and

(7) *respondeat superior* against the City, *id.* ¶¶ 277–280.

Defendants primarily argue that plaintiff has failed to plausibly allege his claims against them. Dkt. No. 46 ("BPD Mem.") at 26–35; Dkt. No. 54 ("Congdon Mem.") at 20–28; Dkt. No. 63 ("Korchak & Loughran Mem.") 13–28; Dkt. No. 69 ("Cronin Mem.") at 12–19. In addition, the individual BCDA defendants also contend that, to the extent plaintiff has plausibly alleged any of his claims against them, they are entitled to absolute or, alternatively, qualified immunity from those claims. Congdon Mem. at 8–17; Korchak & Loughran Mem. at 9–12; Cronin Mem. at 8–11.

In opposition, plaintiff maintains that he has plausibly alleged his Section 1983 and state law claims against defendants, and maintains that their alleged conduct falls outside the scope of absolute or qualified immunity. Dkt. No. 74 ("Pl.'s First Opp.")[5] at 23–47; Dkt. No. 82 ("Pl.'s Second Opp.") at 12–15, 18–36.

---

[5] On March 24, 2025, plaintiff opposed BPD defendants' and ADA Congdon's motions to dismiss. Dkt. No. 74. Plaintiff filed a separate memorandum opposing the motions filed by DA Korchak, Chief ADA Loughran, and ADA Cronin on April 17, 2025. Dkt. No. 82.

### A. Absolute Immunity

The individual BCDA defendants argue that plaintiff's federal and state law claims against them are barred by absolute prosecutorial immunity. Congdon Mem. at 8–17; Korchak & Loughran Mem. at 9–12; Cronin Mem. at 8–11.

Plaintiff disagrees, arguing that he has "explicitly pleaded numerous instances of investigative and administrative misconduct," and that ADA Congdon "was intimately involved in the investigation from the start." Pl.'s Second Opp. at 12–13; Pl.'s First Opp. at 23–31.

As the Second Circuit has repeatedly acknowledged, the principles affording prosecutors absolute prosecutorial immunity from Section 1983 claims for damages are the same as those that protect prosecutors from civil liability under state law. *Shmueli v. City of N.Y.*, 424 F.3d 231, 237–38 (2d Cir. 2005) (citing *Rudow v. City of N.Y.,* 822 F.2d 324, 329 (2d Cir. 1987)).

Absolute prosecutorial immunity is broad, applying even in situations where a prosecutor is alleged to have acted maliciously. *Johnson v. Town of Colonie*, 102 A.D.2d 925, 925 (N.Y. App. Div. 3d Dep't 1984) ("Actions performed by the prosecutor which are associated with the prosecutorial phase of the criminal process . . . bar civil liability for such action, even if it be assumed that such actions were done maliciously."); *Giraldo v. Kessler*, 694 F.3d 161, 166 (2d Cir. 2012) ("[A]bsolute immunity applies to protect the prosecutor even in the face of a complaint's allegations of malicious or corrupt intent behind the acts.").

"In determining whether absolute prosecutorial immunity attaches, [courts] apply a 'functional approach.'" *Giraldo*, 694 F.3d at 165 (quoting *Hill v. City of N.Y.*, 45 F.3d 654, 660 (2d Cir. 1995)); *see also Rodrigues v. City of N.Y.*, 193 A.D.2d 79, 86 (N.Y. App. Div. 1st Dep't 1993) ("[L]ike federal courts, the courts of [New York] take a functional approach when analyzing claims of immunity.").

1. **Advocacy Function**

Consistent with this functional approach, courts routinely find prosecutors are absolutely immune for actions taken in connection with their advocacy function. *Johnson v. Kings Cnty. Dist. Attorney's Off.*, 308 A.D.2d 278, 285 (N.Y. App. Div. 2d Dep't 2003) ("District Attorneys are immune from civil liability for activities 'intimately associated with the judicial phase of the criminal process,' meaning 'initiating a prosecution and in presenting the State's case.'" (quoting *Imbler v. Pachtman*, 424 U.S. 409, 430–431 (1976)). For instance, "a prosecutor enjoys absolute immunity when determining which offenses to charge, initiating a prosecution, presenting a case to a grand jury, and preparing for trial." *Anilao v. Spota*, 27 F.4th 855, 864 (2d Cir. 2022); *see also Blake v. City of N.Y.*, 148 A.D.3d 1101, 1104 (N.Y. App. Div. 2d Dep't 2017) (holding prosecutors entitled to absolute immunity for "activities in processing criminal charges after . . . arrest . . . based upon evidence assembled by police"); *Giraldo*, 694 F.3d at 167 (holding prosecutor entitled to absolute immunity for interviewing putative victim after suspect was arrested); *Flagler v. Trainor*, 663 F.3d 543, 550 (2d Cir. 2011) ("[A] prosecutor is absolutely immune for withholding/preserving evidence to be used in connection with a criminal prosecution.").

2. **Investigative Function**

However, absolute prosecutorial immunity does not shield a prosecutor's investigative activities from liability. *See Simon v. City of N.Y.*, 727 F.3d 167, 172 (2d Cir. 2013) ("Investigation, arrest, and detention have historically and by precedent been regarded as the work of police, not prosecutors, and 'they do not become prosecutorial functions merely because a prosecutor has chosen to participate.'") (quoting *Day v. Morgenthau*, 909 F.2d 75, 77–78 (2d Cir.1990)).

"Although all investigative activity could be considered in some sense to be 'preparing for the initiation of judicial proceedings,' . . . the Supreme Court has sought to draw a line between . . . preparatory steps that a prosecutor takes to be an effective advocate of a case already assembled and . . . investigative steps taken to gather evidence." *Smith v. Garretto*, 147 F.3d 91, 94 (2d Cir. 1998) (quoting *Buckley v. Fitzsimmons*, 509 U.S. 259, 273 (1993))

In doing so, "[t]he Court has identified 'evaluating evidence and interviewing witnesses' as falling on the absolute immunity side of the line, leaving 'searching for the clues and corroboration' that might lead to a recommendation for an arrest on the qualified immunity side." *Smith v. Garretto*, 147 F.3d at 94 (quoting *Buckley,* 509 U.S. at 273); *Sculti v. Finley*, 167 A.D.3d 796, 797 (N.Y. App. Div. 2d Dep't 2018) ("Conduct in connection with the application for a search warrant is investigative in nature and, therefore, is governed by qualified immunity."); *Buckley*, 509 U.S. at 275  (holding prosecutor not absolutely immune for fabrication of evidence during preliminary investigation); *Kirchner v. Cnty. of Niagara*, 107 A.D.3d 1620, 1624 (N.Y. App. Div. 4th Dep't 2013) (rejecting absolute immunity defense where prosecutor coached witness to provide false information to police in an effort to reopen closed investigation).

### 3. Functional Analysis

The Court must look to the individual BCDA defendants' alleged conduct to determine which acts, if any, are advocative in nature and shielded by absolute prosecutorial immunity.

### a. DA Korchak & Chief ADA Loughran

DA Korchak and Chief ADA Loughran argue that they are entitled to absolute immunity because "[e]ach of the activities alleged in the [c]omplaint by Korchak and Loughran were part of their core functions as prosecutors."  Korchak & Loughran Mem. at 12.  In response, plaintiff

contends that DA Korchak and Chief ADA Loughran played a "personal role in directing unconstitutional investigative actions, which are clearly separate from prosecutorial functions." Pl.'s Second Opp. at 14.

 "The directing of an investigation by police and other law enforcement personnel[,]" is an investigative activity, falling outside the scope of absolute immunity. *Barbera v. Smith*, 836 F.2d 96, 101 (2d Cir. 1987); *Claude H. v. Cnty. of Oneida*, 214 A.D.2d 964, 965, 626 N.Y.S.2d 933, 935 (1995) ("Where a prosecutor goes outside his quasi-judicial role[,] and acts as an investigator or police officer, he is entitled only to qualified immunity."). Here, the complaint contains a number of allegations that detail DA Korchak and Chief ADA Loughran's involvement in the investigation.

First, plaintiff alleges that DA Korchak and Chief ADA Loughran worked together with ADA Congdon and police to plan and execute the investigation, Compl. ¶¶ 109–112, 129, and that Chief ADA Loughran also allegedly met with the complainants in an attempt to gather evidence. *Id.* ¶¶ 115, 124. These actions fall outside the scope of DA Korchak's and Chief ADA Loughran's prosecutorial function and are not shielded by absolute prosecutorial immunity.

Second, plaintiff alleges that DA Korchak issued a video statement "assert[ing] that his office received 'numerous' emails and phone calls regarding 'several incidents that occurred recently' in Broome County . . . and encourag[ing] those with knowledge to contact the BCDA[] or local police departments." Compl. ¶ 99. Because a prosecutor's "statements to the media are not entitled to absolute immunity[,]" *Buckley*, 509 U.S. at 277, DA Korchak is not entitled to absolute immunity for his alleged video statement.

Third, plaintiff alleges that DA Korchak and Chief ADA Loughran failed to (1) supervise and train ADA Congdon; (2) advise ADA Congdon of her discovery obligations as a prosecutor; and (3) correct her various mistakes of law. Compl. ¶¶ 127–28, 151–52. However, prosecutors are absolutely immune for failing to train or supervise their subordinates as to their prosecutorial duties and obligations. *See Van de Kamp v. Goldstein*, 555 U.S. 335, 344 (2009) ("[P]rosecutors involved in such supervision or training or information-system management enjoy absolute immunity from the kind of legal claims at issue here."); *see also Crawford v. New York Cnty. Dist. Atty.*, 99 A.D.3d 600, 601 (N.Y. App. Div. 1st Dep't 2012) (holding District Attorney entitled to absolute immunity where he allegedly "discourage[d] ADAs from being respectful of individuals' constitutional rights when prosecuting gun possession cases") (citing *Van de Kamp*, 555 U.S. at 344–46)). Accordingly, DA Korchak and Chief ADA Loughran are absolutely immune from liability for their alleged failure to instruct and advise ADA Congdon on her prosecutorial responsibilities.

The remainder of plaintiff's allegations against DA Korchak and Chief ADA Loughran are also protected by absolute prosecutorial immunity because they concern activities routinely recognized as "intimately associated with the judicial process." Compl. ¶¶ 155 (presenting the case to the grand jury), 160 (filing a certificate of compliance), 161(d) (failing to disclose evidence), 162 (failing to preserve evidence after plaintiff's indictment), 169 (failing to review evidence).

In sum, DA Korchak and Chief ADA Loughran are shielded from liability for their involvement in plaintiff's prosecution following his arrest, but not for their investigative conduct prior to plaintiff's arrest.

### b. ADA Cronin

Like DA Korchak and Chief ADA Loughran, ADA Cronin argues that she is entitled to absolute prosecutorial immunity from plaintiff's claims because plaintiff has not plausibly alleged that she "worked outside of her prosecutorial function."  Cronin Opp. at 9.  In opposition, plaintiff maintains that ADA Cronin "is alleged to have directly participated in the investigation and grand jury presentation that intentionally suppressed exculpatory evidence and knowingly authorized [plaintiff]'s arrest and indictment without probable cause."  Pl.'s Second Opp. at 14.

"Among the acts for which a prosecutor is absolutely immune is the initiation of a prosecution."  *Schloss v. Bouse*, 876 F.2d 287, 289 (2d Cir. 1989) (citing *Imbler*, 424 U.S. at 430)).  A prosecutor also "enjoys absolute immunity for failure to disclose exculpatory evidence, because deciding what disclosure to make is part of a prosecutor's role as advocate, and constitutes a core prosecutorial function."  *Schnitter v. City of Rochester*, 556 F. App'x 5, 7 (2d Cir. 2014) (summary order) (citing *Warney v. Monroe County,* 587 F.3d 113, 125 (2d Cir.2009)).

Consequently, a prosecutor is protected by absolute immunity for withholding exculpatory evidence from a grand jury.[6]  *See Hill*, 45 F.3d 653 (holding absolute immunity existed for assistant district attorney's decision to initiate prosecution and withhold alleged *Brady* material); *Drake v. City of Rochester*, 408 N.Y.S.2d 847, 857 (N.Y. Sup. Ct. 1978) ("[A] district attorney alleged to have withheld exculpatory evidence from a Grand Jury, given improper advice to a Grand Jury, suppressed and concealed evidence and conspired with others to obtain a Grand Jury indictment, permitted the presentation of false and misleading testimony

---

[6] A prosecutor has no duty to present exculpatory evidence to a grand jury, either. *See United States v. Williams*, 504 U.S. 36, 37 (1992) ("Because it has always been thought sufficient for the grand jury to hear only the prosecutor's side, and, consequently that the suspect has no right to present, and the grand jury no obligation to consider, exculpatory evidence, it would be incompatible with the traditional system to impose upon the prosecutor a legal obligation to present such evidence.").

to a Grand Jury, and took no action to correct the same was immune from liability."), *aff'd*, 74

A.D.2d 996 (N.Y. App. Div. 4th Dep't 1980).

According to plaintiff, at some point prior to his arrest, ADA Cronin was hired by the

BCDA and assigned to work with ADA Congdon on his case.  Compl. ¶ 133.  He alleges that

ADA Cronin, (1) assisted ADA Congdon in presenting the criminal case against him to the grand

jury, *id.* ¶ 155; (2) failed to recognize the exculpatory nature of certain information, *id.* ¶ 149; (3)

withheld exculpatory evidence from him and the grand jury, *id.* ¶¶ 154, 161(d), 176; (4) failed to

preserve, obtain, or review all available exculpatory evidence, like the complainants' cell phone

data, *id.* ¶¶ 160, 162, 169; and (5) did not intervene and correct ADA Congdon's mistakes of

law, *id.* ¶ 152.

In sum, plaintiff alleges that ADA Cronin, together with others, initiated the prosecution

against him, and failed to identify and disclose certain exculpatory evidence.  Both categories of

allegations concern "advocacy" functions "intimately associated with the judicial phase of the

criminal process" to which absolute immunity attaches.  *Imbler*, 424 U.S. at 430.

There is, however, a limited exception to this rule.  "A prosecutor engaging in

'prosecutorial activities intimately associated with the judicial phase of the criminal process'

loses 'the absolute immunity he would otherwise enjoy' only if he 'acts without any colorable

claim of authority.'"  *Shmueli*, 424 F.3d at 237 (quoting *Barr v. Abrams*, 810 F.2d 358, 361 (2d

Cir. 1987)).  Here, plaintiff makes no allegation that ADA Cronin lacked authority in prosecuting

plaintiff's case.  *See generally*, Compl.  Accordingly, ADA Cronin is entitled to absolute

prosecutorial immunity from plaintiff's Section 1983 and related state law claims, and is

dismissed as a defendant to this action.

### c. ADA Congdon

Finally, ADA Congdon argues that the complaint "is devoid of any allegation that [she] acted outside her role as an advocate of the State." Congdon Mem. at 10–11.[7] Plaintiff responds that ADA Congdon is not entitled to absolute prosecutorial immunity because she "personally participated in investigative decision-making alongside law enforcement, including involvement in strategy meetings that resulted in the decision to arrest [p]laintiff without probable cause." Pl.'s Opp. at 24.

At the outset, plaintiff makes no allegation that ADA Congdon acted without jurisdiction *during* his prosecution. *See generally*, Compl. Thus, she is protected by absolute immunity for any actions taken as an advocate during the course of the prosecution. However, the allegations in the complaint also indicate that ADA Congdon was heavily involved in the pre-arrest investigation. Compl. ¶¶ 109–112, 121–24, 126, 128–131, 132, 134, 137.

Generally speaking, "where the prosecutor advises the police [*Burns v. Reed,* 500 U.S. 478, 493–495 (1991)] or performs investigative work in order to decide whether a suspect should be arrested [*Buckley,* 509 U.S. at 273–275], the prosecutor is not entitled to absolute immunity." *Kirchner*, 107 A.D.3d at 1623.

The complaint alleges that, as early as December 8, 2021, ADA Congdon was assigned to plaintiff's investigation. Compl. ¶ 112. The BCDA and BPD "worked closely during the investigatory period prior to the decision to charge [p]laintiff," *id.* ¶ 126, but it was ADA

---

[7] According to ADA Congdon, "plaintiff's main complaint is that [she] was an inept prosecutor," Congdon Mem. at 11 (citing Compl. ¶¶ 109–113, 121–137, 149–160, 168), and, by framing his complaint this way, "plaintiff concedes that [ADA Congdon]'s complained-of conduct is prosecutorial in nature and, as such, is therefore shielded by absolute prosecutorial immunity." Congdon Mem. at 11. The Supreme Court has explicitly rejected this circular argument, repeatedly holding that "the actions of a prosecutor are not absolutely immune merely because they are performed by a prosecutor." *Buckley*, 509 U.S. at 273 (citing *Imbler*, 424 U.S. at 430–31).

Congdon who allegedly held "the ultimate decision-making authority over the investigation," *id.* ¶ 131.

Plaintiff also alleges that, on December 14, 2021, ADA Congdon and others met separately with the complainants and tried, unsuccessfully, to obtain the complainants' consent to extraction of their electronic data. Compl. ¶ 115. The complainants denied consent to the extraction again in January 2022. *Id.* ¶ 124. On January 14, 2022, the complainants' attorney, Saitta, e-mailed ADA Congdon and "informed her that he had a folder containing printouts of electronic data" from the complainants' phones. *Id.* ¶ 121. Plaintiff alleges that ADA Congdon instructed BCDA Investigator Jeff Wagner to retrieve the file, but he never did. *Id.* ¶¶ 122–23. According to plaintiff, ADA Congdon also assisted Investigator Miller in trying to draft a search warrant for plaintiff's DNA. *Id.* ¶ 126.

Further, "[o]n or about February 22, 2022," ADA Congdon allegedly "met . . . and decided with BPD to file criminal charges against [plaintiff]." Compl. ¶ 137. Plaintiff alleges that between December 2021 and plaintiff's arrest, ADA Congdon met multiple times with BPD officers and other employees of the BCDA to discuss the allegations against plaintiff and the ongoing investigation. *Id.* ¶¶ 110, 115, 126, 129.

Absolute immunity does not attach to these alleged acts. "The pre-litigation function that a prosecutor performs has at least two aspects: (1) the supervision of and interaction with law enforcement agencies in *acquiring* evidence which might be used in a prosecution, and (2) the *organization, evaluation, and marshalling* of this evidence into a form that will enable the prosecutor to try a case or to seek a warrant, indictment, or order." *Barbera*, 836 F.2d at 100 (emphasis in original).

ADA Congdon argues that her pre-litigation conduct falls within the latter category, characterizing it as an "evaluation of the evidence against plaintiff" and "plainly the type of protected conduct . . . engaged in as an officer of the court . . . which, accordingly, falls under the protections of absolute prosecutorial immunity."  Congdon Mem. at 11.

However, as the Supreme Court made clear in *Buckley*:

> a prosecutor may not shield his investigative work with the aegis of absolute immunity merely because, after a suspect is eventually arrested, indicted, and tried, that work may be retrospectively described as "preparation" for a possible trial; every prosecutor might then shield himself from liability for any constitutional wrong against innocent citizens by ensuring that they go to trial.

509 U.S. at 276; *see also Claude H*, 214 A.D.2d at 965 (holding that prosecutor acted "in an investigative, law-enforcement role when he directed the police to arrest plaintiff").

At this stage, plaintiff has plausibly alleged that ADA Congdon engaged in investigative activities when she worked with BPD throughout the investigation, assisted with evidence-gathering, and directed police to arrest plaintiff.  Compl. ¶¶ 110–12, 115, 121–22, 124, 126, 134, 137.

Plaintiff also alleges that, at trial, complainant Herceg testified that ADA Congdon allegedly instructed her "to destroy electronic data relating to the night in question," Compl. ¶ 71, and "to delete her social media accounts," *id.* ¶ 116.

Notably, the complaint does not indicate when this instruction allegedly occurred.  ADA Congdon, for her part, argues that "[a] liberal reading of the complaint makes clear . . . that this allegedly occurred later[,] during a meeting between defendant and defendant Herceg in preparation for the ultimate trial that occurred."  Congdon Mem. at 17.  However, plaintiff contends that ADA Congdon told Herceg to delete electronic data relating to the night of the alleged assault *before* his arrest and indictment, citing text messages from December where the

complainants discussed deleting photos and social media accounts.  Pl.'s First Opp. at 30 (citing Compl. ¶73(j)).

At this early stage, taking every reasonable inference in plaintiff's favor, the complaint plausibly alleges that this conduct was pre-litigation investigative conduct.  Plaintiff's argument is bolstered by his allegation that Herceg obtained a new phone in March 2022.  Compl. ¶ 174. Because plaintiff was indicted at the end of March, it could be reasonably inferred that Herceg followed ADA Congdon's alleged instruction to destroy electronic data relating to the night of the alleged assault sometime prior to his indictment.  *Id.*

In sum, plaintiff has plausibly alleged that ADA Congdon engaged in investigative conduct for which she is not entitled to absolute immunity.

Although ADA Congdon argues that she is entitled to qualified immunity for any alleged investigative conduct, Congdon Mem. at 17–20, "the better approach to resolving cases in which the defense of qualified immunity is raised is to determine first whether the plaintiff has alleged a deprivation of a constitutional right at all."  *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 842 n.5 (1998).

## B.  Section 1983 Claims

Plaintiff asserts Section 1983 claims for false arrest, malicious prosecution, denial of the right to a fair trial, failure to intervene, civil conspiracy, and supervisory liability against the individual BPD and BCDA defendants.  He also brings those claims against the City under a theory of municipal liability pursuant to *Monell v. Dept. of Soc. Services of City of N.Y.,* 436 U.S. 658 (1978).  Compl. ¶¶ 195–245.  All have moved to dismiss the § 1983 claims asserted against them.

**1. Personal Involvement**

Because "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983," *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir. 1991), the Court addresses it first.

Chief Zikuski, Captain Minor, Investigator Miller, DA Korchak, and Chief ADA Loughran argue that plaintiff has not plausibly alleged their personal involvement in any constitutional violations.  BPD Mem. at 20–26; Korchak & Loughran Mem. at 21–23.  Plaintiff disagrees, arguing that he has plausibly alleged each defendant's personal involvement in his unlawful arrest and prosecution.  Pl.'s First Opp. at 20–23; Pl.'s Second Opp. at 21.

"It is well settled that, in order to establish a defendant's individual liability in a suit brought under § 1983, a plaintiff must show, *inter alia,* the defendant's personal involvement in the alleged constitutional deprivation."  *Grullon v. City of New Haven*, 720 F.3d 133, 138 (2d Cir. 2013).  The same applies to supervisory officials.  *Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020) ("[T]here is no special rule for supervisory liability.  Instead, a plaintiff must plead and prove 'that each Government-official defendant, through the official's own individual actions, has violated the Constitution.'" (quoting *Iqbal*, 556 U.S. at 676)).

**a. Investigator Miller**

Investigator Miller has moved to dismiss plaintiff's claims against her, arguing, in part, that plaintiff has not alleged that "any specific BPD [d]efendant arrested or decided to arrest Plaintiff, charged or decided to charge Plaintiff, fabricated evidence that led to Plaintiff's arrest or prosecution, participated in Plaintiff's prosecution, or withheld any specific exculpatory evidence."  BPD Mem. at 21–22.  In opposition, plaintiff contends that he plausibly alleged that Investigator Miller "was a key player in depriving [plaintiff] of his constitutional rights," further

noting that Investigator Miller's personal involvement "is pleaded at nauseum in [plaintiff]'s complaint."  Pl.'s Opp. at 22.  The Court agrees.

Upon review of the pleading, plaintiff has sufficiently alleged that Investigator Miller was personally involved in the allegedly violative conduct.  Specifically, plaintiff alleges that Investigator Miller interviewed the complainants, Compl. ¶¶ 76, 115; collected evidence, *id.* ¶¶ 77, 83; executed a search warrant at plaintiff's office, *id.* ¶ 85; discussed the investigation at meetings with members of the BCDA, *id.* ¶¶ 110–11; assisted ADA Congdon in attempting to obtain a DNA sample from plaintiff, *id.* ¶ 126; neglected to retrieve, obtain, or otherwise preserve other evidence, *id.* ¶ 78; and failed to document exculpatory statements, *id.* ¶¶ 87, 73(w).  Accordingly, Investigator Miller's motion to dismiss is denied on this ground.

### b.  Supervisory defendants

Plaintiff's complaint asserts "supervisory liability" as an independent cause of action against DA Korchak, Chief ADA Loughran, BPD Chief Zikuski, and BPD Captain Minor.  Compl. ¶¶ 222–29.  Specifically, he alleges that, "[d]efendant supervisors were reckless in their failure to supervise [d]efendants, and either knew or should have known that [d]efendants were falsely arresting and maliciously prosecuting [plaintiff], failing to investigate exculpatory evidence, fabricating and coercing [the] complainants' testimony, suppressing and destroying exculpatory evidence, and depriving [plaintiff] of due process of law."  *Id.* ¶ 225.

Defendants argue this claim must be dismissed because there is no longer a special rule for supervisory liability in the Second Circuit, and plaintiff has not otherwise alleged that they were personally involved in any alleged constitutional violations.  BPD Mem. at 20–26; Korchak & Loughran Mem. at 21–23.  In opposition, plaintiff maintains that he has plausibly alleged their personal involvement in the alleged violations.  Pl.'s First Opp. at 44; Pl.'s Second Opp. at 33.

Defendants are correct that, after the Second Circuit's decision in *Tangreti*, there is no longer a special rule for supervisory liability. *Tangreti,* 983 F.3d at 618 ("[t]here is no special rule for supervisory liability").  "Instead, a plaintiff must plead . . . 'that each Government-official defendant, through the official's own individual actions, has violated the Constitution.'" *Id.* (quoting *Iqbal*, 556 U.S. at 676).  "Such pleadings may not depend on a theory of supervisory liability, because 'government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior*.'" *McCluskey v. Roberts*, 2022 WL 2046079, at *3 (2d Cir. June 7, 2022) (quoting *Tangreti* 983 F.3d at 616)).  Accordingly, plaintiff's standalone cause of action for "supervisory liability" must be dismissed.

Defendants argue that plaintiff has not met his burden under *Tangreti* as to any of the alleged constitutional violations, warranting dismissal of plaintiff's remaining Section 1983 claims against them.  BPD Mem. at 38; Korchak & Loughran Mem. at 21–23.  Plaintiff maintains, however, that his allegations sufficiently establish each violation against each defendant.  Pl.'s First Opp. 20–23; Pl.'s Second Opp. at 21.

As noted above, "a defendant in a § 1983 action may not be held liable for damages for constitutional violations merely because he held a high position of authority."  *Black v. Coughlin*, 76 F.3d 72, 74 (2d Cir. 1996).  Instead, "the focus is on what the *supervisor* did or caused to be done, 'the resulting injury attributable to his conduct, and the *mens rea* required of him to be held liable, which can be no less than the *mens rea* required of anyone else.'" *Tangreti*, 983 F.3d at 618 (quoting *Porro v. Barnes*, 624 F.3d 1322, 1327-28 (10th Cir. 2010) (Gorsuch, J.)) (emphasis in original).

Personal involvement of a supervisor may be established by direct participation in a constitutional violation or "by showing that he created a policy or custom under which the

violation occurred." *Taranto v. Putnam Cnty.*, 2023 WL 6318280, at *14 (S.D.N.Y. Sept. 28, 2023) (internal quotation omitted); *see also Goodall v. N.Y. State Dep't of Corr. & Cmty. Supervision*, 725 F. Supp. 3d 248, 268 (N.D.N.Y. 2024) ("A supervisor can only be held liable 'if that supervisor participates directly in the alleged constitutional violation or if that supervisor creates a policy or custom under which unconstitutional practices occurred.'") (quoting *Tangreti*, 983 F.3d at 617 n.4)).  However, "conclusory allegations that a defendant was involved in the creation and enforcement of unconstitutional policies cannot sustain a claim of personal involvement." *Id.*

### i. Chief Zikuski & Captain Minor

According to defendants, "[w]ith respect to Captain Minor and Chief Zikuski, the Complaint barely mentions them and contains no allegations that they individually engaged in unconstitutional conduct."  BPD Mem. at 24.  Plaintiff disagrees, arguing that he has adequately pleaded Chief Zikuski's and Captain Minor's personal involvement.  Pl.'s Opp. at 21–22.

The complaint offers three particular allegations against these defendants.  First, on December 6, 2021, Captain Minor and Investigator Miller executed a search warrant at plaintiff's office, but did not recover any evidence.  Compl. ¶ 85.  Second, on December 8, 2021, Captain Minor and Investigator Miller attended a meeting with members of the BCDA, where they discussed the investigation and allegedly considered "subpoenaing [the complainants'] phones." *Id.* ¶¶ 109–11.  Third, Chief Zikuski allegedly informed plaintiff's attorney that he opposed filing criminal charges against plaintiff in connection with the complainants' allegations on December 9, 2021.  *Id.* ¶ 96.

Beyond these, the Court finds plaintiff's remaining allegations against Chief Zikuski and Captain Minor speculative, conclusory, or based on their supervisory status, rather than their individual actions.  For example, plaintiff alleges that Captain Minor and Chief Zikuski (1) did

not review evidence in their possession, despite plaintiff's insistence that such evidence was exculpatory; and (2) failed to correct ADA Congdon's various mistakes of law.  Compl. ¶¶ 127–28, 169.  The complaint also fails to identify any particular custom or policy created by either Chief Zikuski or Captain Minor.  *Id.* ¶¶ 32, 34, 224, 231, 233.

Taking plaintiff's nonconclusory factual allegations as true, he has not plausibly alleged that either Chief Zikuski or Captain Minor personally violated his constitutional rights, warranting dismissal of plaintiff's Section 1983 claims against them.

### ii.  DA Korchak & Chief ADA Loughran[8]

Of the BCDA defendants, only DA Korchak and Chief ADA Loughran seek dismissal of plaintiff's Section 1983 claims for lack of personal involvement.  *See* Korchak & Loughran Mem. at 21–23.  They argue that "[p]laintiff fails to plead facts which demonstrate that Korchak and Loughran, through their individual actions, violated Plaintiff's constitutional rights."  *Id.* at 21.  In opposition, plaintiff contends that Korchak and Loughran, "authorized baseless drug charges against him without probable cause and that they directly participated in, approved, or failed to intervene in the wrongful prosecution, thereby violating [plaintiff]'s Fourth and Fourteenth Amendment rights under 42 U.S.C. § 1983."  Pl.'s Second Opp. at 33.

After *Tangreti*, a plaintiff must allege more than supervision alone to hold a supervisor individually liable under Section 1983.  *See Levine v. New York State Police*, 2022 WL 1987845 (N.D.N.Y. June 6, 2022) (dismissing Section 1983 claims against a supervisor defendant because plaintiff's "conclusory allegation that [the supervisor] approved or authorized all arrests is insufficient."); *Thomas v. Town of Lloyd*, 2022 WL 1747650, at *3 (N.D.N.Y. May 31, 2022) (acknowledging that "a supervisor cannot be held liable under § 1983 for his supervision alone");

---

[8] Plaintiff only asserts § 1983 claims for failure to intervene, supervisory liability, and civil rights conspiracy against Chief ADA Loughran.  Compl. ¶¶ 211–229.

*Myers on behalf of Est. of Myers v. Davenport*, 2022 WL 3017367, at *4 (N.D.N.Y. July 29, 2022) ("Liability based solely on the actions of a subordinate under the watch of a superior, or solely due to a failure to supervise, without more, constitutes precisely the type of vicarious, *respondeat superior* liability that *Iqbal* and *Tangreti* eliminate." (citing *Iqbal*, 566 U.S. at 676)).

Upon review, plaintiff's allegations against DA Korchak and Chief ADA Loughran amount to little more than mere supervision.  For instance, plaintiff alleges that, on December 8, 2021, either "Korchak or . . . Loughran asked . . . [ADA] Congdon to attend a meeting with members of BPD regarding [the complainants'] sexual assault allegations."  Compl. ¶ 109.  DA Korchak and Chief ADA Loughran also allegedly attended the meeting, where they discussed the investigation with BPD officers and considered future investigative action.  *Id.* 110–11.  After this initial meeting, "Korchak and/or . . . Loughran assigned . . . Congdon to the investigation" and "ceded ultimate decision-making authority over the investigation to . . . Congdon."  *Id.*  ¶¶ 112, 131.

Plaintiff also avers that, on December 10, 2021, DA Korchak "issued a video statement to Facebook and other channels . . . assert[ing] that his office received 'numerous' emails and phone calls regarding 'several incidents that occurred recently' in Broome County."  Compl. ¶ 99.  Korchak also "encouraged those with knowledge to contact the [BCDA] or local police departments."  *Id.*  Between December 8, 2021, and February 22, 2022, Korchak and Loughran, met with ADA Congdon "multiple times to discuss the investigation."  Compl. ¶ 129.  Plaintiff further alleges that Korchak and Loughran failed to correct ADA Congdon's various mistakes of law throughout the investigation and prosecution.  *Id.*  ¶¶ 127–28.

In other words, the core of plaintiff's complaint against DA Korchak and Chief ADA Loughran is that they assigned ADA Congdon to plaintiff's case despite knowing that she "lacked the necessary prosecutorial experience, knowledge, and training to handle a serious

felony investigation."  Compl. ¶ 131.  Without more, these allegations fall far short of establishing a direct violation of any of plaintiff's constitutional rights.  Accordingly, plaintiff's Section 1983 claims are dismissed as to DA Korchak and ADA Loughran.

### c.  Doe defendants

Plaintiff names two sets of Doe defendants: unidentified City of Binghamton employees Jane/John Does #1-10 and unidentified Broome County employees Jane/John Does #1–10. Compl. ¶¶ 22, 31.  However, the Court addresses only the BPD Doe defendants at this time.  *See supra* Point I at 3 n. 3.  The BPD defendants argue that plaintiff's claims fail as to the BPD Doe defendants because plaintiff's "allegations are insufficient to establish the Doe Defendants' personal involvement for purposes of Plaintiff's federal claims."  Dkt. No. 88 ("BPD Reply") at 10 n. 3.  Plaintiff does not make explicit reference to the Doe defendants in either of his opposition briefings, but he maintains that the "complaint provides sufficiently specific factual allegations notwithstanding his occasional reference to defendants in groups."  Pl.'s First Opp. at 20.

"[W]here, as in this case, [plaintiff] is suing 'John Doe' defendants, the pleading must nevertheless contain plausible allegations of wrongdoing by such defendants, even if their actual names are presently unknown.'"  *James v. Monroe Cnty.*, 2022 WL 17155831, at *7 (W.D.N.Y. Nov. 22, 2022) (citing *Antonetti v. City of N.Y.,* 2022 WL 1105172, at *3 (E.D.N.Y. Apr. 13, 2022)).  "The absence of allegations against them and lack of personal involvement is fatal to his claims against the John Does."  *Azaryev v. City of N.Y.,* 2021 WL 3861722, at *4 (E.D.N.Y. Aug. 27, 2021); *see also Johnson v. N.Y.,* 2019 WL 13563241, at *3 (E.D.N.Y. Nov. 20, 2019) ("While John Does 1-10 appear to be the officers who effected [plaintiff]'s arrest, [plaintiff] does not identify these officers' supervising agency or provide any detail about the officers' particular

roles in his arrest.  Because [plaintiff] fails to state any facts that might constitute 'a claim to relief that is plausible on its face' against these John Doe defendants, his § 1983 claim against them must be dismissed." (quoting *Twombly*, 550 U.S. at 570)).

As the BPD defendants point out, *see* BPD Mem. at 22, several of plaintiff's allegations regarding BPD officers are not attributed to any of the named BPD defendants, but rather to "BPD" generally.  Compl. ¶¶ 70, 86–87, 90–91, 98, 109(g), 114, 123, 132, 134, 137–38, 141, 159, 162, 167.  In opposition, plaintiff argues that his claims are plausibly alleged "notwithstanding his occasional reference to defendants in groups."  Pl.'s Opp. at 20.

Specifically, plaintiff alleges that BPD officers "obtained footage from security cameras," which was never shown to the complainants.  Compl. ¶¶ 86, 90–91.  Plaintiff also alleges that "no one from BPD . . . took any steps to obtain or preserve . . . [the complainant's] electronic data."  *Id.* ¶ 114.  Further, according to plaintiff, ADA Congdon allegedly "met with BPD . . . and decided with BPD to file criminal charges against [plaintiff]."  *Id.* ¶ 137.  Plaintiff claims it was BPD "notified [plaintiff]'s attorney that [plaintiff] would have to appear to be arrested, charged and arraigned," and that plaintiff was ultimately arrested by "members of BPD" on or around February 22, 2022.  *Id.* ¶ 138, 134.

Collectively and taken as true, plaintiff has certainly alleged that other unknown BPD officers were involved in his investigation and arrest, but he has not plausibly alleged that any individual Doe defendant personally violated his constitutional rights, as is required after the Second Circuit's decision in *Tangreti*.  Accordingly, the BPD Doe defendants are dismissed.

## 2. False Arrest

The Court begins its assessment of the merits of plaintiff's Section 1983 claims with plaintiff's "First Cause of Action," which is characterized as a claim for "Malicious Prosecution and False Arrest." Compl. at ¶¶ 195–200.

"Although they often accompany one another, false arrest and malicious prosecution are distinct causes of action." *Spearman v. Dutchess Cnty.*, 2008 WL 2945991, at *3 (N.D.N.Y. July 25, 2008) (citing *Heck v. Humphrey,* 512 U.S. 477 (1994)). Accordingly, the Court will address them separately, beginning with false arrest.

The remaining defendants to plaintiff's Section 1983 false arrest claim are Investigator Miller and ADA Congdon. Both have moved to dismiss. BPD Mem. at 26–28; Congdon Mem. at 20–22. Investigator Miller argues that plaintiff has not alleged that she arrested plaintiff, BPD Mem. at 26–27, and plaintiff's allegations do not rebut the presumption of probable cause established by his indictment, *id.* at 26–28. ADA Congdon argues that defendants had probable cause at the time of plaintiff's arrest, thereby defeating his false arrest claim as a matter of law. Congdon Mem. at 21–22.

In opposition, plaintiff contends that he has plausibly alleged that (1) ADA Congdon directed Investigator Miller to file the initial charges against him without probable cause, Pl.'s First Opp. at 27; (2) his allegations rebut the presumption of probable cause established by his indictment, *id.* at 31–32; and (3) "there was much evidence to doubt Demkovich and Herceg's credibility and reliability to undercut probable cause," *id.* at 32.

"A § 1983 claim for false arrest, resting on the Fourth Amendment right of an individual to be free from unreasonable seizures, including arrest without probable cause . . . is substantially

the same as a claim for false arrest under New York law." *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996) (citing *Lennon v. Miller,* 66 F.3d 416, 423 (2d Cir. 1995)).

"Under New York law, the elements of a false arrest . . . claim are: '(1) the defendant intended to confine the plaintiff, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged.'" *Hernandez v. United States*, 939 F.3d 191, 199 (2d Cir. 2019) (quoting *McGowan v. United States*, 825 F.3d 118, 126 (2d Cir. 2016)).

### a. Intent to Confine

Investigator Miller argues that plaintiff has not plausibly alleged the first element (*i.e.*, an intent to confine) as to her, because plaintiff does not contend that she, specifically, arrested him. BPD Mem. at 26–27; *see also* Compl. ¶ 134 ("The arrest was effectuated and processed by *members of BPD*.") (emphasis added).  Plaintiff does not address this argument specifically, but argues generally that, "[t]he Complaint squarely alleges that Det. Miller signed two felony complaints and '[o]n February 22, 2022, BPD notified Rindgen's attorney that he would have to appear to be arrested, charged and arraigned.'"  Pl.'s First Opp. at 33 (quoting Compl. ¶ 138).

"[A] defendant who is not an arresting officer may be liable for false arrest if the defendant instigated an arrest[.] "  *Lopez v. City of N.Y.*, 901 F. Supp. 684, 688 (S.D.N.Y. 1995) (citing *Rosario v. Amalgamated Ladies Garment, Etc.*, 605 F.2d 1228, 1248 (2d Cir.1979)), *cert. denied*, 446 U.S. 919 (1980)).  However, "a police officer can only be liable for a false arrest that occurs outside of his presence if he 'had reason to know' that such a false arrest was likely to occur." *Escalera v. Lunn*, 361 F.3d 737, 748 n.4 (2d Cir. 2004) (citing *Anderson v. Branen,* 17 F.3d 552, 557 (2d Cir.1994)).

Plaintiff alleges that Investigator Miller was the BPD officer assigned to investigate the sexual assault allegations against plaintiff.  Compl. ¶ 75.  According to the complaint, BPD and the BCDA "worked closely during the investigatory period prior to the decision to charge [p]laintiff."  *Id.* ¶ 126.  Plaintiff alleges various instances where Investigator Miller worked directly with ADA Congdon on the investigation.  *Id.* at 109–111, 115, 126.  Ultimately, ADA Congdon "decided with BPD to file criminal charges against [p]laintiff."  *Id.* ¶ 137.

Taken together, these allegations do not permit an inference that Investigator Miller personally instigated plaintiff's arrest.  Whether plaintiff has plausibly alleged that Investigator Miller 'had reason to know' plaintiff's false arrest was likely to occur will depend on whether plaintiff has plausibly alleged that Miller was aware that the arresting officers lacked probable cause to arrest.

### b.  Probable Cause

The next "question for [the Court] to consider is whether [plaintiff]'s arrest was 'privileged,' or 'justified.'"  *Savino v. City of N.Y.*, 331 F.3d 63, 76 (2d Cir. 2003).  "The existence of probable cause to arrest constitutes justification and 'is a complete defense to an action for false arrest.'"  *Weyant*, 101 F.3d at 852 (quoting *Bernard v. United States,* 25 F.3d 98, 102 (2d Cir. 1994)).

For purposes of a false arrest claim, "[p]robable cause exists when an officer has 'knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested.'"  *Savino*, 331 F.3d at 76 (quoting *Martinez v. Simonetti,* 202 F.3d 625, 634 (2d Cir. 2000)).  "[T]he probable cause inquiry is based upon whether the facts known by the arresting officer at the time of the arrest objectively provided probable cause to arrest."  *Jaegly v. Couch*, 439 F.3d 149, 153

(2d Cir. 2006) (quoting *Devenpeck v. Alford,* 543 U.S. 146, 153 (2004)).  As relevant here, "[w]hen information is received from a putative victim or an eyewitness, probable cause exists, [*Martinez*, 202 F.3d at 634]*,* unless the circumstances raise doubt as to the person's veracity." *Curley v. Vill. of Suffern*, 268 F.3d 65, 70 (2d Cir. 2001) (citing *Singer v. Fulton County Sheriff,* 63 F.3d 110, 119 (2d Cir. 1995)).

The complaint alleges that plaintiff was arrested and charged with "Criminal Sale of a Controlled Substance in the Third Degree . . . and Criminal Sale of a Controlled Substance in the Fifth Degree . . ."  Compl. ¶ 140.  Defendants point to several allegations in support of their contention that there was "ample, constitutionally adequate probable cause" to arrest plaintiff. Congdon Mem. at 21–22.[9]  These include that the complainants (1) filed a police report, Compl. ¶¶ 68, 74; (2) offered sworn testimony in support of their allegations, *id.* ¶¶ 71, 90; and (3) provided evidence corroborating that they were with plaintiff, Leor, and Rindgen on the night of the alleged assault, *id.* ¶ 72.  As defendants point out, plaintiff also admits that "[he] and [the complainants] did cocaine together."  *Id.*  ¶ 57.  Taken as true, the facts alleged demonstrate that defendants had probable cause to arrest plaintiff.

In opposition, plaintiff first argues that defendants lacked probable cause to arrest him because they possessed exculpatory evidence prior to his arrest including: (1) Demkovich's alleged statement to Investigator Miller that Demkovich "was questioning whether she was, in

---

[9] Investigator Miller also argues, albeit erroneously, that plaintiff's false arrest claim fails because he has not pleaded sufficient facts to rebut the presumption of probable cause that arose from his grand jury indictment.  BPD Mem. at 28.  "Because liability for . . . false arrest . . . under New York law give[s] rise to liability under 42 U.S.C. § 1983 . . . [courts] look to New York law to determine whether a presumption of probable cause arising from a grand jury indictment can be a defense to these claims." *McClellan v. Smith*, 439 F.3d 137, 145 (2d Cir. 2006) (internal citation omitted).

It cannot.  "[T]he New York Court of Appeals has expressly held that the presumption of probable cause arising from an indictment 'applies only in causes of action for malicious prosecution and is totally misplaced when applied in false [arrest] actions.'"  *Savino*, 331 F.3d at 75 (quoting *Broughton v. State*, 335 N.E.2d 310, 313 (N.Y. 1975).  In any event, the facts alleged establish that defendants had probable cause to arrest plaintiff.

fact, raped, or if the physical or sexual contact was consensual," Compl. ¶ 75; and (2) surveillance footage that depicted "Herceg and Demkovich cognizant, in control of their actions, initiating and engaging in consensual sexual contact – kissing and touching – with each other and with [plaintiff], Yaron Kweller, and Leor Kweller," *id.* ¶ 84. However, because both Demkovich's alleged statement and the surveillance footage concern whether the alleged sexual assault was a consensual sexual encounter, neither vitiate probable cause to arrest plaintiff for the possession and sale of drugs.

Next, plaintiff contends that "[n]either BPD nor BCDA[ ] questioned Demkovich or Herceg about their prior and habitual drug use before arresting and prosecuting [plaintiff]." *Id.* ¶ 159. The remainder of plaintiff's allegations concern the alleged sexual assault, and defendants' investigation of the alleged sexual assault. Ordinarily, however, "[o]nce a police officer has a reasonable basis for believing there is probable cause, he is not required to explore and eliminate every theoretically plausible claim of innocence before making an arrest." *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 128 (2d Cir. 1997) (citing *Baker v. McCollan,* 443 U.S. 137, 145–46 (1979)).

Because plaintiff's allegations establish that defendants had probable cause to arrest him, and plaintiff has failed to plausibly allege any facts vitiating defendants' probable cause to arrest, his false arrest claim fails as a matter of law and must be dismissed.

### 3. Malicious Prosecution

Of the moving defendants, plaintiff's Section 1983 malicious prosecution claims remain only against ADA Congdon and Investigator Miller. Compl. ¶¶ 195–200. Both have moved to dismiss, arguing that (1) ADA Congdon is entitled to absolute prosecutorial immunity for initiating a criminal proceeding; (2) plaintiff cannot establish that any BPD defendant initiated or

continued a proceeding against plaintiff on the facts alleged; (3) plaintiff has failed to rebut the presumption of probable cause established by his grand jury indictment; and (4) the complaint lacks any allegation of actual malice.  Congdon Mem. at 9–10, 22–24; BPD Mem. at 28–31.

In opposition, plaintiff argues that (1) ADA Congdon is not immune because she fabricated evidence while acting in an investigatory capacity prior to plaintiff's indictment; (2) he plausibly alleged that Investigator Miller initiated the prosecution against him; (3) the presumption of probable cause is rebutted by the dismissal of the facilitation and drug-related charges; (4) the presumption of probable cause as to the sexual assault-related charges is rebutted by plaintiff's allegations that defendants failed to obtain certain evidence and suppressed other exculpatory evidence from the grand jury; and (5) the Court may infer malice because plaintiff's allegations rebut the presumption of probable cause.  Pl.'s First Opp. at 32–39.

"To state a 42 U.S.C. § 1983 claim for malicious prosecution, a plaintiff must plead both 'a violation of his rights under the Fourth Amendment' and 'the elements of a malicious prosecution claim under state law.'"  *Dettelis v. Sharbaugh*, 919 F.3d 161, 163 (2d Cir. 2019) (quoting *Manganiello v. City of N.Y.*, 612 F.3d 149, 160–61 (2d Cir. 2010)).  "Under New York law, a malicious-prosecution claim requires a plaintiff to show '(1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for the defendant's actions.'"  *Dettelis*, 919 F.3d at 163–64 (quoting *Murphy v. Lynn*, 118 F.3d 938, 947 (2d Cir. 1997)).

### a.  Initiation

"The first element of a malicious prosecution cause of action, under state law or § 1983, is . . . 'that the defendant initiated a prosecution against the plaintiff.'"  *Rohman v. New York City*

*Transit Auth. (NYCTA)*, 215 F.3d 208, 217 (2d Cir. 2000) (quoting *Posr v. Court Officer Shield #*
*207*, 180 F.3d 409, 417 (2d Cir. 1999)).

Although both defendants challenge plaintiff's ability to establish the 'initiation' element
based on the facts alleged in the complaint, their arguments are premised on different theories.

Investigator Miller argues that plaintiff has not alleged that she, or any of the BPD
defendants, commenced or continued a criminal proceeding against plaintiff. BPD Mem. at 28–
30. In opposition, plaintiff contends that "defendant's argument must be rejected because . . .
[t]he Complaint squarely alleges that [Investigator] Miller signed two felony complaints.'" Pl.'s
First Opp. at 33. However, as Investigator Miller points out, "[t]he [c]omplaint makes no such
allegation." Dkt. No. 88 ("BPD Reply") at 11.

"To initiate a prosecution, a defendant must do more than report the crime or give
testimony. [S]he must 'play[ ] an active role in the prosecution, such as giving advice and
encouragement or importuning the authorities to act.'" *Manganiello*, 612 F.3d at 163 (quoting
*Rohman,* 215 F.3d at 217). "[P]olice officers can 'initiate' prosecution by filing charges or other
accusatory instruments." *Cameron v. City of N.Y.*, 598 F.3d 50, 63 (2d Cir. 2010). "This
element might be satisfied by, for example, showing that an officer generated witness statements
or was regularly in touch with the prosecutor regarding the case." *Bermudez v. City of N.Y.*, 790
F.3d 368, 377 (2d Cir. 2015) (citing *Manganiello* 612 F.3d at 163).

Plaintiff satisfies these requirements. He alleges that: (1) Investigator Miller was the
BPD officer assigned to investigate the complainants' allegations, Compl. ¶ 75; (2) Miller met
with members of the BCDA, including ADA Congdon, on December 8, 2021, to discuss the
investigation, *id.* ¶¶ 109–111; (3) Miller and members of the BCDA met with the complainants
on December 14, 2021, *id.* ¶ 115; (4) BPD worked closely with the BCDA throughout the

investigation and, at some point during the investigation, ADA Congdon and Investigator Miller

worked together on drafting a search warrant to obtain plaintiff's DNA, *id.* ¶ 126.

Collectively, plaintiff plausibly alleges that Investigator Miller was considerably involved

in plaintiff's investigation.  Specifically, Investigator Miller took statements from the

complainants, gathered evidence, and worked directly with ADA Congdon throughout the

investigation.

Further, allegations that a police officer "forwarded statements to a prosecutor without

sharing that the statements were suspect," can also satisfy the initiation requirement of a

malicious prosecution claim.  *Dufort,* 874 F.3d at 353 (citing *Manganiello*, 612 F.3d at 163).

Indeed, "New York law has long equated the civil defendant's failure to make a full and

complete statement of the facts to the District Attorney or the court . . . with that defendant's

initiation of a malicious prosecution."  *Ramos v. City of N.Y.*, 285 A.D.2d 284, 299–300 (N.Y.

App. Div. 1st Dep't 2001) (citing *Hopkinson v. Lehigh Val. R. Co.*, 164 N.E. 104 (N.Y. 1928));

*see also Bailey v. City of N.Y.*, 79 F. Supp. 3d 424, 449 (E.D.N.Y. 2015) (holding that a police

officer's "fail[ing] to make a complete and full statement of facts" to the prosecutor can

constitute initiation).

Plaintiff alleges that:

Demkovich told investigators from BPD that she was questioning whether
she was, in fact, raped, or if the physical or sexual contact was consensual.
This was not recorded by Defendant Miller or anyone else from BPD.

Compl. ¶ 87.

Investigator Miller argues that plaintiff has not plausibly alleged that Demkovich told *her*

that the sexual contact was consensual, or that she failed to document it.  BPD Mem. at 22.

The Court disagrees.  According to plaintiff, (1) his encounter with the complainants took

place in the early morning hours of November 27, 2021; (2) Demkovich texted her mother "I

told them [BPD] the next day I was questioning if what happened to me was actually rape . . .";

and (3) "[o]n November 28, 2021, Defendant Miller separately interviewed Defendant Herceg

and Defendant Demkovich."  Compl. ¶¶ 2, 73(w), 76.  From these facts, it can be inferred that

Demkovich told Investigator Miller, to whom she spoke *the next day*, that she was questioning

whether she had sufficiently denied consent.

Because plaintiff plausibly alleged that Investigator Miller met and worked with ADA

Congdon throughout the investigation, and that Investigator Miller failed to make a full and

complete statement of the facts, he has plausibly alleged the 'initiation' element of his malicious

prosecution claim against Investigator Miller.

ADA Congdon makes a different argument.  She contends that, as a prosecutor, she is

absolutely immune for the commencement and continuation of a criminal proceeding, thus

barring plaintiff's malicious prosecution claim against her.  Congdon Mem. at 9–10.  Plaintiff

argues in opposition that "[a]bsolute immunity does not protect prosecutors when they initiate

criminal proceedings without probable cause."  Pl.'s First Opp. at 27.

As discussed *supra*, ADA Congdon is entitled to absolute immunity for her prosecutorial

conduct: that is, any conduct undertaken as an advocate, in preparation for and during the

prosecution of the criminal case against plaintiff.  Therefore, the Court considers only whether

ADA Congdon's investigative conduct violated plaintiff's constitutional rights.  *See supra* Point

IV.A.3.c.  As for investigative conduct, plaintiff alleges that ADA Congdon (1) participated in

meetings; (2) worked closely with BPD; (3) met with the complainants; (4) instructed Herceg to

delete electronic data; and (5) directed BPD to arrest plaintiff.  Compl. ¶¶ 109–111, 115, 71, 137.

It is ordinarily "impossible to satisfy the 'initiation' element of a malicious prosecution

claim against the prosecutor[;] After all, 'a prosecutor unquestionably acts as an advocate—and

therefore receives absolute immunity—when she initiates and pursues a criminal prosecution.'"
*Harris v. v. Tioga Cnty.*, 663 F. Supp. 3d 212, 241 (N.D.N.Y. 2023) (quoting *D'Alessandro v.
City of N.Y.*, 713 F. App'x 1, 5 (2d Cir. 2017) (summary order)).

In fact, as ADA Congdon correctly notes, absolute prosecutorial immunity extends to
"the professional evaluation of the evidence assembled by the police and appropriate preparation
for its presentation at trial or before a grand jury after a decision to seek an indictment has been
made." *Buckley*, 509 U.S. at 273; Congdon Mem. at 9.

However, "[w]hen a prosecutor performs the investigative functions normally performed
by a detective or police officer, it is 'neither appropriate nor justifiable that, for the same act,
immunity should protect the one and not the other.'" *Buckley*, 509 U.S. at 273 (quoting
*Hampton v. Chicago,* 484 F.2d 602, 608 (7th Cir. 1973)).

In that regard, the shield of absolute prosecutorial immunity falls "[w]hen a prosecutor
performs the investigative functions normally performed by a detective or police officer[.]"
*Buckley*, 509 U.S. at 273. Thus, "the 'initiation' element of a malicious prosecution claim may
be satisfied if a defendant fabricates evidence that is material to the probable cause
determination." *Harris*, 663 F. Supp. 3d at 241 (citing *McDaniel v. City of N.Y.*, 585 F. Supp. 3d
503, 516–17 (S.D.N.Y. 2022) (collecting cases)). As relevant here, "government officials may
be held liable for fabricating evidence through false statements *or omissions*." *Morse v. Fusto*,
804 F.3d 538, 547 (2d Cir. 2015) (emphasis added).

Here, plaintiff alleges that ADA Congdon directed Herceg to delete electronic data prior
to plaintiff's arrest. Compl. ¶¶ 71, 79, 116. Herceg's text messages from the relevant period
undoubtedly undermine the veracity of her and Demkovich's allegations. Compl. ¶ 73. At this
stage, plaintiff has plausibly alleged that the omission of Herceg's text messages was material to

the probable cause determination.  Accordingly, plaintiff's allegations satisfy the initiation element as to ADA Congdon.

### b.  Probable Cause

Defendants also seek dismissal of plaintiff's malicious prosecution claim because he has failed to plausibly allege facts to rebut the presumption of probable cause supplied by his indictment.  BPD Mem. at 30–31; Congdon Mem. at 22–24.  In opposition, plaintiff maintains that the presumption of probable cause is rebutted by the dismissal of the facilitation and drug-related charges for insufficient evidence, Pl.'s First Opp. at 35–37; and the presumption of probable cause as to the sexual assault-related charges is rebutted by plaintiff's allegations that defendants failed to obtain certain evidence and suppressed other exculpatory evidence from the grand jury, *id.* at 37–38.

As with false arrest, "the existence of probable cause is a complete defense to a claim of malicious prosecution in New York."  *Savino v. City of N.Y.*, 331 F.3d 63, 72 (2d Cir. 2003) (citing *Colon v. City of N.Y.*, 455 N.E.2d 1248, 1250 (N.Y. 1983)).  "'Probable cause, in the context of malicious prosecution, has . . . been described as such facts and circumstances as would lead a reasonably prudent person to believe the plaintiff guilty.'"  *Kee v. City of N.Y.,* 12 F.4th 150, 166 (2d Cir. 2021) (quoting *Boyd v. City of N.Y.,* 336 F.3d 72, 76 (2d Cir. 2003)).

"[U]nder New York law, indictment by a grand jury creates a presumption of probable cause."  *Savino*, 331 F.3d at 72.  "[I]t is the plaintiff who bears the burden of proof in rebutting the presumption of probable cause that arises from the indictment."  *Id.* at 73.

Here, a presumption of probable cause was established when "[t]he Grand Jury returned an indictment as to [plaintiff], charging him with two counts of Criminal Sale of a Controlled Substance . . . Criminal Possession of a Controlled Substance in the Third Degree . . . two counts

of Criminal Facilitation in the Fourth Degree . . . Sexual Abuse in the First Degree . . . Criminal

Sexual Act in the First Degree . . . and Unlawfully Dealing With a Child in the First Degree . . . "

Compl. ¶ 156.

The presumption of probable cause established by an indictment "can only be overcome

by evidence that the indictment 'was the product of fraud, perjury, the suppression of evidence

by the police, or other police conduct undertaken in bad faith.'" *Bermudez v. City of N.Y.,* 790

F.3d 368, 377 (2d Cir. 2015) (quoting *Green v. Montgomery,* 219 F.3d 52, 60 (2d Cir. 2000)).

Plaintiff first argues that the presumption of probable cause is rebutted as to the

facilitation and drug-related charges because those charges were dismissed pursuant to Section

210.20(1)(b) of the New York Rules of Criminal Procedure. Pl.'s First Opp. at 35–36. Yet

"dismissals of . . . indictments due to legally insufficient evidence d[o] not vitiate the

presumption of probable cause created by the indictments." *Bertuglia v. Schaffler*, 672 F. App'x

96, 100 (2d Cir. 2016) (summary order), *cert. denied*, 583 U.S. 818 (2017); *Thompson v. Kline*,

504 F. Supp. 3d 200, 214 (W.D.N.Y. 2020) ("[T]he fact a court found the initial indictment

defective and dismissed it, without prejudice, for insufficient evidence is clearly not sufficient to

rebut probable cause. The dismissal on that ground does not rebut probable cause.").

Accordingly, plaintiff cannot rely on the dismissal of the facilitation and drug-related

charges to rebut the presumption of probable cause created by his indictment on those charges.

Plaintiff maintains that the presumption of probable cause has been rebutted as to all of

the charged offenses because defendants decided to file charges against him "without having

completed a basic investigation into the alleged offenses." Pl.'s First Opp. at 37.

Specifically, plaintiff contends that defendants (1) failed to conduct "forensic testing of

the . . . rape kits of Demkovich and Herceg" prior to filing charges; (2) never confronted the

complainants with allegedly exculpatory surveillance footage; (3) failed to inform the grand jury that "Demkovich had reported that she was questioning whether a rape had occurred"; (4) failed to review the complainants' communications relating to the alleged events prior to his indictment; and (5) suppressed exculpatory electronic data.  Pl.'s First Opp. at 37.

Defendants disagree, arguing that plaintiff has failed to meet his burden because he "failed to point to any facts establishing suppression of evidence or other bad faith conduct on the part of the BPD Defendants," BPD Reply at 11, and further that ADA Congdon's alleged failure to disclose exculpatory evidence to the grand jury did not taint his indictment, Congdon Mem. at 24.

Under New York law, a plaintiff cannot "rebut the presumption of probable cause with mere 'conjecture' and 'surmise' that his indictment was procured as a result of conduct undertaken by the defendants in bad faith." *Savino*, 331 F.3d at 73 (quoting *Bryant v. Maffucci,* 923 F.2d 979, 982 (2d Cir. 1991)).  "The rule in New York differs in this respect from that in some jurisdictions which permit the presumption to be overcome by any evidence tending to show the absence of probable cause." *Colon*, 455 N.E.2d at 1251.

First, plaintiff alleges that the grand jury was never informed of the "exculpatory DNA results that were learned after its indictment was returned." Compl. ¶ 154.  However, a prosecutor has no duty to present exculpatory evidence to a grand jury. *See Williams*, 504 U.S. at 37 ("[I]t has always been thought sufficient for the grand jury to hear only the prosecutor's side, and, consequently that the suspect has no right to present, and the grand jury no obligation to consider, exculpatory evidence.").   In any event, plaintiff concedes that defendants did not

possess the DNA results prior to his indictment.  Accordingly, it could not have been suppressed.[10]

Second, plaintiff alleges that the complainants were never confronted with allegedly exculpatory surveillance footage.  Plaintiff alleges that, on November 30, 2021, Yaron Kweller's attorney provided Investigator Miller footage from cameras inside the Colonial in the hours prior to the alleged assault.  Compl. ¶ 83.  According to plaintiff, "Herceg testified that she was never shown the footage from the Colonial that materially contradicted her and . . . Demkovich's account by either BPD or BCDA[.]"  *Id.* ¶ 90.  Crucially, however, plaintiff does not allege that Investigator Miller hid, lied about, or otherwise suppressed any surveillance footage from the prosecution.  *See generally id.* ¶¶ 83–91.  Plaintiff also does not allege that Investigator Miller fabricated or suppressed the surveillance footage to paint an incomplete picture of the facts in the hopes of securing an indictment.  Rather, plaintiff alleges only that Investigator Miller did not confront the *complainants* with the allegedly contradictory footage.  *Id.* ¶¶ 90–91.  Accordingly, this allegation is insufficient to rebut the presumption of probable cause.[11]

Third, plaintiff contends that Investigator Miller failed to document Demkovich's statement that she was questioning whether the alleged assault would be "classified" as consensual.  Compl. ¶ 87.  "In order for probable cause to dissipate, the groundless nature of the charges must be made apparent by the discovery of some intervening fact."  *Lowth v. Town of*

---

[10] Plaintiff also argues that defendants' failure to *conduct* DNA testing prior to the commencement of the proceeding somehow rebuts the presumption of probable cause.  However, even where "further avenues of investigation were open to the police . . . their failure to pursue the investigation is not the equivalent of fraud or the suppression of evidence."  *Colon*, 455 N.E.2d at 1251.

[11] Even had plaintiff alleged that Investigator Miller concealed the surveillance footage from the prosecution, surveillance footage depicting the complainants "cognizant, in control of their actions, initiating and engaging in consensual sexual contact," "smiling and appearing in good spirits throughout the evening," and "walking through the basement area of their own free will," Compl. ¶ 84, does not plausibly vitiate the existence of probable cause as to alleged offenses occurring later in the night and outside the view of surveillance cameras.

*Cheektowaga*, 82 F.3d 563, 571 (2d Cir. 1996), *as amended* (May 21, 1996).  Demkovich's

alleged expression of uncertainty did not render the charges against plaintiff "groundless,"

particularly in light of the other evidence Investigator Miller possessed.  Compl. ¶¶ 74, 77, 84,

86, 73(a)(a).

 Fourth, plaintiff alleges that defendants suppressed exculpatory text messages from the

grand jury.  The complainants provided text messages and photographs from the night of the

alleged sexual assault to Investigator Miller.  Compl. ¶¶ 76–77.  According to plaintiff, "[t]he

provided messages represented select, non-continuous accounts of the night in question and did

not provide a complete record of the relevant period."  *Id.* ¶ 78.  Notably, "[t]he excluded text

messages . . . included messages stating that the sexual contact between [the complainants] and

[plaintiff], Yaron Kweller, and/or Leor Kweller, had been consensual."  *Id.* ¶ 79.  Plaintiff has

not plausibly alleged that Investigator Miller was aware of, let alone intentionally suppressed,

any exculpatory text messages.  In fact, plaintiff explicitly alleges that the exculpatory messages

were not among those in Investigator Miller's possession.  Accordingly, these allegations do not

rebut the presumption of probable cause.

 Plaintiff's final allegation—that ADA Congdon instructed Herceg "to destroy electronic

data relating to the night in question . . . and that [Herceg] did in fact destroy that evidence,"

Compl. ¶ 71—warrants a different conclusion.  Because the deleted text messages raise serious

doubts as to the veracity of the complainants' allegations, *see id.* ¶ 73, and ADA Congdon

allegedly ordered their destruction while working in an investigative capacity, *see supra* Point

IV.A.3.c, this allegation plausibly rebuts the presumption of probable cause as to ADA Congdon.

But plaintiff has not alleged that Investigator Miller had any knowledge of ADA Congdon's

directive to Herceg.

Accordingly, he has rebutted the presumption of probable cause as to ADA Congdon only, and his malicious prosecution claim against Investigator Miller must be dismissed.

### c. Actual Malice

ADA Congdon also argues that plaintiff failed to allege actual malice, the final element of his malicious prosecution claim. Congdon Mem. at 24. Specifically, ADA Congdon contends that any allegations of malice against her are conclusory. Congdon Mem. at 24. In opposition, plaintiff responds that "the Court may reasonably infer malice," because his allegations "plausibly rebut the presumption of probable cause created by the grand jury indictments." Pl.'s First Opp. at 38.

Under New York law:

> The "actual malice" element of a malicious prosecution action does not require a plaintiff to prove that the defendant was motivated by spite or hatred . . . [r]ather, it means that the defendant must have commenced the prior criminal proceeding due to a wrong or improper motive, something other than a desire to see the ends of justice served.

*Id.* at 976. "A lack of probable cause generally creates an inference of malice." *Boyd*, 336 F.3d at 78 (*Ricciuti*, 124 F.3d at 131).

Plaintiff has plausibly alleged facts that rebut the presumption of probable cause as to ADA Congdon, thereby creating an inference of malice. *See supra* Point IV.B.3.b. Therefore, at this stage, plaintiff has stated a plausible Section 1983 malicious prosecution claim against ADA Congdon.

### 4. Fourteenth Amendment Due Process and Denial of the Right to a Fair Trial

Plaintiff's "Second Cause of Action" remains only as to ADA Congdon and Investigator Miller and is identified as "Fourteenth Amendment Deprivation of Liberty Without Due Process of Law and Denial of a Fair Trial by Fabricating Evidence, Withholding Material Exculpatory

and Impeachment Evidence, and Deliberately Failing to Conduct a Constitutionally Adequate Investigation."  Compl. at ¶¶ 201–210.

This claim is based, in part, on defendants' alleged failure to "conduct a constitutionally adequate investigation."  Yet, "[a]s Defendants correctly argue, 'there is no constitutional right to an adequate investigation.'"  *Buari v. City of N.Y.*, 530 F. Supp. 3d 356, 389 (S.D.N.Y. 2021) (quoting *Newton v. City of N.Y.*, 566 F. Supp. 2d 256, 278 (S.D.N.Y. 2008)); *see also Hicks v. Marchman*, 719 F. App'x 61, 64 (2d Cir. 2018) (summary order) (affirming district court's dismissal of plaintiff's fair trial claim where plaintiff "cite[d] no authority for the proposition that there is a stand-alone fair trial claim based on officers' failure to conduct an adequate investigation.").  Accordingly, plaintiff's fair trial claim based on defendants' "failure to investigate" must be dismissed.

The remainder of plaintiff's claim can reasonably be understood as a claim for denial of the right to a fair trial premised on two theories: (1) fabrication of evidence; and (2) withholding of exculpatory and impeachment evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963).  "A fair trial claim is a civil claim for violations of a criminal defendant's Fourteenth Amendment due process rights."  *Fappiano v. City of N.Y.*, 640 F. App'x 115, 118 (2d Cir. 2016) (summary order) (citing *Ramchair v. Conway,* 601 F.3d 66, 73 (2d Cir. 2010)).

Investigator Miller and ADA Congdon have moved to dismiss, both arguing that plaintiff has failed to state a claim under either theory.  BPD Mem. at 31–34; Congdon Mem. at 24–25. According to plaintiff, he has plausibly alleged that defendants fabricated evidence and failed to disclose exculpatory evidence in violation of their duties under *Brady v. Maryland*, 373 U.S. 83 (1963).

### a.   Fabrication of Evidence

"When a police officer creates false information likely to influence a jury's decision and forwards that information to prosecutors, he violates the accused's constitutional right to a fair trial, and the harm occasioned by such an unconscionable action is redressable in an action for damages under 42 U.S.C. § 1983." *Ricciuti*, 124 F.3d at 130.

To state a fair trial claim premised on the fabrication of evidence, a plaintiff must allege that an "(1) investigating official (2) fabricate[d] information (3) that [was] likely to influence a jury's verdict, (4) forward[ed] that information to prosecutors, and (5) the plaintiff suffer[ed] a deprivation of life, liberty, or property as a result." *Garnett v. Undercover Officer C0039*, 838 F.3d 265, 279 (2d Cir. 2016) (quoting *Ricciuti*, 124 F.3d at 130).

### i.   Investigator Miller

Investigator Miller argues that plaintiff's allegations in support of his fabrication claim are boilerplate and lack the requisite specificity.  BPD Mem. at 32–33.  In opposition, plaintiff argues that Investigator Miller's "failure to include exculpatory statements made by Demkovich in investigatory reports, failure to elicit such information before a grand jury, and failure to disclose these statements to the defense, constitutes a deliberate misrepresentation of the case that deprived [plaintiff] of due process."  Pl.'s First Opp. at 39.

The Second Circuit has consistently held that "the second element of a fair trial claim based on fabricated evidence requires a plaintiff to prove that a defendant's use of inaccurate information was 'knowing, as opposed to mistaken.'"  *Davis-Guider v. City of Troy*, 2024 WL 5199294, at *3 (2d Cir. Dec. 23, 2024) (summary order) (quoting *Barnes v. City of N.Y.*, 68 F.4th 123, 129 (2d Cir. 2023)); *see also Ashley v. City of N.Y.*, 992 F.3d 128, 143 (2d Cir. 2021) ("The fabrication element requires only that the defendant knowingly make a false statement or omission.").

Plaintiff does not allege that Investigator Miller, herself, testified falsely before any jury or affirmatively fabricated any evidence.  *See generally* Compl.  Instead, plaintiff alleges that "Demkovich told members of BPD that she was questioning whether she was, in fact, raped, or if the physical or sexual contact was consensual" and, because that statement "was not recorded by Defendant Miller," "the Grand Jury did not learn that . . . Demkovich had reported that she was questioning whether a rape had occurred."  *Id.*  ¶¶ 87, 154.

"[T]he requirements that the information be both false and likely to influence a jury's decision constrain the types of information that can serve as the basis for a denial of the right to a fair trial claim."  *Garnett*, 838 F.3d at 280.  "Information may be 'false' if material omissions render an otherwise true statement false."  *Morse*, 804 F.3d at 548.

Investigator Miller's omission of that portion of Demkovich's statement did not render the rest of her statement "false."  Even if it did, plaintiff does not plausibly allege that Miller *knew* Demkovich's allegations were false.  *See Davis-Guider*, 2024 WL 5199294, at *3 ("[Plaintiff]'s argument relies on the speculation that because Defendants provided prosecutors with inaccurate information, they must have fabricated evidence.  Without any proof of *scienter*, however, that assumption is not a reasonable inference.  The mere fact that the parties present conflicting evidence does not mean that one side's evidence was fabricated.").

Moreover, at the time Investigator Miller interviewed the complainants, Demkovich's allegations against plaintiff were corroborated by Herceg's allegations, the text messages and photos provided by the complainants, and surveillance footage.  *See supra* Point IV.C.2.b; *see also Brown v. Vill. of Endicott*, 2025 WL 863105, at *30 (N.D.N.Y. Mar. 19, 2025) ("Insofar as the parties agree that [the complainant] provided inconsistent statements during one of her interviews[,] the failure to present this inconsistency to the grand jury does not make the

testimony 'false.'  This is particularly true when [the complainant] made numerous other, consistent, statements concerning the alleged abuse.").

In sum, plaintiff has failed to state factual allegations that could support a reasonable inference that Investigator Miller knowingly fabricated evidence, either affirmatively or by omission, warranting dismissal of plaintiff's fabrication claim against her.

### ii.  ADA Congdon

ADA Congdon argues that plaintiff's fabrication claim against her is barred by absolute prosecutorial immunity, as her allegedly violative conduct falls within the scope of her role as an advocate.  Congdon Mem. at 24–25.  In opposition, plaintiff argues that ADA Congdon is not entitled to absolute immunity because his her "investigatory conduct, evaluation and gathering of evidence, decision to initiate criminal proceedings without probable cause, destruction of evidence, and the withholding of exculpatory evidence from defense counsel is not protected by absolute immunity."  Pl.'s First Opp. at 42.

In *Zahrey v. Coffey*, the Second Circuit explicitly recognized a constitutional "right not to be deprived of liberty as a result of the fabrication of evidence by a government officer acting in an investigating capacity."  221 F.3d 342, 349 (2d Cir. 2000).  This includes prosecutors, as "a subsequent immunized act of a single official does not break the chain of causation traceable to his initial misconduct occurring in another capacity."  *Id.* at 353 (citing *White v. Frank*, 855 F.2d 956, 961 (2d Cir. 1988)).

Thus, a prosecutor, acting in an investigative capacity, deprives a criminal defendant of the constitutional right to a fair trial where they deliberately omit material information from evidence that would be likely to influence a jury's decision.  *See Morse*, 804 F.3d at 547–549 (finding prosecutor and investigator, acting in investigative capacities, deprived dentist of his

constitutional right to a fair criminal trial through deliberate material omissions in billing summaries that were material to grand jury's decision to indict).

Plaintiff alleges that, in November 2022, the BCDA "received a hard drive with the extractions of the cell phones of the complainants," Compl. ¶ 168, but none of Herceg's communications from November 27, 2021[,] through March 2022 were present," because Herceg obtained a new phone and iCloud account in March 2022. *Id.* ¶ 174. Plaintiff eventually obtained Herceg's messages from the relevant period in July 2023 after learning of the existence of the Saitta folder. *Id.* ¶ 177. Plaintiff learned that Saitta informed ADA Congdon about the Saitta folder two months prior to plaintiff's indictment and Herceg's alleged destruction of evidence, but ADA Congdon never retrieved it. *Id.* ¶¶ 178–79. According to plaintiff, the Saitta folder contained "numerous new exculpatory records not contained" in the BCDA report. *Id.* ¶ 183. Herceg allegedly testified at plaintiff's trial that ADA Congdon instructed her to "destroy electronic data relating to the night in question . . . and that she did in fact destroy that evidence." *Id.* ¶ 71.

Collectively, plaintiff has plausibly alleged that ADA Congdon (1) instructed Herceg to delete material electronic data prior to plaintiff's indictment; (2) failed to retrieve existing copies of that material electronic data, despite her awareness of its availability prior to plaintiff's indictment; and (3) subsequently obtained and produced a hard drive of the complainants' electronic data that necessarily omitted the data Herceg destroyed at her request. Compl. ¶¶ 71, 178–79, 183.

Thus, plaintiff has plausibly alleged that ADA Congdon fabricated or otherwise omitted material evidence. Accordingly, plaintiff has plausibly alleged a fabrication of evidence claim survives against ADA Congdon.

**b.** *Brady* **Violation**

Plaintiff also alleges that defendants deprived him "of his right to a fair trial by withholding material exculpatory and impeachment evidence." Compl. ¶ 201. This "theory of liability is essentially a civil claim seeking damages for a *Brady* violation." *Fappiano*, 640 F. App'x at 118 (citing *Bermudez,* 790 F.3d at 376 n. 4). "A classic *Brady* violation contains three elements: 'The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued.'" *Fappiano*, 640 F. App'x at 118 (quoting *United States v. Rivas,* 377 F.3d 195, 199 (2d Cir. 2004)).

"To prevail on such a claim, a plaintiff must show the materiality of the nondisclosed evidence." *Bellamy v. City of N.Y.,* 914 F.3d 727, 751 (2d Cir. 2019). To determine materiality, "the question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles v. Whitley*, 514 U.S. 419, 434 (1995).

The Second Circuit has repeatedly acknowledged the "longstanding constitutional principle that as long as a defendant possesses *Brady* evidence in time for its effective use, the government has not deprived the defendant of due process of law simply because it did not produce the evidence sooner." *United States v. Coppa*, 267 F.3d 132, 144 (2d Cir. 2001). Therefore, "[t]here is no *Brady* violation unless there is a reasonable probability that earlier disclosure of the evidence would have produced a different result at trial." *Id.*

"Most courts that have directly considered the question have held that an acquittal extinguishes a § 1983 plaintiff's due process claim for nondisclosure of *Brady* material." *Ambrose v. City of N.Y.*, 623 F. Supp. 2d 454, 469 (S.D.N.Y. 2009) (collecting cases); *see also*

*McClean v. Cnty. of Westchester*, 2018 WL 6329420, at *18 (S.D.N.Y. Dec. 3, 2018) (holding the same, following failure to convict at trial), *aff'd sub nom. McClean v. City of Mount Vernon*, 776 F. App'x 725 (2d Cir. 2019) (summary order).

Here, plaintiff was acquitted, Compl. ¶¶ 11, 165, 181, 195, 198, 215, 220, 228, 256, 262, 266, 275, thereby extinguishing his *Brady* claim.  While plaintiff alleges that defendants failed to disclose the Saitta folder, which contained exculpatory *Brady* evidence, Compl. ¶ 183, he also admits that he obtained the Saitta folder prior to trial, and, evidently, was able to make effective use of it.  *Id.* ¶¶ 183, 185 ("The trial court issued a subpoena for the records on July 5, 2023, and the records . . . were provided to Counsel for Plaintiff . . . On October 31, 2023, Plaintiff and Mr. Rindgen were acquitted of all charges after the jury deliberated for only two hours before returning a not guilty verdict.").

Consequently, plaintiff cannot sustain a fair trial claim for an alleged *Brady* violation on these facts.

## 5.  Failure to Intervene

Plaintiff's "Third Cause of Action" is identified as a claim for "failure to intervene." Compl. ¶¶ 211–16.  As a threshold matter, failure to intervene is not a standalone cause of action. It is a theory of "bystander" liability imposed where a government official could have, but did not, intervene in a constitutional violation committed by another government official in his or her presence.  *See Ellis v. City of Elmira*, 2018 WL 6047070, at *8 (W.D.N.Y. Nov. 19, 2018) (noting that "federal courts uniformly have recognized a theory of 'bystander liability' based on a defendant's failure to intervene in § 1983 actions.") (citing *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994)).  As such, it may be asserted even where a defendant did not directly participate in an alleged constitutional violation.

Though plaintiff also asserts this claim against the City, "[m]unicipalities may only be held liable under § 1983 for the acts of their employees if the deprivation results from a policy or custom of the municipality." *Zapata v. City of N.Y.,* 502 F.3d 192, 194 n. 2 (2d Cir. 2007). Because failure to intervene is a form of individual, rather than municipal, liability, plaintiff's failure to intervene claim against the City must be dismissed. Accordingly, of the moving defendants, this claim remains as to the individual BPD defendants, ADA Congdon, DA Korchak, Chief ADA Loughran.

The individual defendants argue that plaintiff has not alleged an underlying constitutional violation or, alternatively, that plaintiff has not plausibly alleged that defendants had a realistic opportunity to intervene in any constitutional violations. BPD Mem. at 35–36; Korchak & Loughran Mem. at 19–20. Additionally, ADA Congdon argues that she "could never have had a reasonable opportunity to intervene in her own actions." Congdon Mem. at 25. In opposition, plaintiff maintains that he has plausibly alleged that defendants "had knowledge of relevant facts and [a] realistic opportunity during their joint investigation to communicate with one another to prevent constitutional harm, but failed to do so." Pl.'s First Opp. at 43; *see also* Pl.'s Second Opp. at 31.

A defendant may be held liable for failure to intervene "if '(1) the officer had a realistic opportunity to intervene and prevent the harm; (2) a reasonable person in the officer's position would know that the victim's constitutional rights were being violated; and (3) the officer does not take reasonable steps to intervene.'" *Jackson v. City of N.Y.*, 939 F. Supp. 2d 219, 231–32 (E.D.N.Y. 2013) (quoting *Jean–Laurent v. Wilkinson,* 540 F.Supp.2d 501, 512 (S.D.N.Y. 2008)).

As relevant here, a failure to intervene claim "is predicated on there being an underlying violation of [plaintiff]'s constitutional rights that the defendants could have prevented."

*McIntosh v. City of N.Y.*, 722 F. App'x. 42, 46 (2d Cir. 2018) (summary order) (citing *Terebesi*, 764 F.3d at 243) ("An officer who fails to intercede in the . . . constitutional violation is liable for the preventable harm caused by the actions of other officers.")).  As discussed *supra*, plaintiff has plausibly alleged constitutional violations against ADA Congdon, and his surviving Section 1983 claims against her are malicious prosecution and denial of the right to a fair trial premised on the fabrication of evidence.

While "it is widely recognized that all law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence," *Anderson*, 17 F.3d at 557 (citing *O'Neill v. Krzeminski,* 839 F.2d 9, 11 (2d Cir. 1988)),[12] "[o]bviously, a person who is held liable under a theory of direct participation in the constitutional violation cannot also be held liable for a failure to intervene." *Rizk v. City of N.Y.*, 462 F. Supp. 3d 203, 226 (E.D.N.Y. 2020) (citing *Jackson*, 939 F. Supp. 2d at 231–32).  Because plaintiff has only plausibly alleged that ADA Congdon violated his constitutional rights, she cannot be liable for failure to intervene in her own conduct.

As for the remaining defendants, DA Korchak and Chief ADA Loughran argue that plaintiff's failure to intervene claim should be dismissed as to them, because "[a] cause of action for failure to intervene is more appropriately asserted against law enforcement officers, not prosecutors."  Korchak & Loughran Mem. at 19.  They rely on *Breton v. City of N.Y.*, 404 F. Supp. 3d 799, 814 (S.D.N.Y. 2019) for the proposition that "a claim for failure to intervene

---

[12] While the Second Circuit has not addressed whether law enforcement officials or prosecutors have a duty to intercede in a *prosecutor's* alleged misconduct, plaintiff's surviving claims against ADA Congdon concern actions taken in her investigatory capacity, for which she, like a law enforcement officer, is entitled to—at most—qualified immunity. *See Buckley*, 509 U.S. at 273 ("When a prosecutor performs the investigative functions normally performed by a detective or police officer, it is 'neither appropriate nor justifiable that, for the same act, immunity should protect the one and not the other.'") (quoting *Hampton,* 484 F.2d at 608)).  Thus, for purposes of assessing defendants' failure to intervene in ADA Congdon's alleged constitutional violations, she will be treated as a law enforcement officer.

cannot be brought against those actively involved in the prosecution itself," Korchak & Loughran Mem. at 20, but their reliance is misplaced.

The defendants in *Breton* did not argue that those involved in a prosecution can never be liable for failure to intervene, but rather, that those who directly participated in a violation cannot be held liable for failure to intervene in their own violative conduct. Because DA Korchak or Chief ADA Loughran do not contend that they directly participated in any violation of plaintiff's rights, *Breton* is inapposite.[13]

Lastly, the individual defendants argue that plaintiff has failed to plausibly allege that they had a realistic opportunity to intervene in the alleged violations. BPD Mem. at 35–36; Korchak & Loughran Mem. at 19–20. "[F]or liability to attach, there must have been a realistic opportunity to intervene to prevent the harm from occurring." *Anderson*, 17 F.3d at 557. All three of plaintiff's surviving Section 1983 claims are premised on plaintiff's allegation that, prior to his arrest and indictment, ADA Congdon instructed Herceg to destroy electronic data related to the night of the alleged assault. Compl. ¶¶ 66, 112.

The complaint does not allege that any defendant was present for, aware of, or had any realistic opportunity to intervene in or prevent ADA Congdon from instructing or directing Herceg to destroy allegedly exculpatory electronic data. *See generally* Compl.

Accordingly, plaintiff has failed to state a plausible Section 1983 claim under a failure to intervene theory as to any individual defendant.

---

[13] Further, for failure to intervene liability to attach, the alleged violation must occur in the defendant's presence. *O'Neill v. Krzeminski*, 839 F.2d 9 (2d Cir. 1988). If it were true that anyone involved in a prosecution could never be liable for failing to intervene, failure to intervene liability would be rendered superfluous as neither the direct participant, nor the tacit bystander, could be held liable.

### 6. Civil Rights Conspiracy

Plaintiff's "Fourth Cause of Action" is identified as a "Civil Rights Conspiracy" claim against all defendants. Compl. ¶¶ 217–221. Broadly, plaintiff alleges that defendants "shared a common unlawful goal and agreed to act in concert to deprive [plaintiff] of his clearly established constitutional rights." *Id.* ¶ 218.

Defendants argue that this claim must be dismissed because plaintiff does not plausibly allege the existence of an agreement between defendants, the conduct of the individual BCDA defendants is protected by absolute immunity, and, insofar as plaintiff alleges conspiracies between actors wholly within BPD or wholly within the BCDA, those claims are barred by the intra-corporate conspiracy doctrine. BPD Mem. at 36–38; Congdon Mem. at 26–27; Korchak & Loughran Mem. at 20–21. Plaintiff responds that he has plausibly alleged defendants conspired to violate his rights during the investigatory period and his conspiracy claims are not barred by the intra-corporate conspiracy doctrine because he does not allege a conspiracy between purely BPD defendants or purely BCDA defendants. Pl.'s Opp. at 81–84.

"To survive a motion to dismiss, a conspiracy claim under 42 U.S.C. § 1983 must allege facts plausibly suggesting that (1) an agreement existed between two or more state actors to act in concert to inflict an unconstitutional injury on plaintiff, and (2) an overt act was committed in furtherance of that goal." *Vega v. Artus*, 610 F. Supp. 2d 185, 202 (N.D.N.Y. 2009) (citing *Ciambriello v. Cnty. of Nassau*, 292 F.3d 307, 324–25 (2d Cir. 2002) (citing *Pangburn v. Culbertson,* 200 F.3d 65, 72 (2d Cir. 1999)). "A complaint containing only conclusory, vague, or general allegations of conspiracy to deprive a person of constitutional rights cannot withstand a motion to dismiss." *Sommer v. Dixon*, 709 F.2d 173, 175 (2d Cir. 1983).

As with failure to intervene, a civil rights conspiracy claim must be predicated on an underlying constitutional violation. *See Gmurzynska v. Hutton*, 355 F.3d 206, 211 (2d Cir. 2004) ("Because [plaintiff] has not adequately pled any actionable underlying federal claim, its allegations of conspiracy are without legal import."); *Droz v. McCadden*, 580 F.3d 106, 109 (2d Cir. 2009) ("Because neither of the underlying section 1983 causes of action can be established, the claim for conspiracy also fails."), *as amended* (Oct. 7, 2009); *Garland v. New York City Fire Dep't*, No. 23-663, 2024 WL 445001, at *5 (2d Cir. Feb. 6, 2024) ("Without an underlying constitutional claim, their § 1983 conspiracy claim fails as a matter of law.") (summary order), *cert. denied*, 145 S. Ct. 266 (2024).

Here, plaintiff has plausibly alleged his Section 1983 malicious prosecution and fabrication of evidence claims based on his allegation that ADA Congdon instructed Herceg to delete electronic data relating to the night in question.

Outside of ADA Congdon and Herceg, plaintiff does not allege that any other defendants were aware of or involved in any violative conduct. While plaintiff does allege that ADA Congdon worked closely with BPD officers and other BCDA employees during the investigation, Compl. ¶ 126, these allegations do not permit an inference that defendants entered an agreement with Congdon to violate plaintiff's rights. Therefore, at this stage, plaintiff has plausibly alleged a civil rights conspiracy claim against ADA Congdon and Herceg only, warranting dismissal of his conspiracy claims against all other moving defendants.

### 7. Monell Liability

Plaintiff's "Sixth Cause of Action" is characterized as a "42 U.S.C. § 1983 *Monell* Claim for Unconstitutional Custom or Policy and Failure to Supervise and Train." Compl. ¶¶ 230–245. Of the moving defendants, plaintiff asserts his *Monell* claim against DA Korchak, Chief ADA

Loughran, ADA Congdon, ADA Cronin, Chief Zikuski, Captain Minor, Investigator Miller, and the City. *Id.*

As an initial matter, the Supreme Court in *Monell v. Dep't of Soc. Servs. of City of N.Y.* noted that:

> Since official-capacity suits generally represent only another way of pleading an action against an entity of which an officer is an agent . . . [the Court's] holding today[,] that local governments can be sued under § 1983[,] necessarily decides that local government officials sued in their official capacities are "persons" under § 1983 in those cases in which, as here, a local government would be suable in its own name.

436 U.S. at 691 n. 55. Conversely, "a suit against a government official in his or her personal capacity cannot lead to . . . liability upon the governmental entity," because "a municipality cannot be made liable under 42 U.S.C. § 1983 on a *respondeat superior* basis." *Graham*, 473 U.S. at 167–168. In other words, a municipal official, sued only in their personal or individual capacity, is not a proper defendant to a claim premised on *Monell* liability.

Plaintiff appears to be suing the individual defendants only in their personal capacities, *see* Compl. ¶¶ 23–26, warranting dismissal of his "*Monell* claim[s]" against them. Insofar as plaintiff intended to assert his *Monell* claims against the individual defendants in their official capacities, "they are redundant to the claims against the [City]," and are therefore dismissed. *Booker v. Bd. of Educ., Baldwinsville Cent. Sch. Dist.*, 238 F. Supp. 2d 469, 475 (N.D.N.Y. 2002).

As to the City's liability, the Second Circuit has held that:

> Where the plaintiff does proceed against both the municipal actors alleged to have inflicted the tort and the municipality that promulgated the offensive policy, the plaintiff's failure to secure a judgment against the individual actors would, indeed, preclude a judgment against the municipality if the ruling in favor of the individual defendants resulted from the plaintiff's failure to show that they committed the alleged tort.

*Askins v. Doe No. 1*, 727 F.3d 248, 253–54 (2d Cir. 2013).  Put differently, a *Monell* claim fails

as a matter of law where a plaintiff has not plausibly alleged an underlying constitutional

violation.

Plaintiff's *Monell* claim against the City is necessarily premised on his allegations against

the individual BPD defendants, who are employees of the City.  Compl. ¶ 29.  However, plaintiff

has not plausibly alleged that any individual BPD defendant violated his constitutional rights.

*See supra* Points IV.B.1–6.  Therefore, plaintiff's *Monell* claim against the City must be

dismissed for lack of an underlying constitutional violation.

### 8.  Qualified Immunity

ADA Congdon argues that she is entitled to qualified immunity for any of her alleged

actions not protected by absolute immunity.  Congdon Mem. 17–20.  In opposition, plaintiff

contends that courts generally deny qualified immunity where prosecutors allegedly fabricated

evidence while acting in an investigative capacity.  Pl.'s Opp. at 48–49.

"Qualified immunity is available to officials so long as their actions do not violate

'clearly established statutory or constitutional rights of which a reasonable person would have

known.'"  *Chamberlain Est. of Chamberlain v. City of White Plains*, 960 F.3d 100, 110 (2d Cir.

2020) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

"[A]s a general rule, 'the defense of qualified immunity cannot support the grant of a

[Rule] 12(b)(6) motion.'"  *Chamberlain Est. of Chamberlain*, 960 F.3d at 110 (quoting *Green v.

Maraio*, 722 F.2d 1013, 1018 (2d Cir. 1983)).  "Not only must the facts supporting the defense

appear on the face of the complaint, but, as with all Rule 12(b)(6) motions, the motion may be

granted only where it appears [that the alleged facts, if true, plausibly state a claim] that would

entitle him to relief.'"  *Chamberlain Est. of Chamberlain*, 960 F.3d at 110 (quoting *McKenna v.*

*Wright*, 386 F.3d 432, 436 (2d Cir. 2004)).  "Thus, a qualified immunity defense presented on a

Rule 12(b)(6) motion 'faces a formidable hurdle . . . and is usually not successful.'"

*Chamberlain Est. of Chamberlain*, 960 F.3d at 111 (quoting *Field Day, LLC v. County of Suffolk*,

463 F.3d 167, 191–92 (2d Cir. 2006)).

Plaintiff's surviving claims against ADA Congdon for malicious prosecution and

fabrication of evidence are premised on his allegation that ADA Congdon instructed complainant

Herceg to delete exculpatory electronic data.  The Second Circuit has explicitly held that the

"right not to be deprived of liberty as a result of *any government officer's* fabrication of evidence

. . . was clearly established in 1996." *Zahrey*, 221 F.3d at 357 (emphasis in original).  As noted

*supra*, "[g]overnment officials may be held liable for fabricating evidence through false

statements *or omissions*."  *Morse*, 804 F.3d at 547 (emphasis added).  According to plaintiff,

ADA Congdon directed Herceg to destroy exculpatory evidence sometime during or after

December 2021.  Compl. ¶¶ 71, 116.  Therefore, at this stage, ADA Congdon is not entitled to

qualified immunity.

### C.  State Law Claims

Plaintiff identifies his state law cause of actions as: (1) malicious prosecution and false

arrest; (2) abuse of process; (3) intentional, reckless, or negligent infliction of emotional distress;

(4) negligent hiring, training, and retention; (5) violations of Sections 6 and 12 of Article I of the

New York State Constitution; and (6) *respondeat superior*.  The moving defendants argue that

all of plaintiff's state law causes of action must be dismissed.  BPD Mem. at 26–31, 35, 43–45;

Congdon Mem. at 20–25, 27–29; Korchak & Loughran Mem. at 13–18, 26–29.

As a threshold matter, "[i]t is well-established . . . that *respondeat superior* 'is not a cause

of action at all, but a theory of liability that must attach to a separate claim.'"  *Lederman v.*

*Benepe*, 2016 WL 11588628, at *5 (S.D.N.Y. Mar. 11, 2016) (quoting *Alexander v. Westbury*

*Union Free Sch. Dist.*, 829 F. Supp. 2d 89, 110 n.6 (E.D.N.Y. 2011)).  Accordingly, the Court addresses *respondeat superior* liability in tandem with the underlying cause(s) of action for which it is asserted.

### 1.  False Arrest

Plaintiff asserts his "Seventh Cause of Action" for "malicious prosecution and false arrest" against all defendants.  Compl. ¶¶ 246–257.  Because false arrest and malicious prosecution are distinct causes of action under state law, the Court will address them separately. *See Broughton*, 335 N.E.2d at 313 ("Although [false imprisonment and malicious prosecution] are kindred actions, each protects a different personal interest and is composed of different elements.").

"'A § 1983 claim for false arrest, resting on the Fourth Amendment right of an individual to be free from unreasonable seizures . . . is substantially the same as a claim for false arrest under New York law.'"  *Kee*, 12 F.4th at 158 (quoting *Weyant*, 101 F.3d at 852).  Because the elements of a false arrest claim brought pursuant to Section 1983 are derived from the elements of a false arrest claim under state law, defendants' motions to dismiss plaintiff's state law false arrest claims must be granted as to all moving individual BPD and BCDA defendants for the reasons stated herein.  *See supra* Point.IV.B.2.

Plaintiff also brings his state law claim for false arrest against the City under a theory of *respondeat superior*.  "[T]he doctrine of [*r*]*espondeat superior* renders a[n] [employer] vicariously liable for a tort committed by his [employee] while acting within the scope of his employment."  *Riviello v. Waldron*, 391 N.E.2d 1278, 1280–81 (N.Y. 1979).  Because plaintiff has not plausibly alleged false arrest against any City employees, his false arrest claim against the City must be dismissed.

### 2. Malicious Prosecution

Plaintiff asserts a state law malicious prosecution claim against all defendants.  Compl. ¶¶ 246–257.  As with false arrest, "[c]laims for malicious prosecution brought under Section 1983 are substantially the same as claims for malicious prosecution brought under state law."  *Ortiz v. Stambach*, 137 F.4th 48, 61 (2d Cir. 2025).  Accordingly, plaintiff's state law malicious prosecution claim may proceed against ADA Congdon, but must be dismissed as to the other individual BCDA and BPD defendants.  *See supra* Point IV.B.2.

Plaintiff's state law malicious prosecution claims premised on *respondeat superior* liability must be dismissed against City, for the same reasons cited with respect to his state law false arrest claims against those defendants.  *See supra* Point IV.C.1.

### 3. Abuse of Process

Of the moving defendants, plaintiff's "Eighth Cause of Action" for abuse of process is asserted against Chief Zikuski, DA Korchak, and the City.  Compl. ¶¶ 258–262.  Defendants argue that this claim must be dismissed because (1) plaintiff "has failed to set forth sufficient plausible, non-conclusory allegations that . . . would establish any improper or malicious motive on the part of the City or Chief Zikuski," BPD Mem. at 39; and (2) plaintiff makes only "broad and conclusory allegations that Korchak had an ulterior motive for [p]laintiff's arrest," Korchak & Loughran Mem. at 26.  In opposition, plaintiff argues that he plausibly alleged that the City, Chief Zikuski, and DA Korchak,[14] "abused their official authority by allowing criminal charges to proceed without probable cause, or a complete investigation, solely to mitigate the public

---

[14] In plaintiff's second opposition, he argues that he has plausibly alleged his abuse of process claim against DA Korchak *and* Chief ADA Loughran.  Pl.'s Second Opp. at 34.  However, the complaint indicates that this claim is brought only against the County, the City, DA Korchak, and Chief Zikuski.  Compl. ¶¶ 258–262.

pressure following the events that transpired on November 27, 2021." Pl.'s First Opp. at 45; Pl.'s Second Opp. at 34.

A claim for "[a]buse of process has three essential elements: (1) regularly issued process, either civil or criminal, (2) an intent to do harm without excuse or justification, and (3) use of the process in a perverted manner to obtain a collateral objective." *Curiano v. Suozzi*, 469 N.E.2d 1324, 1326 (N.Y. 1984). "The mere commencement of an action, even with malicious intent, does not give rise to a cause of action for abuse of process." *Dixon v. City of Rochester*, 234 A.D.3d 1301, 1302 (N.Y. App. Div. 4th Dept. 2025).

Plaintiff does not allege facts which could support an inference that either Korchak or Zikuski perverted the process brought against plaintiff. *See supra* Point IV.B.1; *see, generally,* Compl. Instead, plaintiff alleges only that defendants used regularly issued process "to quell public pressure mounting for his arrest and prosecution and bolster DA Korchak's re-election chances in the upcoming year." Compl. ¶ 261.

However, "[i]t is not enough that the actor ha[s] an ulterior motive in using the process of the court. It must further appear that he did something in the use of the process outside of the purpose for which it was intended . . .[t]here must be a further act done outside the use of the process—a perversion of the process." *Hauser v. Bartow*, 7 N.E.2d 268, 269 (N.Y. 1937).

As discussed *supra*, plaintiff has not plausibly alleged that either DA Korchak or Chief Zikuski were personally involved in any of the challenged conduct. *See supra*, Point IV.B.1. Allegations that Korchak or Zikuski had reason to benefit from the perversion of the process against plaintiff cannot permit the inference, absent any other allegations, that they actually committed any acts to distort the process.

Accordingly, plaintiff has failed to state an abuse of process claim against either DA Korchak or Chief Zikuski.  Further, because plaintiff has not plausibly alleged abuse of process against Chief Zikuski, his claim against the City must also be dismissed, as it is necessarily based on *respondeat superior* liability.

### 4.  Intentional, Reckless, or Negligent Infliction of Emotional Distress

Plaintiff's "Ninth Cause of Action" is identified as a claim for "intentional, reckless, or negligent infliction of emotional distress" against all defendants.  Compl.  ¶¶ 263–66.  All moving defendants argue that this cause of action must be dismissed.  BPD Mem. at 40–41; Congdon Mem. at 27–28; Korchak & Loughran Mem. at 27.

At the outset, "reckless conduct is encompassed within the tort of intentional infliction of emotional distress and does not constitute a separate and distinct cause of action."  *James v. Flynn*, 132 A.D.3d 1214, 1216 (N.Y. App. Div. 3d Dep't 2015).

### a.  Intentional (or Reckless) Infliction of Emotional Distress

Defendants argue that plaintiff's intentional or reckless infliction of emotional distress claim must be dismissed because (1) plaintiff cannot bring such a claim under New York law where traditional tort claims are available; and (2) regardless, plaintiff has not alleged sufficiently extreme or outrageous conduct.  BPD Mem. at 40–41; Congdon Mem. at 27–28; Korchak & Loughran Mem. at 27.

"[U]nder New York law, an intentional infliction tort may 'be invoked only as a last resort.'"  *Salmon v. Blesser*, 802 F.3d 249, 256 (2d Cir. 2015) (quoting *Turley v. ISG Lackawanna, Inc.,* 774 F.3d 140, 158 (2d Cir. 2014)).  "[T]he New York Court of Appeals has questioned whether an intentional infliction claim can ever be brought where the challenged conduct 'falls well within the ambit of other traditional tort liability.'"  *Salmon*, 802 F.3d at 256

(quoting *Fischer v. Maloney*, 373 N.E.2d 1215, 1217 (N.Y. 1978).  "All four Appellate Division courts have answered the question and held that it cannot."  *Salmon*, 802 F.3d at 256 (collecting cases).

Plaintiff's intentional infliction of emotional distressed is premised on the same alleged conduct which forms the basis of his malicious prosecution and false arrest claims.  Compl. ¶ 264 ("The deliberate conduct of [d]efendants in fabricating false testimony and evidence, refusal to investigate exculpatory evidence, their cover-up of the truth, conscious and deliberate avoidance of the truth, perpetuated in public statements, constitutes the intentional infliction of emotional distress.").  Because plaintiff seeks to impose traditional tort liability based on defendants' alleged conduct, the "last resort" claim of intentional infliction of emotional distress is duplicative, unnecessary, and consequently, dismissed.

Plaintiff's allegations that defendants failed to intervene to prevent members of the public from retaliating against him fare no better.  Compl. ¶¶ 92–107.  "[U]nder New York law, a cause of action alleging intentional infliction of emotion distress "has four elements: (i) extreme and outrageous conduct; (ii) intent to cause, or disregard of a substantial probability of causing, severe emotional distress; (iii) a causal connection between the conduct and injury; and (iv) severe emotional distress.'"  *Taggart v. Costabile*, 131 A.D.3d 243, 249 (N.Y. App. Div. 2d Dept. 2015) (quoting *Howell v. New York Post Co.,* 612 N.E.2d 699, 702 (N.Y. 1993)).

The causation element requires a plaintiff to allege that a defendant's *own* extreme and outrageous conduct caused severe emotional distress.  A defendant is not liable for failing to prevent or mitigate the extreme outrageous conduct of third parties.  *See Taggart*, 131 A.D.3d at 250–51.

In *Taggart*, the court dismissed plaintiffs' intention infliction of emotional distress claim where the plaintiffs "alleged in the complaint that the defendants 'exhibited outrageous and extreme conduct in renting to tenants who posed a clear and present danger to the neighborhood,' and 'refused to control the dangerous behaviors of those tenants.'" *Taggart*, 131 A.D.3d at 250. On one occasion, two armed men, later determined to be visitors of the defendants' tenants, broke into plaintiffs' home and threatened them after plaintiffs contacted the police about a large gathering the day before. *Id.* at 246. Plaintiffs attributed this incident to the landlord's "failure to rein in their tenants." *Id.* at 250. In dismissing this claim, the Appellate Division noted that:

> Although the individuals who broke into the plaintiffs' home may have engaged in extreme and outrageous conduct, the complaint alleges no basis upon which the intruders' conduct may be imputed to the defendants. The defendants' intentional conduct, as alleged in the complaint, amounts to nothing more than a failure to ensure that their tenants and their friends refrained from committing the acts described in the complaint.

*Taggart*, 131 A.D.3d at 250.

Here, too, plaintiff's allegations concern the extreme and outrageous conduct of third parties and, accordingly, cannot support a claim against the individual defendants based on their alleged failure to prevent that conduct.

Lastly, plaintiff cannot maintain a claim against the City, because New York law does not permit claims for intentional infliction of emotional distress against governmental entities for public policy reasons. *See Boyle v. Caledonia-Mumford Cent. Sch.*, 34 140 A.D.3d 1619, 1620–21 (N.Y. App. Div. 4th Dept. 2016) ("The cause of action asserting 'outrageous conduct causing emotional distress' was properly dismissed inasmuch as '[p]ublic policy bars claims sounding in intentional infliction of emotional distress against a government entity.'"), *lv denied*, 68 N.E.3d 102 (N.Y. 2016); *Taylor*, 229 A.D.3d at 1129 ("[P]ublic policy bars claims for intentional infliction of emotional distress against a governmental entity."); *Liranzo v. New York City Health*

*and Hosps. Corp.*, 300 A.D.2d 548, 548 (N.Y. App. Div. 2d Dept. 2002) ("Public policy bars claims for intentional infliction of emotional distress against a governmental entity.").

In sum, plaintiff's claim for intentional infliction of emotional distress is dismissed as to the individual BPD and BCDA defendants and the City.

### b. Negligent Infliction of Emotional Distress

Defendants argue that plaintiff's negligent infliction of emotional distress claim must be dismissed because (1) plaintiff has failed to allege that defendants owed him a special duty beyond that owed to the public; and (2) plaintiff has failed to otherwise allege that defendants conduct unreasonably caused him to fear for his own physical safety.  BPD Mem. at 41; Congdon Mem. at 28; Korchak & Loughran Mem. at 27.  In opposition, plaintiff does not separately address defendants' arguments as to his negligent infliction of emotional distress claim.  Regardless, this claim fails.

"A cause of action to recover damages for negligent infliction of emotional distress generally requires a plaintiff to show a breach of a duty owed to him which unreasonably endangered his physical safety, or caused him to fear for his own safety." *Sacino v. Warwick Valley Cent. Sch. Dist.*, 138 A.D.3d 717, 719 (N.Y. App. Div. 2d Dep't 2016).  To recover for negligent infliction of emotional distress, "the damaged plaintiff [must] be able to point the finger of responsibility at a defendant owing, not a general duty to society, but a specific duty to him." *Johnson v. Jamaica Hosp.*, 467 N.E.2d 502, 503 (N.Y. 1984); *see also Valdez v. City of N.Y.*, 960 N.E.2d 356, 361 (N.Y. 2011).

Here, plaintiff alleges that, at all relevant times, defendants were acting under the color of state law and within the scope of their employment.  Compl. ¶¶ 20–22, 29–31.  Accordingly, plaintiff is required to allege that defendants owed a special duty to plaintiff in order to sustain

his claim.  *Marino v. City of N.Y.*, 223 A.D.3d 888, 890 (N.Y. App. Div. 2d Dept. 2024) ("Since

the defendants were acting in a governmental capacity, the plaintiff was required to prove that

the defendants owed him a special duty.").  A special duty exists only where the following

circumstances are alleged:

> (1) an assumption by the municipality, through promises or actions, of an
> affirmative duty to act on behalf of the party who was injured; (2) knowledge on
> the part of the municipality's agents that inaction could lead to harm; (3) some form
> of direct contact between the municipality's agents and the injured party; and (4)
> that party's justifiable reliance on the municipality's affirmative undertaking

*Cuffy v. City of N.Y.*, 505 N.E.2d 937, 940 (N.Y. 1987).

Here, there are no allegations that any defendant made any affirmative indication of an

intent to act on behalf of plaintiff.  *See generally* Compl.  To be sure, plaintiff explicitly alleges

that "[d]efendants' tortious conduct was undertaken while carrying out routine investigative, law

enforcement and prosecutorial functions, of the City of Binghamton and Broome County."

Compl. ¶ 279.  Taken in a light most favorable to plaintiff, the complaint does not plausibly

allege that defendants owed plaintiff a special duty beyond that owed to any other criminal

defendant.  *See Lauer v. City of N.Y.*, 733 N.E.2d 184, 189 (N.Y. 2000) (refusing to "impose a

new duty on the Office of the Chief Medical Examiner, which for the future would run to

members of the public who may become subjects of a criminal investigation").

Though the City also argues that governmental function immunity bars plaintiff's

negligent infliction of emotional distress claim against the City, BPD Mem. at 43–45, the Court

need not reach this issue.  *Valdez*, 960 N.E.2d at 365 ("If plaintiff[ ] cannot overcome the

threshold burden of demonstrating that defendant owed the requisite duty of care, there will be

no occasion to address whether defendant can avoid liability by relying on the governmental

function immunity defense.").

In sum, plaintiff's negligent infliction of emotional distress claim has not been plausibly alleged and must dismissed as to the moving defendants.

### 5. Negligent Hiring, Training, and Retention

Of the moving defendants, plaintiff asserts his "Tenth Cause of Action" for "Negligent Hiring, Training, and Retention," against DA Korchak, Chief ADA Loughran, Chief Zikuski, and the City. Compl. ¶¶ 267–272.

All have moved to dismiss, arguing that (1) plaintiff has alleged defendants acted within the scope of their employment, thereby precluding a claim for negligent hiring, training, and retention; (2) plaintiff has not plausibly alleged that defendants were on notice of any prior acts of any employees; and (3) the City is entitled to governmental function immunity for the discretionary acts of hiring, retention, and supervision. BPD Mem. at 41–42; Korchak & Loughran Mem. at 28. In response, plaintiff requests that this claim be withdrawn as to City, the individual BPD defendants, and ADA Congdon.[15] Pl.'s First Opp. at 47. Notably, plaintiff has not addressed this claim with respect to DA Korchak and ADA Loughran. *See generally* Pl.'s Second Opp. In any event, plaintiff has not plausibly alleged a claim for negligent hiring, training, and retention against them.

Unlike *respondeat superior*, which imposes liability on an employer only where an employee commits a tort while acting within the scope of their employment, an employer cannot be liable for negligent hiring, supervision, or retention where an employee acts within the scope of their employment. *Taylor v. City of Buffalo*, 229 A.D.3d 1125, 1128 (N.Y. App. Div. 4th Dep't 2024) ("It is well settled . . . that 'where an employee is acting within the scope of [their] employment, the employer is liable for the employee's negligence under a theory of *respondeat*

---

[15] The complaint does not indicate that plaintiff has asserted this claim against ADA Congdon.

*superior* and no claim may proceed against the employer for negligent hiring, retention, supervision, or training.'") (quoting *Moll v. Griffith*, 208 A.D.3d 1032, 1033 (N.Y. App. Div 4th Dep't 2022)).

As defendants point out, plaintiff makes no allegation that any defendant acted outside the scope of their employment at any time.  Compl. ¶¶ 20–22, 29–31, 212, 218, 278–79. Accordingly, plaintiff has failed to plausibly allege a negligent hiring, training, and retention claim against either DA Korchak or Chief ADA Loughran.

### 6.  New York State Constitutional Violations

Plaintiff's "Eleventh Cause of Action" asserts violations of his rights under Article I, Sections 6 and 12 of the New York State Constitution against all defendants.  Compl. ¶¶ 273–76.

All moving defendants argue that plaintiff's state law constitutional claims must be dismissed because (1) those claims are duplicative of his claims brought under parallel provisions of the United States Constitution, as Section 1983 affords plaintiff an adequate alternative remedy; and (2) regardless, he has not plausibly alleged any violations of his New York State Constitutional rights.  BPD Mem. at 34–35; Congdon Mem. at 25–26; Korchak & Loughran Mem. at 17–18.  In opposition, plaintiff maintains that his "state constitutional claims provide independent protections that are broader than those under the U.S. Constitution and may afford relief that § 1983 does not."  Pl.'s First Opp. at 42; Pl.'s Second Opp. at 30–31.

The Court of Appeals has "recognized a private right of action to recover damages against the State for violations of the Equal Protection and Search and Seizure Clauses . . . Finding neither injunctive, declaratory, nor exclusionary relief adequate to protect against the invasion of personal liberty interests suffered by the claimants."  *Martinez v. City of Schenectady*, 276 A.D.2d 993, 996 (N.Y. App. Div. 3d Dep't 2000) (citing *Brown v. State*, 674

N.E.2d 1129, 1140–41 (N.Y. 1996)), *aff'd*, 761 N.E.2d 560 (N.Y. 2001). "[H]owever, the Court of Appeals made it clear that th[is] 'narrow remedy'. . . was not 'boundless.'" *Lyles v. State*, 2 A.D.3d 694, 695 (N.Y. App. Div. 2d Dep't 2003) (quoting *Martinez v. City of Schenectady*, 761 N.E.2d 560, 563 (N.Y. 2001)), *aff'd*, 820 N.E.2d 860 (N.Y. 2004).

In *Lyles*, the Appellate Division for the Second Department held that:

> recognition of the claimant's State constitutional claims was neither necessary nor appropriate to ensure the full realization of his rights, because the alleged wrongs could have been redressed by an alternative remedy, namely, timely interposed common-law tort claims for assault and battery, false imprisonment, and the intentional and negligent injury to his property.

*Lyles*, 2 A.D.3d at 695.

Similarly, here, plaintiff alleges that his rights under the New York State Constitution were violated when he was "wrongly arrested and maliciously prosecuted." Compl. ¶ 276. Thus, recognition of a state constitutional claim is not necessary, as he has timely interposed common-law tort claims for false arrest and malicious prosecution, both of which permit a damages remedy. *See* Compl. ¶¶ 246–57.

Accordingly, plaintiff's tenth cause of action for violations of the New York State Constitution is dismissed as to the moving defendants.

**7. Qualified Immunity**

ADA Congdon also argues that "to the extent any of [her] alleged conduct is not encompassed by absolute immunity[,] qualified immunity bars any and all remaining claims by plaintiff." Congdon Mem. 17. In opposition, plaintiff contends that his claims are not barred by qualified immunity "because [ADA Congdon] participated in the fabrication and withholding of exculpatory evidence in an attempt establish probable cause to arrest and prosecute [plaintiff]." Pl.'s First Opp. at 48.

Courts look to state law to determine whether a government official is entitled to qualified immunity from state law claims. *Napolitano v. Flynn*, 949 F.2d 617 (2d Cir. 1991). "New York law . . . grant[s] government officials qualified immunity on state-law claims except where the officials' actions are undertaken in bad faith or without a reasonable basis." *Jones v. Parmley*, 465 F.3d 46, 63 (2d Cir. 2006); *see also Arteaga v. State*, 527 N.E.2d 1194, 1196 (N.Y. 1988) (holding that a state official's action is entitled to qualified immunity from state law claims "except when there is bad faith or the action taken is without a reasonable basis.").

Plaintiff's surviving state law malicious prosecution claim against ADA Congdon is premised on the allegation that ADA Congdon directed Herceg to delete electronic data prior to plaintiff's arrest. *See supra* Point IV.C.2.

The qualified immunity defense is precluded at the pre-answer motion to dismiss where, as here, the plaintiff alleges that a defendant's conduct was undertaken in bad faith. *See Kirchner*, 107 A.D.3d at 1624 ("Here, plaintiff alleged that Caldwell's actions were made in bad faith, thus precluding application of the defense of qualified immunity at this stage of the litigation.").

While plaintiff's allegation that ADA Congdon directed Herceg to destroy allegedly exculpatory evidence is likely enough to establish bad faith on its own, Compl. ¶ 71, plaintiff's allegation that ADA Congdon subsequently failed to retrieve the Saitta folder, which included copies of the material she directed Herceg to destroy, for over a year and a half, Compl. ¶ 179, despite being aware of its existence prior to plaintiff's arrest, further supports an inference of bad faith. Accordingly, at this stage, ADA Congdon has not established entitlement to qualified immunity from plaintiff's state law claims.

### D. Leave to Amend

As a final matter, the Court must address whether plaintiff should be given leave to amend his complaint. Apart from the final sentence of his 'Conclusion' paragraph, plaintiff offers nothing in either opposition brief to support his request for leave to amend his complaint. Pl.'s First Opp. at 49; Pl.'s Second Opp. at 36.

Under this district's Local Rules of Practice, "[a] party moving to amend a pleading . . . must attach an unsigned copy of the proposed amended pleading to its motion papers." L.R. 15.1(a). "[T]he proposed amended pleading must be a complete pleading, which will supersede the pleading sought to be amended in all respects." *Id.* A motion to amend "must set forth specifically the proposed insertions and deletions of language and identify the amendments in the proposed pleading." *Id.*

Plaintiff has failed to comply with this Local Rule. His failure to attach a proposed amended pleading is particularly frustrating, "as it precludes the Court from 'examin[ing] the exact amendment that it is being asked to permit[;] ... ensur[ing] that all of the allegations asserted . . . are contained in a single document[;] ... [and] eliminat[ing] the confusing nature of piecemeal amended pleadings.'" *Wynn v. Lee*, 2019 WL 13546213, at *1 (N.D.N.Y. May 1, 2019) (quoting *Cusamano v. Sobek*, 604 F. Supp. 2d 416, 508 (N.D.N.Y. 2009)).

Plaintiff's non-compliance with the Local Rules of Practice is a sufficient basis on which to deny his motion to amend. *Reynolds-Sitzer v. EISAI, Inc.*, 586 F. Supp. 3d 123 (N.D.N.Y. 2022) (denying motion for leave to amend where plaintiffs requested leave in a brief paragraph of their opposition papers and failed to comply with the Local Rules); *Webb v. Mentor Worldwide LLC*, 453 F. Supp. 3d 550 (N.D.N.Y. 2020) (denying plaintiff's motion for leave to amend, in part, for noncompliance with the Local Rules); *Braxton v. Bell*, 2020 WL 13908846, at

*1 (N.D.N.Y. July 7, 2020) (denying "motion to amend for failure to comply with the Local Rules for the Northern District of New York and Federal Rules of Civil Procedure.").

While plaintiff is correct that "the usual practice is to grant leave to amend" when justice so requires, Pl.'s First Opp. at 49 (citing *Romani v. Sanofi S.A.*, 899 F.2d 195, 198 (2d Cir. 1990)), "a court need not always allow a party to replead simply because it asked.  In particular, denial of leave to amend is proper where the request gives no clue as to how the complaint's defects would be cured."  *Noto v. 22nd Century Grp., Inc.*, 35 F.4th 95, 107 (2d Cir. 2022) (internal quotation omitted); *Murphy Med. Assocs., LLC v. Yale Univ.*, 120 F.4th 1107, 1114 (2d Cir. 2024) ("We have previously held that where plaintiffs have similarly 'failed to make formal motions to amend or to offer proposed amended complaints,' there is 'no abuse of discretion in the district court's implicit denial of [the] plaintiffs' cursory requests for leave to amend.'" (quoting *In re Lehman Bros. Mortg.-Backed Sec. Litig.*, 650 F.3d 167, 188 (2d Cir. 2011)); *Solomon v. Flipps Media, Inc*., 136 F.4th 41 (2d Cir. 2025) (affirming district court's denial of plaintiff's request for leave to amend her complaint where "she waited until her opposition to the motion to dismiss to request leave, and she did so only in a single footnote on the final page of her brief.").

Plaintiff was given extra time, Dkt. Nos. 67 & 71, and nearly twenty additional pages, Dkt. Nos. 73 & 81, in which to respond to defendants' motions—most of which raise identical or substantially overlapping legal issues.  Yet, plaintiff failed to offer any indication of what new or additional, non-conclusory factual allegations he would raise to cure the deficiencies in his complaint, despite exceeding the already-extended page limitations on both opposition briefs. *See generally* Pl.'s First Opp.  & Pl.'s Second Opp.  Accordingly, plaintiff's request for leave to amend his complaint is denied.

V.    **CONCLUSION**

Therefore, it is

ORDERED that

1.  Chief Zikuski, Captain Minor, Investigator Miller, Unidentified City of Binghamton
    employees Jane/John Does #1-10, DA Korchak, Chief ADA Loughran, ADA Cronin,
    and the City of Binghamton are dismissed; and

2.  Plaintiff's Third, Sixth, Ninth, and Eleventh Causes of Action are dismissed against
    ADA Congdon.

3.  Plaintiff's surviving claims against ADA Congdon are § 1983 Malicious Prosecution,
    § 1983 Denial of the Right to a Fair Trial based on Fabrication of Evidence, § 1983
    Civil Rights Conspiracy, and state law Malicious Prosecution.

The Clerk of the Court is directed to:

a.  Terminate the dismissed defendants from the docket report; and

b.  Terminate moving defendants' pending motions (Dkt. Nos. 46, 54, 63, 69).

**IT IS SO ORDERED.**

Dated:  September 29, 2025
         Utica, New York.

Anthony J. Brindisi
U.S. District Judge